FOLEY & LARDNER LLP
(A Wisconsin Limited Liability Partnership)
Barry G. Felder
Anne B. Sekel
90 Park Avenue
New York, New York  10016
(212) 682-7474

*Attorneys for Defendant True Ultimate Standards Everywhere, Inc.*
*(sued herein as Trusted Universal Standards in Electronic Transactions, Inc.)*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RUSS SMITH, pro se,<br><br>Plaintiff,<br><br>v.<br><br>TRUSTED UNIVERSAL STANDARDS IN ELECTRONIC TRANSACTIONS, INC. (d/b/a TRUSTe, Inc.); MICROSOFT, INC.; CISCO SYSTEMS, INC.; and COMCAST CABLE COMMUNICATIONS, LLC<br><br>Defendant. | **Civil Action No. 1:09-CV-04567-RBK-KMW**<br><br><br>**Document Electronically Filed** |

## MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

NYC_632290.3

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT .............................................................................. 1

RELEVANT BACKGROUND ................................................................................. 2

ARGUMENT ........................................................................................................... 6
    I.     Smith Lacks Standing to Pursue His Claims ......................................... 8
          A.     Smith Lacks Standing Under Article III ...................................... 8
          B.     Smith Also Lacks Standing Under The Relevant New
                 Jersey Statute .......................................................................... 11
    II.    The Complaint Fails To State A Claim Against TRUSTe ................. 12
          A.     The Complaint Fails To State A Claim Under The New
                 Jersey Consumer Fraud Act ..................................................... 12
          B.     To The Extent The Complaint Attempts To Plead A
                 Contract Claim, It Must Be Dismissed ...................................... 14

CONCLUSION ....................................................................................................... 15

NYC_632290.3

# TABLE OF AUTHORITIES

## CASES

*Apace Commc'ns, Ltd. v. Burke,*
  522 F. Supp. 2d 509 (W.D.N.Y. 2007) ................................................................ 7

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.E.2d 929 (2007) ...................... 7

*Bell v. Acxiom,*
  2006 WL 2850042 (E.D. Ark. Oct. 3, 2006) ...................................................... 10

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................. 9

*Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.,*
  123 F. Supp. 2d 245 (D.N.J. 2000) ...................................................................... 7

*Conley v. Gibson,*
  355 U.S. 41, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957) .................................................. 7

*Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.,*
  165 F.3d 221 (3d Cir. 1998) ................................................................................. 9

*Dabush v. Mercedes-Benz USA, LLC,*
  378 N.J. Super. 105, 874 A.2d 1110 (N.J. Super. App. Div. 2005) ................... 11

*Directv v. Marino,*
  2005 WL 1367232 (D.N.J. June 8, 2005) ...................................................... 6, 13

*Dyer v. Northwest Airlines Corps.,*
  334 F. Supp. 2d 1196 (D.N.D. 2004) ................................................................. 13

*Gerlinger v. Amazon.com,*
  526 F.3d 1253 (9th Cir. 2008) .............................................................................. 8

*Gil v. Related Mgmt. Co.,*
  2006 WL 2358574 (D.N.J. Aug. 14, 2006) ........................................................ 14

*Henderson v. Hertz Corp.,*
  2005 WL 4127090 (N.J. Super. App. Div. June 22, 2006) ........................... 11-12

NYC_632290.3

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
   926 F.2d 1406 (3d Cir. 1991)................................................................................. 7

*Lee v. Am, Nat'l Ins. Co.*,
   260 F.3d 997 (9th Cir. 2001).............................................................................. 10

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .........................................................................................8-9

*Meshinksy v. Nichols Yacht Sales, Inc.*,
   110 N.J. 464, 541 A.2d 1063 (N.J. 1988) ......................................................... 11

*Pichler v. UNITE*,
   2008 WL 4138410 (3d Cir. Sept. 9, 2008)........................................................ 10

*Standard Fire Ins. Co. v. MTU Detroit Diesel, Inc.*,
   2009 WL 2568199 (D.N.J. Aug. 13, 2009)........................................................ 12

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ...........................................................................................8-9

*Stollenwerk v. Tri-West Healthcare Alliance*,
   2005 WL 2465906 (D. Ariz. Sept. 6, 2005)...................................................... 12

*Trikas v. Universal Card Servs. Corp.*,
   351 F. Supp. 2d 37 (E.D.N.Y. 2005).................................................................. 13

*Weinberg v. Sprint Corp.*,
   173 N.J. 233, 801 A.2d 281...........................................................................10-12

## STATUTES

18 U.S.C. § 3121 *et seq.* .............................................................................. 6

18 U.S.C.A. § 2510 *et seq.* ......................................................................... 6

N.J.S.A. 2A:156A-1 ...................................................................................... 6

N.J.S.A. 56:8-2 *et seq.* ................................................................................. 5

N.J.S.A. 56:8-19 ........................................................................................... 11

iv

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 12(b)(6) ........................................................ 1, 6-7

Article III of the United States Constitution ..................................................... *Passim*

NYC_632290.3

Defendant True Ultimate Standards Everywhere, Inc. ("TRUSTe," sued herein as Trusted Universal Standards in Electronic Transactions, Inc.), submits this Memorandum of Law in support of its Motion to Dismiss the Complaint of *Pro Se* Plaintiff Russ Smith ("Smith"). TRUSTe moves, pursuant to Article III of the United States Constitution and Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Smith's complaint (the "Complaint") for lack of standing and failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

Smith's *pro se* complaint is an unmeritorious attempt to state a claim where none exists. Though styled as a case involving the improper review of information, this case is not a typical case involving the alleged review of private information. The Complaint itself reveals that in fact Microsoft Corporation ("Microsoft," sued incorrectly herein as Microsoft, Inc.), Comcast Cable Communications, LLC ("Comcast"), and Cisco Systems, Inc. ("Cisco") were attempting to protect users from spam by, in Smith's view, improperly blocking his email account. Smith contends that the alleged blocking occurred due to the creation of "profiles" by defendants which revealed that Smith had been using his email account for improper purposes, including "spamming." The complaint notably fails to even attempt to plead damages resulting from any of the alleged actions of the defendants, and instead only seeks the recovery of injunctive relief



and the recovery of costs.

Moreover, TRUSTe has no direct connection to Smith, or in the alleged blocking of his emails, but instead is alleged to have failed to meet its obligations as an independent third-party reviewer of privacy policies. Although the Complaint alleges various statutory violations against Microsoft, Comcast and Cisco,[1] Smith's claims against TRUSTe appear to be plead only under the New Jersey Consumer Fraud Act and for common law breach of contract. Even accepting as true the allegations in the Complaint, Smith's claims against TRUSTe fail for one basic, obvious reason: *nowhere in the Complaint does Smith allege that he has been damaged by virtue of the alleged acts complained of.* Smith thus lacks standing; his failure to plead damages is fatal to his claims against TRUSTe, and warrants dismissal of those claims. Moreover, to the extent Smith otherwise has attempted to state a common law breach of contract claim against TRUSTe, that claim also must be dismissed.

## RELEVANT BACKGROUND

Defendant TRUSTe is an internet privacy services provider that helps businesses promote online safety and trust by, among other things, consulting with

---

[1] We understand that Microsoft, Comcast and Cisco will be submitting separate motions to dismiss based upon, *inter alia*, pleading deficiencies in the claims asserted against them.

2

respect to its member companies' privacy policies, and providing dispute resolution services relating to those policies. (See Compl., ¶¶ 8-11).[2] TRUSTe reviews the privacy policies of its member companies (which constitute some of the biggest and most well-respected U.S. corporations), and allows those companies to display TRUSTe's well-recognized seal of approval on its website if the policy meets TRUSTe's rigorous privacy requirements. Id. TRUSTe further provides a "Watchdog Dispute Resolution program," whereby TRUSTe offers to mediate certain privacy-related disputes between individuals and TRUSTe's member companies. Id. TRUSTe's determination in such disputes is contractually binding upon its member companies, but not the individual complainants. Id.

TRUSTe's clients includes defendant Comcast. Id. at ¶ 16.[3] Smith claims to have paid for Comcast's Broadband Internet Services. Id. at ¶ 13. The Complaint alleges that on or about July 3, 2008, Microsoft (by way of its Frontbridge program) included the IP address of Smith's email server in a spam "blacklist" distributed to third-parties, and that Microsoft renewed that action on or about

---

[2] For the Court's reference, a more thorough description of the various services offered by TRUSTe can be found on the company's website at http://www.truste.com/about_TRUSTe/index.html.

[3] Although Microsoft also is a client of TRUSTe and TRUSTe has reviewed Microsoft's marketing program privacy policy (Compl., ¶ 21), TRUSTe has not contracted with Microsoft with respect to Microsoft's Frontbridge services at issue herein. Id. at ¶ 33.

NYC_632290.3

September 23, 2008, as a result of which certain of Smith's email communications were blocked. Id. at ¶¶ 27, 31. The Complaint further alleges that Comcast took steps to block certain of Smith's email communications on or about March 9, 2009 and again on April 16, 2009, apparently based upon information about Smith's email account that Comcast had received from Cisco.[4] Id. at ¶¶ 38, 40, 42. Smith asserts that the collection of information about his email server IP address and blocking of his email account were illegal.

Smith claims that he initiated two TRUSTe Watchdog Complaints against Microsoft and Comcast as a result of these alleged activities, nos. 43304 and 48106, respectively. Id. at ¶¶ 32, 43. It appears that Smith's complaints to TRUSTe were that Microsoft and Comcast had failed to adhere to their publicized privacy policies in taking steps to block his emails. Id.

According to the Complaint, TRUSTe responded to Smith by informing him that the acts he had complained of against Microsoft appeared to have been in relation to Microsoft's Frontbridge services, which are governed by a separate privacy policy for which TRUSTe disputed that it ever had been contracted to

---

[4] Smith contends that Cisco took these steps after having assigned his IP address with a poor "reputation score." (Compl., ¶¶ 47-51). Although the Complaint alludes to the fact that Smith's email account was blocked because it was associated with sending spam emails, Smith does not specifically explain what he had used his email account for, or why his email account was "blacklisted" (nor does the Complaint deny that Smith has used his email account to transmit spam).

4

review.[5] Id. at ¶ 33. TRUSTe thus notified Smith that it "does not certify Frontbridge operations and we have no jurisdiction over this matter." Id. The Complaint alleges that by responding in this manner, "TRUSTe failed to prove a reasonable response that addressed issues or take reasonable action to ensure Microsoft complied with the TRUSTe program requirements." Id. at 44.

With respect to Smith's complaint about Comcast, the Complaint states that TRUSTe acknowledged that it had followed up with Comcast and had obtained certain information from it, but the Complaint does not explain what happened next other than that Smith was denied access to his email account at some point. (Compl., ¶¶ 43-44). Nevertheless, Smith alleges (without providing any detail) that "TRUSTe failed to prove a reasonable response that addressed issues or take reasonable action to ensure Comcast complied with the TRUSTe program requirements." Id.

Smith commenced the instant action *pro se* on or about July 29, 2009.[6] The Complaint alleges that TRUSTe violated the New Jersey Consumer Fraud Act (N.J.S.A. 56:8-2 *et seq.*), and asserts ten (10) "counts" against TRUSTe (spelled

---

[5] In his complaint to TRUSTe, Smith referenced Microsoft's marketing privacy policy, which TRUSTe had been contracted to review. (Compl., ¶ 33).

[6] The Complaint was filed in New Jersey Superior Court, Cape May County, and was removed by the defendants to this Court on September 4, 2009.

5

out in Paragraphs 53 through 63) based on the allegations that "TRUSTe made false and misleading representations at its web site (*sic*) in violation of the New Jersey Consumer Fraud Act and/or has failed to comply with its contractual requirements to offer a dispute resolution service ..." (Compl., ¶ 53). The Complaint also purports to seek relief against the other defendants (and not TRUSTe) under, *inter alia*, the New Jersey Wiretapping and Electronic Surveillance Control Act (N.J.S.A. 2A:156A-1), Federal Wiretap Law (18 U.S.C.A. § 2510 *et seq.*), The Pen Register Act (18 U.S.C. § 3121 *et seq.*), and New Jersey common law. (See Compl., ¶¶ 4, 6). Smith seeks a variety of injunctive remedies, as well as "costs." Id. at 92.

**_Notably, nowhere in the Complaint does Smith allege that he has been, or may become, damaged in any way_**.

## ARGUMENT

Federal Rule of Civil Procedure 12(b)(6) provides that an action shall be dismissed if the Complaint fails to state a claim upon which relief may be granted. On a motion to dismiss, a court must assume the truth of the factual allegations of the complaint and make all reasonable inferences in favor of the plaintiff. Directv v. Marino, 2005 WL 1367232, *2 (D.N.J. June 8, 2005).[7] While it was once the

---

[7] Copies of all unreported cases cited in this memorandum are attached hereto as Exhibit A.

6

standard that "a complaint should not be dismissed for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support

of his claim which would entitle him to relief", "the Supreme Court has recently

stiffened the pleading standards under the Federal Rules." Apace Commc'ns, Ltd.

v. Burke, 522 F. Supp. 2d 509, 515 (W.D.N.Y. 2007) (citing Conley v. Gibson,

355 U.S. 41, 45-46 , 78 S.Ct. 99, 102, 2 L.Ed. 2d 80 (1957)).  Under the current

standard, to survive a motion to dismiss pursuant to Rule 12 (b)(6), the allegations

in the complaint must meet the standard of "plausibility" rather than

"conceivability."  Id.  As the Supreme Court announced in Bell Atlantic Corp. v.

Twombly,

> While a complaint attacked by a Rule 12 (b)(6) to
> dismiss does not need detailed factual allegations,...a
> plaintiff's obligation to provide the grounds of his
> entitlement to relief requires more than labels and
> conclusions, and a formulaic recitation of the elements of
> a cause of action will not do...Factual allegations must
> be enough to raise a right to relief above the speculative
> level...

550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.E.2d 929 (2007) (internal citations

and quotations omitted).

Further, "[a]lthough the lack of standing issue gives rise to a question of this

Court's subject matter jurisdiction, the proper standard to be applied to the standing

issue is that of a motion to dismiss under 12(b)(6)." Camden County Bd. of Chosen

Freeholders v. Beretta U.S.A. Corp., 123 F. Supp. 2d 245, 256 (D.N.J. 2000) (citing Kehr

7



Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406 (3d Cir. 1991)).

Here, the allegations directed against TRUSTE in the Complaint fail to satisfy the applicable pleading standard, as the Complaint does not establish that Smith has standing, does not plead any "ascertainable loss," and does not aver the existence of any enforceable contractual rights against TRUSTe. Thus, Smith's claims against TRUSTe should be dismissed in their entirety.

## I.    **Smith Lacks Standing to Pursue His Claims**

### A.    **Smith Lacks Standing Under Article III**

Article III of the United States Constitution requires that every plaintiff establish standing in order to proceed with a cause of action. Article III standing is the "irreducible constitutional minimum" of standing and a "threshold issue" to be addressed before a federal court "proceeds at all in any cause." See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998); Gerlinger v. Amazon.com, 526 F.3d 1253, 1255 (9th Cir. 2008). Because it is a jurisdictional issue, Article III standing can be challenged at any point in the case or raised *sua sponte* by federal courts. See Steel Co., 523 U.S. at 94; see also Erwin Chemerinsky, Constitutional Law – Principles and Policies (2d Ed. 2002). Article III's requirements are not mere pleading formalities; rather, they are "an indispensable part of the plaintiff's case, [and] each element must be supported in the same way as any other matter on which the

8

plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561.

To establish Article III standing at trial, plaintiffs bear the burden of satisfying three elements by a preponderance of the evidence: (1) that they have "suffered an '*injury in fact*' – an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that there is "a causal connection between the injury and the conduct complained of"; and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 560-61 (emphasis added). These standing requirements cannot be overridden by statute, as Article III has been held to be an "immutable" constitutional principle of the United States judicial system without exceptions. See Bennett v. Spear, 520 U.S. 154, 162 (1997); Steel Co., 523 U.S. 83, 94-95 (1998); Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 225 (3d Cir. 1998).

Here, even construing the allegations of the Complaint in Smith's favor, it is clear that Smith cannot establish the required standing under Article III, as he fails to allege anywhere in his Complaint that he has suffered any damages due to TRUSTe's (or any other defendant's) alleged conduct. Smith does *not* claim that he has suffered, or will suffer, any monetary or other compensable damages, or that an injunction is necessary to prevent him from suffering any such losses.

9

Indeed, Smith does not even seek money damages in his Complaint, aside from some unspecified "costs" associated with bringing suit. (See Compl., ¶ 92). The *most* that Smith's Complaint alleges is that Smith's Comcast email account has been blocked, and that he has been denied access to it. See id. at ¶¶ 27, 31, 38, 42, 45. Even if true, these allegations do not come anywhere close to establishing an "ascertainable loss" sufficient to confer standing. See, e.g., Weinberg v. Sprint Corp., 173 N.J. 233, 246-47, 801 A.2d 281, 289 (plaintiff lacked "ascertainable loss" under New Jersey Consumer Fraud Act, where he could not demonstrate that he paid any more for telephone calls than the telephone company's "filed rate," and thus suffered no cognizable damages); Pichler v. UNITE, 2008 WL 4138410 (3d Cir. Sept. 9, 2008) (dismissing invasion of privacy claims for lack of standing); Bell v. Acxiom, 2006 WL 2850042 (E.D. Ark. Oct. 3, 2006) (plaintiff's claims alleging that hacking incident left her vulnerable to junk mail dismissed for lack of standing); Lee v. Am, Nat'l Ins. Co., 260 F.3d 997, 1001 (9th Cir. 2001) (plaintiff's claim "to challenge the company's allegedly unfair business practices as a private attorney general even if he suffered no individualized injury" under California law could not be brought in federal court because of Article III's restriction that plaintiff "has actually been injured by the defendant's challenged conduct"). Because he cannot establish Article III standing, Smith's claims against TRUSTe must be dismissed in their entirety.

10

**B.    Smith Also Lacks Standing Under The Relevant New Jersey Statute**

While Smith's lack of Article III standing is a sufficient ground to dismiss his complaint, his claims fare no better when analyzed under New Jersey law. The New Jersey Consumer Fraud Act imposes its own standing requirement that a plaintiff establish that he or she has suffered an "ascertainable loss." See N.J.S.A. 56:8-19; Meshinksy v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475-76, 541 A.2d 1063, 1068-69 (N.J. 1988). Indeed, the New Jersey Supreme Court has held that failure to satisfy this requirement is an absolute bar for bringing a private cause of action under the statute. See Weinberg, 173 N.J. at 249-50; Dabush v. Mercedes-Benz USA, LLC, 378 N.J. Super. 105, 116, 874 A.2d 1110, 1116 (N.J. Super. App. Div. 2005) ("a private plaintiff *must* demonstrate an ascertainable loss of moneys or property, real or personal, as a result of the defendant's unlawful conduct") (emphasis added; internal quotations omitted). In cases alleging violations of the New Jersey Consumer Fraud Act related to misrepresentations or breaches of contract, "ascertainable loss" requires a showing that the claimant suffered "either out-of-pocket loss or a demonstration of loss in value." Henderson v. Hertz Corp., 2005 WL 4127090, *7 (N.J. Super. App. Div. June 22, 2006). Again, because the Complaint contains no allegations of any "ascertainable loss" by Smith, either out-of-pocket or otherwise, he cannot plead standing sufficient to sue under the New Jersey Consumer Fraud Act. His claims therefore fail, as a matter of law.

11

## II.    The Complaint Fails To State A Claim Against TRUSTe

### A.    The Complaint Fails To State A Claim Under The New Jersey Consumer Fraud Act

The Complaint alleges that TRUSTe violated the New Jersey Consumer

Fraud Act by making "false and misleading representations at its web site (*sic*)"

related to its dispute resolution services. (Compl. ¶ 53). Putting aside that the

Complaint fails to provide any specificity whatsoever regarding the alleged

misrepresentations by TRUSTe,[8] these allegations (even if true, which they are

not) fail to state a cognizable claim under the New Jersey Consumer Fraud Act.

As discussed above (see supra at 8), the Complaint contains no allegations that

Smith suffered, or will suffer, any compensable damages.[9] Smith's failure to plead

any damages warrants dismissal of his New Jersey Consumer Fraud Act claim.

Weinberg, 173 N.J. at 244-45; Henderson, 2005 WL 4127090 at *7-8 (N.J. Super.

---

[8] Indeed, this pleading deficiency independently warrants dismissal of Smith's claims against TRUSTe. See, e.g., Standard Fire Ins. Co. v. MTU Detroit Diesel, Inc., 2009 WL 2568199, *6 (D.N.J. Aug. 13, 2009) (New Jersey Consumer Fraud Act claim sounding in fraud requires particularity in its pleading of the alleged misrepresentations).

[9] Moreover, even if the acts Smith complains of (blocking of his emails and being denied access to his account) somehow constituted cognizable damages, the Complaint alleges no actionable, causal connection between those events and TRUSTe, further warranting dismissal of the Complaint vis-à-vis TRUSTe. See, e.g., Stollenwerk v. Tri-West Healthcare Alliance, 2005 WL 2465906 (D. Ariz. Sept. 6, 2005) (dismissing claims based upon privacy breaches where plaintiffs did not establish that defendants' alleged negligence caused any cognizable damages).

12

App. Div. June 22, 2006) (plaintiff's failure to allege any ascertainable loss held fatal to New Jersey Consumer Fraud Act claim; claim dismissed).[10]

Additionally, the absence of any allegation in the Complaint that there existed any consumer transaction between Smith and TRUSTe independently is fatal to Smith's New Jersey Consumer Fraud Act claim against TRUSTe. See, e.g., Directv, 2005 WL 1367232 at *3 (dismissing New Jersey Consumer Fraud Act counterclaim alleging that plaintiff was disseminating false information about defendants' credit worthiness, where no consumer transaction was alleged). Here, the Complaint alleges, at most, that Smith sought to avail himself of TRUSTe's free, non-binding dispute resolution procedure. (See Compl., ¶¶ 32, 43). By Smith's own allegations, he purchased nothing from TRUSTe, and thus he is unable to state a claim against TRUSTe under the New Jersey Consumer Fraud Act.

---

[10] Although the Complaint does not appear to assert that TRUSTe improperly disclosed any of Smith's personal information or breached its own privacy policies, to the extent that Smith were to allege that, or to the extent Smith alleges that TRUSTe conspired with the other defendants to invade his privacy, such allegations would themselves not plead any damages sufficient to state a claim. See, e.g., Trikas v. Universal Card Servs. Corp., 351 F. Supp. 2d 37, 45 (E.D.N.Y. 2005) (plaintiff's allegations of emotional distress based upon defendant's alleged errors on his credit report failed to establish cognizable damages under the Fair Credit Report Act); Dyer v. Northwest Airlines Corps., 334 F. Supp. 2d 1196, 1198 (D.N.D. 2004) (in suit alleging breach of defendants' privacy policies in disclosing plaintiff's personal information to certain government agencies, claims dismissed for lack of cognizable damages).

**B.    To The Extent The Complaint Attempts To Plead A Contract Claim, It Must Be Dismissed**

Smith pleads, in the alternative, that TRUSTe "failed to comply with its contractual requirements to offer a dispute resolution service ...." (Compl., ¶ 53). To the extent that this allegation attempts to state a claim against TRUSTe for breach of contract, it is fatally flawed, as the Complaint does not allege the existence of any contract between Smith and TRUSTe (and, in fact, there is none). See, e.g., Gil v. Related Mgmt. Co., 2006 WL 2358574, *3 (D.N.J. Aug. 14, 2006) ("In order to allege a breach of contract claim, plaintiff must establish that a valid contract existed between the plaintiff and defendant").

14

## CONCLUSION

For all the foregoing reasons, it is clear that Smith has failed to allege any

facts supporting a claim against TRUSTe. Accordingly, this Court should grant

TRUSTe's motion and dismiss the Complaint with prejudice.

Dated: New York, New York
      September 29, 2009

                FOLEY & LARDNER LLP

                /s/ Barry G. Felder
                Barry G. Felder
                Anne B. Sekel
                90 Park Avenue
                New York, NY  10016
                Tel.: (212) 682-7474
                Fax: (212) 687-2329
                E-mail:  bfelder@foley.com
                E-mail: asekel@foley.com

                *Attorneys for True Ultimate*
                *Standards Everywhere, Inc. (sued*
                *herein as Trusted Universal*
                *Standards in Electronic, Inc.)*

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 2850042 (E.D.Ark.)
**(Cite as: 2006 WL 2850042 (E.D.Ark.))**

☞
Only the Westlaw citation is currently available.

United States District Court,
E.D. Arkansas,
Western Division.
April BELL, on behalf of herself and others simil-
arly situated, Plaintiff
v.
ACXIOM CORPORATION, Defendant.
**No. 4:06CV00485-WRW.**

Oct. 3, 2006.

George L. McWilliams, James Clark Wyly, Sean
Fletcher Rommel, Jack Thomas Patterson, II, Pat-
ton, Roberts, McWilliams & Capshaw, Little Rock,
AR, John G. Emerson, Houston, TX, Scott E.
Poynter, Emerson Poynter LLP, Little Rock, AR,
for Plaintiff.

Amy Lee Stewart, Rose Law Firm, Little Rock,
AR, David Kramer, Douglas J. Clark, Gerard Steg-
maier, Wilson, Sonsini, Goodrich & Rosati, Reston,
VA, for Defendant.

#### ORDER

WM. R. WILSON, JR., District Judge.

**\*1** Defendant Acxiom Corporation ("Acxiom")
stores personal, financial, and other company data
for its corporate clients. In 2003, Acxiom's com-
puter bank was hacked and client files were com-
promised. Plaintiff filed this class action seeking
damages and injunctive relief alleging that Acx-
iom's lax security jeopardized her privacy and left
her at a risk of receiving junk mail and of becoming
a victim of identify theft. Defendant moved for dis-
missal (Doc. No. 5). Plaintiff has responded (Doc.
No. 16). For the reasons stated below, Defendant's
Motion to Dismiss is GRANTED.

### I. History

Acxiom is a data bank that stores marketing in-
formation about its clients' customers. Acxiom
takes this information and "match[es] names with
lifestyles and demographic information from other
sources ... [to] give ... [its] client a clear picture of
the people buying its products and services."[FN1]

> FN1. *Acxiom Corp. v. Axiom, Inc.,* 27
> F.Supp.2d 478, 482 (D.Del .1998).

In order for its clients to reach their information,
Acxiom maintains a File Transfer Protocol ("FTP")
site. To access this site, the client must have a user-
name and password, assigned by Acxiom. Between
November 2001 and the summer of 2003, Scott
Levine, an Acxiom client, exploited a hole in Acx-
iom's security system, accessed the Acxiom FTP
server, and downloaded other client's databases.
Levine sold some of the information to a marketing
company in Georgia, who then used the names and
addresses to advertise via direct mail. Levine has
since been convicted for these illegal activities.[FN2]

> FN2. *United States v. Scott Levine,*
> 4:04CR00175 (E.D.Ark.2006).

After Levine's conviction, the Plaintiff, April Bell,
filed suit against Acxiom on behalf of herself and
all others similarly situated. She alleged that Acx-
iom failed to protect its clients' data. Plaintiff also
alleged that she is at a higher risk of receiving junk
mail and of being an identity theft victim.

### II. Standard of Review

The standard for a motion to dismiss under Fed. R.
Civ. P 12(b)(1) and 12(b)(6) is that the court must
construe the facts alleged in the complaint in the
most favorable light towards the plaintiffs.[FN3] The
court should not dismiss the complaint unless it ap-
pears that there are no set of facts which would en-
title the plaintiffs to relief.[FN4] The court is "free to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2850042 (E.D.Ark.)
**(Cite as: 2006 WL 2850042 (E.D.Ark.))**

ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."[FN5] Finally, on a motion to dismiss (as opposed to a motion for summary judgment) the court should assume that general factual allegations embrace the specific facts necessary to support the plaintiff's claim.[FN6]

> FN3. *In re Stafmark, Inc. Securities Litigation,* 123 F.Supp.2d 1160, 1162-1163 (E.D.Ark.2000).

> FN4. *Id.*

> FN5. *Wiles v. Capitol Indemnity Corp.,* 280 F.3d 868, 870 (8th Cir.2002).

> FN6. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889 (1990)(*citing U.S. v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669 (1973)).

**III. Analysis**

In its motion to dismiss, Acxiom contends that Plaintiff does not have standing, and in the alternative, that she has not stated a claim upon which relief can be granted. In order to have standing, a plaintiff must meet three requirements.[FN7] First, a plaintiff must demonstrate that she has suffered an injury in fact which is actual, concrete, and particularized.[FN8] Second, the plaintiff must show a causal connection between the conduct complained of and the injury.[FN9] Third, the plaintiff must establish that the injury will be redressed by a favorable decision.[FN10] The plaintiff has the burden of establishing each of these three requirements.[FN11]

> FN7. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992).

> FN8. *Id. See also, O'Shea v. Littleton,* 414 U.S. 488, 494 (1974); *Los Angeles v. Lyons,* 461 U.S. 95, 101-102 (1983); *Whit-*

*more v. Arkansas,* 495 U.S. 149, 155 (1990)(city residents did not have standing to sue USDA over construction of two sewage ponds in the 100 year flood plain, because although there was a possibility that the flood would occur while the residents owned or occupied land in proximity to the ponds, it was a matter of 'sheer speculation' that there would be a flood and that if a flood happened, it would damage the plaintiffs' properties.).

> FN9. *Id. See also, Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 41 (1976).

> FN10. *Id.*

> FN11. *Shain v. Veneman,* 376 F.3d 815, 817 (8th Cir.2004), *cert. denied,* 543 U.S. 1090 (2005).

**\*2** The burden to show standing is not a mere pleading requirement, but "an indispensable part of the plaintiff's case."[FN12] "Each and every element of the standing requirements 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.' "[FN13] Strict compliance with this jurisdictional standing requirement is mandated.[FN14] Assertions of potential future injury do not satisfy the injury-in-fact test. "A threatened injury must be certainly impending to constitute injury in fact."[FN15]

> FN12. *Delorme v. U.S.,* 354 F.3d 810, 815 (8th Cir.2004) (*quoting Lujan,* 504 U.S. at 561).

> FN13. *Id.*

> FN14. *Johnson v. Missouri,* 142 F.3d 1087, 1088 (8th Cir.1998) (internal citation omitted).

> FN15. *Sierra Club v. Robertson,* 28 F.3d

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2850042 (E.D.Ark.)
**(Cite as: 2006 WL 2850042 (E.D.Ark.))**

753, 758 (8th Cir.1994)( "assertions of potential future injury do not satisfy the 'injury-in-fact' test"); *see also Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990).

In *Lujan,* environmental groups challenged governmental regulations concerning the Endangered Species Act.[FN16] The groups contended that they had traveled abroad to view endangered species in the past and intended to do so in the future, and that the regulations would negatively affect their ability to do so.[FN17] Reasoning that the groups did not show that one or more of their members would be directly affected by the regulations and that intentions to view endangered species at some "indefinite future time" did not demonstrate an imminent injury, the Supreme Court ruled that the groups failed to show an injury in fact, and thus did not have standing to contest the regulations.[FN18]

    FN16. *Lujan,* 504 U.S. at 563-64.

    FN17. *Id.*

    FN18. *Id.* at 556.

In this case, Plaintiff alleged that she suffered an increased risk of both receiving unsolicited mailing advertisements and of identity theft. In response, Defendant argues that both Plaintiff's alleged injuries are speculative-Plaintiff has not plead that she has received a single marketing mailer or had her identity stolen. Moreover, several courts have held that the receipt of unsolicited and unwanted mail does not constitute actual harm.[FN19] Additionally, while there have been several lawsuits alleging an increased risk of identity theft, no court has considered the risk itself to be damage.[FN20] Only where the plaintiff has actually suffered identity theft has the court found that there were damages.[FN21]

    FN19. *Smith v. Chase Manhattan Bank,* 293 A.D.2d 598, 599-600 (N.Y.App.2002)(finding that where bank had sold names, addresses and financial data to marketing company, the receipt of unwanted marketing solicitations was not an actual harm); *Shibley v. Time, Inc.,* 341 N.E.2d 337, 339-40 (Ohio App.1975)(finding that the "right of privacy does not extend to the mailbox" and finding that under Ohio law, sale of 'personality profiles' does not constitute an invasion of privacy); *Lamont v. Commissioner of Motor Vehicles,* 269 F.Supp. 880, 883 (S.D.N.Y.1967)("The mail box, however noxious its advertising contents often seem to judges as well as other people, is hardly the kind of enclave that requires constitutional defense to protect 'the privacies of life.' The short, though regular, journey from mail box to trash can ... is an acceptable burden, at least so far as the Constitution is concerned.").

    FN20. *Walters v. DHL Express,* 2006 WL 1314132 at 5 (C.D.Ill. May 12, 2006)(dismissing claim for damages of increased risk of identity theft under 49 U.S.C. § 14706 *et seq.* The court reasoned that damages for risk of identity theft would be based on speculation, as opposed to actual loss.); *Guin v. Brazos Higher Education Service Corp., Inc.,* 2006 WL 288483 at 5 (D.Minn. Feb. 7, 2006)(rejecting that an increased risk of identity theft constituted damages where a laptop containing sensitive data was stolen and there was no evidence that any party whose information could have been on the laptop had experienced identity theft as a result.); *Stollenwerk v. Tri-West Healthcare Alliance,* 2005 WL 2465906 at 4 (D.Ariz. Sept. 6, 2005)(dismissing case where hard drives containing personal information were stolen from defendant's facility, reasoning that plaintiffs must, at a minimum, establish "1) significant exposure of sensitive personal information, 2) a significantly increased risk of identity

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2850042 (E.D.Ark.)
**(Cite as: 2006 WL 2850042 (E.D.Ark.))**

fraud as a result of that exposure and 3) the necessity and effectiveness of credit monitoring in detecting, treating and/or preventing identity fraud.").

FN21. *Remsburg v. Docusearch, Inc.,* 816 A.2d 100, 1007-8 (N.H.2003)(holding an private investigatory firm liable where they had sold information, including the social security number and work address of plaintiff's daughter, to a man who had been stalking and then killed plaintiff's daughter. The court reasoned that a private investigator owed a duty to exercise reasonable care to not subject a third party to an increased risk of criminal misconduct, including stalking and identity theft.).

Furthermore, Plaintiff does not know whether her name and information were contained within the databases stolen by Levine. More than three years after the theft, Plaintiff has not alleged that she has suffered anything greater than an increased risk of identity theft.[FN22] Because Plaintiff has not alleged that she has suffered any concrete damages, she does not have standing under the case-or-controversy requirement.

FN22. 76% of all identity theft is discovered before 24 months after the theft. Only 12 % is discovered more than 48 months after the theft. *Federal Trade Commission Identity Theft Victim Complaint Data 2005,* p. 11, http://www.consumer.gov/idtheft/pdf/clearinghouse_2005.pdf.

Alternatively, Plaintiff argues that she satisfies the 'identifiable trifle' doctrine found in *U.S. v. Students Challenging Regulatory Agency Procedures (SCRAP).*[FN23] In this case, the Court held that SCRAP had standing because their use of area parks and nature areas would be affected. The Court held, "[t]he basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the

trifle is the basis for standing and the principle supplies the motivation."[FN24] However, the 'identifiable trifles' that the Court was referring to were, respectively, a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax.[FN25] In this case, the plaintiff is not trying to protect something as concrete as her political right to be free of fines and taxes-she is asking for protection against a harm that is speculative. Because "assertions of potential future injury do not satisfy the injury-in-fact test,"[FN26] Plaintiff's claims must be dismissed for lack of standing.

FN23. 412 U.S. 669, 690 n. 14 (1973).

FN24. *Id.*

FN25. *Id.*

FN26. *Sierra Club,* 28 F.3d at 758.

**IV. Conclusion**

**\*3** For the above reasons Defendant's Motion to Dismiss is GRANTED.

IT IS SO ORDERED this 3rd day of October, 2006.

E.D.Ark.,2006.
Bell v. Acxiom Corp.
Not Reported in F.Supp.2d, 2006 WL 2850042 (E.D.Ark.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Not Reported in F.Supp.2d, 2005 WL 1367232 (D.N.J.)
**(Cite as: 2005 WL 1367232 (D.N.J.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
DIRECTV, INC., Plaintiff,
v.
Michael J. MARINO, et al. Defendants.
**No. Civ. 03-5606(GEB).**

June 8, 2005.

David Andrew Cohen, Saiber, Schlesinger, Satz & Goldstein, LLC, Newark, NJ, for Plaintiff.

Jonathan J. Sobel, Galerman & Tabakin, LLP, Voorhees, NJ, Steven J. Abelson, Freehold, NJ, for Defendants.

## MEMORANDUM OPINION

BROWN, J.

**\*1** This matter comes before the Court upon plaintiff DIRECTV's ("Plaintiff" or "DIRECTV") motion to dismiss defendant Dave Richards' ("Defendant") counterclaim pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. DIRECTV also seeks to recover its attorneys' fees associated with this motion. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. The Court, having considered the parties' submissions and decided the matter without oral argument pursuant to Fed.R.Civ.P. 78, will grant DIRECTV's motion and award attorneys' fees.

## I. BACKGROUND

On November 25, 2003, DIRECTV instituted this action against several named defendants,[FN1] including Dave Richards, alleging violation of the Federal Communications Act of 1934 ("the Com-

munications Act"), 47 U.S.C. § 605, and the Electronic Communications Privacy Act ("the Privacy Act"), 18 U.S.C. §§ 2510-2521. *See* Complaint ¶ 5.

FN1. All other defendants in this action have settled with DIRECTV.

DIRECTV is a direct broadcast satellite provider that delivers television programming to millions of homes and businesses across the nation. *See* Complaint ¶ 1. DIRECTV invested over $1.25 billion in developing its direct broadcast satellite system. *Id.* In order to secure and prevent unauthorized viewing of its programming, DIRECTV encrypts, or electronically scrambles, its satellite transmissions. *Id.* at ¶ 2. DIRECTV has been plagued by the proliferation of companies engaged in the sale of illegal equipment that unscrambles their signal and allows users to view their programming for free. With the assistance of law enforcement authorities, DIRECTV has engaged in an aggressive campaign designed to identify the manufacturers and distributors of pirate access devices and the individuals purchasing them and recover lost revenue via legal actions.

On or around December 1, 2001, DIRECTV executed Writs of Seizure upon an internet-based seller, The Computer Shanty. *Id.* at ¶ 3. Through its website, The Computer Shanty was allegedly selling pirate access devices that are used to illegally intercept transmission signals, including DIRECTV's programming. *Id.* DIRECTV acquired The Computer Shanty's business records and commenced actions against those individuals who allegedly purchased illegal devices for resale or to intercept DIRECTV's programming for unauthorized viewing. *Id.*

DIRECTV alleges that Defendant purchased pirate access devices over the internet on The Computer Shanty's website. *Id.* at ¶ 13. On or about May 30, 2001, Defendant allegedly purchased two devices; namely, two "Boot Loader Boards." *Id.* at ¶ 13(a).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2
Not Reported in F.Supp.2d, 2005 WL 1367232 (D.N.J.)
**(Cite as: 2005 WL 1367232 (D.N.J.))**

These devices were shipped to Defendant's home in Lodi, New Jersey. *Id.* DIRECTV claims that Defendant's actions violate Section 605 of the Communications Act and Sections 2510-2521 of the Privacy Act.

On August 31, 2004, Defendant filed a motion to dismiss DIRECTV's complaint and a motion to quash the third-party subpoena on PayPal.[FN2] On October 14, 2004, this Court denied both motions. Subsequently, on October 18, 2004, Defendant filed an answer and counterclaim, asserting that DIRECTV had engaged in false, misleading and deceptive acts and practices in violation of the New Jersey Consumer Fraud Act, N.J. STAT. ANN.. §§ 56:8-2 and 56:8-19, *et seq.,* by circulating derogatory and inaccurate information regarding Defendant's financial responsibility and credit worthiness ("Counterclaim"), causing him to suffer emotional and financial damages. *See* Counterclaim ¶¶ 6-31. By letter dated November 3, 2004, DIRECTV advised Sobel that it believed the Counterclaim was patently frivolous and demanded that it be withdrawn. During a November 15, 2004 Telephonic Status Conference with Magistrate Judge John J. Hughes, the parties addressed Defendant's counterclaim. Judge Hughes' November 19, 2004 Scheduling Order states: "In the event that Defendant Richards does not withdraw his Counterclaim, Plaintiff may, at any time, move to dismiss Defendant Richards' Counterclaim and may seek its attorney's fees in connection therewith." *See* Scheduling Order, entered November 19, 2004[52].

> FN2. On February 17, 2004, Defendant's counsel, Jonathan J. Sobel, Esq. ("Sobel") also filed a motion to dismiss DIRECTV's complaint against two other named defendants, Aaron Kremble and Richard Yoss. This Court denied both motions on March 15, 2005.

**\*2** Defendant has not withdrawn the Counterclaim. On December 1, 2004, DIRECTV filed the instant motion to dismiss the Counterclaim and seeks its attorneys' fees and costs associated with the motion.

## II. ANALYSIS

### A. *Standard for a Motion to Dismiss*

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. *Oran v. Stafford,* 226 F.3d 275, 279 (3d Cir.2000); *Langford v. City of Atl. City,* 235 F.3d 845, 850 (3d Cir.2000); *Bartholomew v. Fischl,* 782 F.2d 1148, 1152 (3d Cir.1986). The Court may not dismiss a complaint unless plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Angelastro v. Prudential-Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.1985), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Under Rule 12(b)(6), the Court must "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff. [The motion can be granted] only if no relief could be granted under any set of facts that could be proved." *Turbe v. Gov't of the V.I.,* 938 F.2d 427, 428 (3d Cir.1991) (citing *Unger v. Nat'l Residents Matching Program,* 928 F.2d 1392, 1394-95 (3d Cir.1991)); *see also Langford,* 235 F.3d at 850; *Dykes v. SE. Pa. Transp. Auth.,* 68 F.3d 1564, 1565, n. 1 (3d Cir.1995), *cert. denied,* 517 U.S. 1142, 116 S.Ct. 1434, 134 L.Ed.2d 556 (1996); *Piecknick v. Commw. of Pa.,* 36 F.3d 1250, 1255 (3d Cir.1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). A complaint may be dismissed for failure to state a claim where it appears beyond any doubt "that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1367232 (D.N.J.)

**(Cite as: 2005 WL 1367232 (D.N.J.))**

A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *see also Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.").

**B. *Defendant's Counterclaim Must Be Dismissed Because DIRECTV And Defendant Did Not Engage In A Consumer Transaction***

Defendant contends that DIRECTV has engaged in a campaign designed to undermine Defendant's financial responsibility and credit worthiness by disseminating false, misleading and deceptive information in violation of the New Jersey Consumer Fraud Act. *See* Counterclaim ¶¶ 6-31. More specifically, Defendant alleges that DIRECTV's conduct violates Sections 56:8-2 and 56:8-19 of the New Jersey Consumer Fraud Act. *See* N.J. STAT. ANN.. §§ 56:8-2 and 56:8-19 (2005). Section 56:8-2 provides, in pertinent part that:

*3 The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. STAT. ANN.. §§ 56:8-2 (2005). Section 56:8-19 provides a private right of action for conduct proscribed by the statute.

The absence of a consumer transaction between the parties is fatal to Defendant's counterclaim. The Supreme Court of New Jersey has clarified that the New Jersey Consumer Fraud Act is

aimed basically at unlawful sales and advertising practices designed to induce *consumers* to purchase merchandise or real estate ... The legislative concern was over sharp practices and dealings in the marketing of merchandise and real estate whereby the *consumer* could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices.

*Daaleman v. Elizabethtown Gas Co.,* 77 N.J. 267, 390 A.2d 566, 568-69 (N.J.1978) (emphasis added). Put simply, the Act is intended to protect consumers engaging in consumer transactions. *See J & R Ice Cream Corp. v. California Smoothie Licensing Corp.,* 31 F.3d 1259, 1272 (3d Cir.1994). Further, New Jersey courts have clarified that the New Jersey Consumer Fraud Act only applies to "bona fide consumers" of a product. *See Grauer v. Norman Chevrolet GEO,* 321 N.J.Super. 547, 729 A.2d 522, 524 (N.J.Super. Ct. Law Div.1998). In the present case, even drawing all favorable inferences in Defendant's favor, it is impossible to find that a bona fide consumer transaction existed between the parties.

On the contrary, this entire litigation is premised on the absence of a legitimate consumer transaction; that is, the underlying facts allege that Defendant was illegally intercepting DIRECTV's programming without paying for it. *See DIRECTV, Inc. v. Pepe,* 03-2424 (Katharine S. Hayden, U.S.D.J.) (holding that the defendant's counterclaim that DIRECTV's initiation and pursuit of claims that defendant illegally intercepted its' signal did not violate the New Jersey Consumer Fraud Act because "[t]he actual *absence* of a consumer relationship is the focus of the lawsuit against [the defendant].") (emphasis in original). This Courts determination that DIRECTV's complaint could succeed as a matter of law is antithetical to any contention that their

conduct somehow violated the New Jersey Consumer Fraud Act. Further, Defendant's contention that his status as a legitimate subscriber of DIRECTV's programming somehow brings his counterclaim within the purview of the New Jersey Consumer Fraud Act is devoid of merit. Defendant is attempting to obscure the facts underlying DIRECTV's claims. That Defendant may also pay for some of DIRECTV's programming is entirely irrelevant to whether or not Defendant purchased pirate access devices to illegally intercept DIRECTV's signal.[FN3] Therefore, the Court finds that Defendant's counterclaim must be dismissed.

> FN3. Defendant also appears to argue that an extension of the New Jersey Consumer Fraud Act to cover DIRECTV's alleged conduct is warranted. The Court strongly disagrees. The Act is to be liberally construed in favor of *the consumer.* As discussed above, there is no consumer transaction in this case.

### C. DIRECTV Is Entitled To Attorneys' Fees

**\*4** By letter dated November 3, 2004, DIRECTV demanded that Sobel withdraw the counterclaim.[FN4] In the letter, DIRECTV advised Sobel that it regarded the Counterclaim as "patently frivolous," directing him to Judge Hayden's opinion in *DIRECTV v. Pepe.* The letter advised Sobel that DIRECTV would seek sanctions if he did not withdraw the counterclaim. Significantly, DIRECTV alleges that Sobel has asserted the identical counterclaim on behalf of fourteen (14) other defendants in actions brought by DIRECTV under the Communications Act and Privacy Act and has voluntarily dismissed this counterclaim in all fourteen (14) instances after DIRECTV filed a motion to dismiss. In his opposition brief, Sobel does not dispute the veracity of these allegations. Instead, Sobel merely argues that whether or not he asserted and subsequently withdrew similar or identical counterclaims in other actions is irrelevant. Sobel is only partially correct. White it is true that his conduct in

these other actions is irrelevant to whether the Counterclaims must be dismissed as a matter of law, the Court finds this conduct to be clearly relevant to the question of whether attorneys' fees are appropriate in this case.

> FN4. The letter also requested that Sobel withdraw the identical counterclaim asserted in three other actions brought by DIRECTV against his clients. *See DIRECTV, Inc. v. Cimiluca* (Gary Hemburger), Civ. No. 03-2422; *DIRECTV, Inc. v. Minnick* (Jim Minnick), Civ. No. 03-311; *DIRECTV, Inc. v. Minnick* (Martha Grubb), Civ. No. 03-311.

Further, this issue was discussed by the parties during a November 15, 2004 telephonic status conference with Judge Hughes. During that call, DIRECTV advised Judge Hughes that it believed the counterclaim was patently frivolous and that Sobel had voluntarily dismissed identical claims on fourteen (14) other occasions. Judge Hughes addressed this issue in his November 18, 2004 Scheduling Order, specifically stating: "In the event that Defendant Richards does not withdraw his Counterclaim, Plaintiff may, at any time, move to dismiss Defendant Richards' Counterclaim and may seek its attorney's fees in connection therewith."[FN5] *See* Scheduling Order, entered November 19, 2004[52].

> FN5. Defendant contends "that the portion of Judge Hughes' Order which authorizes Plaintiff to seeks fees is inappropriate" because Judge Hughes lacked the "authority to impose such a condition in a Scheduling Order." Defendant's Opposition Brief at 15-16. Defendant's argument is without merit. Local Civil Rule 72.1(a)(3)(C) provides that "[a]s part of the Magistrate Judge's general supervision of the civil calendar, the Magistrate Judge shall conduct scheduling conferences and enter scheduling orders in accordance with Fed.R.Civ.P. 16 ..." Local Civ. R. 72.1(a)(3)(C) (2005). Federal Rule of Civil Procedure 16(b)(6)

Not Reported in F.Supp.2d, 2005 WL 1367232 (D.N.J.)
**(Cite as: 2005 WL 1367232 (D.N.J.))**

provides that the scheduling order may also include "any other matters appropriate in the circumstances of the case." Fed.R.Civ.P. 16(b)(6) (2005). Accordingly, this Court concludes that Judge Hughes had the authority to include a provision permitting DIRECTV to move for attorneys' fees and costs in the November 18, 2004 Scheduling Order.

Defendant also contends that DIRECTV's motion to dismiss the Counterclaim is untimely. However, DIRECTV's November 3 letter to Sobel evidences that Sobel consented to an extension of time to answer or otherwise respond until he advised whether he intended to withdraw the Counterclaim. Attorneys are encouraged to work cooperatively and extend professional courtesies. This Court would undermine those policies if it were to permit Defendant to now argue that DIRECTV's motion should be considered untimely. Further, during a November 15, 2004 teleconference with Judge Hughes, DIRECTV raised its' position that the Counterclaim was frivolous and was granted permission to seek attorneys' fees should Sobel not withdraw the motion. Judge Hughes November 18, 2004 Order permitted DIRECTV to move to dismiss and seek fees and costs at any time. As discussed above, Judge Hughes had the authority to enter the November 18, 2004 Scheduling Order. Moreover, Defendant never asserted that a motion to dismiss filed by DIRECTV should be considered untimely nor did he contest the contents of Judge Hughes' November 15 Order. As such, Defendant is precluded by the doctrine of laches from now arguing that the motion is untimely. Therefore, this Court concludes that DIRECTV's motion was timely filed.

In light of these facts and this Court's determination that the Counterclaim is entirely without merit, the Court holds that DIRECTV is entitled to the attorneys' fees and costs incurred in addressing the Counterclaim. DIRECTV placed Sobel on notice two times-via its November 3, 2004 letter and during the November 15, 2004 teleconference with Judge Hughes-that it believed his claims to be patently frivolous. The letter pointed Sobel to Judge Hayden's decision in *Pepe* which pointedly concluded that the identical counterclaim could not be sustained under the Consumer Fraud Act because there was no consumer transaction.[FN6] Further, Sobel's decision to voluntary withdraw similar or identical counterclaims in fourteen (14) other DIRECTV actions is circumstantial evidence that Sobel understands that the Counterclaim has no basis in law or in fact. Further, as discussed above, this Court already determined that DIRECTV's claims had merit when it denied Defendant's motion to dismiss. That holding is clearly inapposite to the success of the Counterclaim. Accordingly, the Court concludes that it is appropriate to award DIRECTV the attorneys' fees incurred in association with this motion.

> FN6. For the reasons discussed in Section II.B., this Court finds the reasoning in *Pepe* to be sound. As discussed *infra,* in its' November 3 letter, DIRECTV cautioned Sobel that it believed the Counterclaim was frivolous and cited to *Pepe.* The Court considers this to be circumstantial evidence that Sobel was aware that the Counterclaim was frivolous yet chose not to withdraw it.

*5 DIRECTV requests fees in the amount of $1,343.00, which allegedly represents 7.9 hours of associate time at the rate of $170.00 per hour.[FN7] *See* DIRECTV Reply Brief. However, DIRECTV has failed to submit an appropriate affidavit of services comporting with Local Civil Rule 54.1. Without an affidavit of services, this Court is unable to determine whether this amount is reasonable

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1367232 (D.N.J.)
**(Cite as: 2005 WL 1367232 (D.N.J.))**

and justified under the circumstances. Accordingly, DIRECTV is directed to submit an appropriate affidavit of services within thirty (30) days of the entry of the Order accompanying this Memorandum Opinion.

> FN7. Counsel for DIRECTV, David A. Cohen, Esq. ("Cohen"), represents in the reply brief that "[he] has[s] not sought reimbursement for any of [his] time reviewing the motion or in preparation for drafting and filing this reply." Instead, DIRECTV only seeks $1,343.00, representing the associate time spent on the matter. As discussed above, this Court will consider whether this amount is warranted upon DIRECTV's timely submission of an affidavit of services comporting with Local Civ. R. 54.1. This Court will not entertain any request for fees or costs above $1,343.00.

### III. CONCLUSION

For the foregoing reasons, DIRECTV's motion to dismiss is granted. Further, the Court finds that DIRECTV is entitled to the reasonable attorneys' fees expended preparing this motion. DIRECTV is directed to submit an appropriate affidavit of services comporting with Local Civil Rule 54.1 within thirty (30) days of the entry of the Order accompanying this Memorandum Opinion. An appropriate form of Order is filed herewith.

D.N.J.,2005.
Directv, Inc. v. Marino
Not Reported in F.Supp.2d, 2005 WL 1367232 (D.N.J.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Not Reported in F.Supp.2d, 2006 WL 2358574 (D.N.J.)
(Cite as: 2006 WL 2358574 (D.N.J.))

☞
Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
Miguel GIL, Plaintiff,
v.
RELATED MANAGEMENT COMPANY, Manuel
Risueno, Sabrin Basile, Defendants.
**Civ. No. 06-2174 (WHW).**

Aug. 14, 2006.

Emanuel S. Fish, Counselor at Law, Maplewood,
NJ, for Plaintiff.

Robert N. Holtzman, Kramer Levin Naftalis &
Frankel LLP, New York, NY, for Defendants.

**OPINION**

WALLS, Senior District Judge.

*1 Plaintiff Miguel Gil ("plaintiff") moves to re-
mand this matter to the Superior Court of New Jer-
sey, Essex County Law Division. Defendants Re-
lated Management Company, L.P. ("Related"),
Manuel Risueno, and Sabrin Basile (collectively
"defendants") move to dismiss plaintiff's complaint
for failure to state a claim upon which relief can be
granted. The motions are decided without oral argu-
ment pursuant to Fed.R.Civ.P. 78. Plaintiff's motion
to remand is denied and defendants' motion to dis-
miss is granted.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff, a resident of New Jersey, was employed
by Related (improperly named in the complaint as
Related Management Co.) as a management techni-
cian from April 1995 until his termination on Feb-

ruary 28, 2006. Throughout plaintiff's employment,
Related maintained an employment manual that
provided that the company could issue written
warnings to employees or place employees on pro-
bation if an employee failed to meet certain per-
formance standards.

On April 13, 2006, plaintiff filed a complaint
against Related in state court alleging wrongful ter-
mination. In count one, plaintiff alleged that Re-
lated's employment manual created a contract of
employment, which plaintiff relied upon. In count
two, plaintiff alleged that his termination was in
breach of the employment manual and the implied
contract of employment.

On May 1, 2006, plaintiff amended his complaint,
naming as additional defendants Manuel Risueno
("Risueno"), plaintiff's direct supervisor, and Sab-
rin Basile ("Basile"), Related's district manager.
Plaintiff restated his claims of breach of contract
and breach of implied contract of employment
against all defendants, and added a third count
against all defendants alleging that plaintiff's ter-
mination was in breach of the covenant of good
faith and fair dealing related to the implied contract
of employment arising from the employment manu-
al. Defendants Risueno and Basile are residents of
New Jersey.

On May 12, 2006, Related filed a Notice of Remov-
al, pursuant to 28 U.S.C. §§ 1332 and 1441.[FN1] On
May 24, 2006, plaintiff moved to remand, arguing
that the amended complaint filed on May 1, 2006,
which named Basile and Risueno in addition to Re-
lated, destroyed diversity of citizenship. Defendants
oppose plaintiff's motion and maintain that Basile
and Risueno do not prevent removal based on the
doctrine of fraudulent joinder. In addition, on May
18, 2006, Related filed a motion to dismiss for fail-
ure to state a claim upon which relief can be gran-
ted. Basile and Risueno joined the motion to dis-
miss on July 17, 2006.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2358574 (D.N.J.)
**(Cite as: 2006 WL 2358574 (D.N.J.))**

FN1. Although plaintiff contends in his motion to remand that (1) he advised Related's counsel on April 21, 2006 of his intent to file an amended complaint; and (2) on three separate occasions he informed Related that an amended complaint was filed, (Pl. Br. at 3-4), Related notes it was never served with a copy of the amended complaint prior to removal. (Def. Opp'n Br. at 6).

STANDARD OF REVIEW

**A. Motion to Remand**

A defendant may remove a case based on diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441. The District Court has original jurisdiction over matters between citizens of different states when the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(1). When a defendant removes a case from state court based on diversity jurisdiction, it must prove complete diversity: namely that "none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought ." 28 U.S.C. § 1441(b). For removal to be valid, diversity of citizenship must exist at the time the notice of removal is filed. *In re Briscoe,* 448 F.3d 201, 217 (3d Cir.2006); *Steel Valley Author. v. Union Switch & Signal* Div., 809 F.2d 1006, 1010 (3d Cir .1987), *cert. dismissed,* 484 U.S. 1021 (1988).

**\*2** On a motion to remand, "removal statutes 'are to be strictly construed against removal and all doubts should be resolved in favor of remand.' " *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851 (3d Cir.1992) (quoting *Steel Valley,* 809 F.2d at 1012 n. 6). This Court must accept as true all factual allegations of the complaint, and must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff. *Batoff,* 977 F.2d at 851-52.

While it is true that removal is invalid when the de-

fendant fails to prove complete diversity, 28 U.S.C. § 1441(b), the Third Circuit has noted an exception to this rule in the form of fraudulent joinder. The doctrine of fraudulent joinder, which does not prevent the removal of non-diverse parties, is applied "where there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment." *Boyer v. Snap-On-Tools Corp.,* 913 F.2d 108, 111 (3d Cir.1990) (quoting *Abels v. State Farm Fire & Cas. Co.,* 770 F.2d 26, 32 (3d Cir.1985), *appeal after remand,* 694 F.Supp. 140 (1988)), *cert. denied,* 498 U.S. 1085 (1991). "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Boyer,* 913 F.2d at 111 (quoting *Coker v.. Amoco Oil* Co., 709 F.2d 1433, 1440-41 (11th Cir.1983)). In sum, joinder is fraudulent where a plaintiff commits outright fraud in the pleadings of jurisdictional facts or the action against defendants is defective as a matter of law. *See Boyer,* 913 F.2d at 111-12 (holding that the court may not decide fraudulent joinder on the merits). Here, there is no allegation that plaintiff committed fraud, only that his joinder of Basile and Risueno has no merit under New Jersey law.

**B. Motion to Dismiss**

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2358574 (D.N.J.)
**(Cite as: 2006 WL 2358574 (D.N.J.))**

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. *See Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. *See* Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *See Sentinel Trust Co. v. Universal Bonding Ins. Co.,* 316 F.3d 213, 216 (3d Cir.2003); *see also* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed.1990). "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' " *Mele v. Federal Reserve Bank of N.Y.,* 359 F.3d 251, 255 n. 5 (3d Cir.2004) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)).

## DISCUSSION

**A. Motion to Remand**

**\*3** Before Related filed its notice of removal on May 12, 2006, plaintiff filed a First Amended Complaint on May 1, 2006 naming Risueno and Basile as individual defendants, and now seeks remand based on the fact that Risueno and Basile defeat diversity jurisdiction. Defendants challenge the motion to remand, arguing that there is no reasonable basis in fact or colorable ground supporting the claim against either Risueno or Basile. In other words, because plaintiff failed to allege a viable cause of action against Risueno or Basile, their joinder was fraudulent.

Plaintiff claims that Risueno and Basile wrongfully terminated his employment by not following the employment manual. He asserts that they violated both an express and implied contract of employment, and breached the covenant of good faith and fair dealing.

In order to allege a breach of contract claim, plaintiff must establish that a valid contract existed between the plaintiff and defendant. *See Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,* 275 F.Supp.2d 543, 566 (3d Cir.2003) (holding that "to prevail on its breach of contract claim, defendant must prove ... a valid contract existed between plaintiff and defendant"); *Washington v. Cooper Hosp./Univ. Med. Ctr.,* No. 03-5791, 2005 WL 3299006, at \*10 (D.N.J.2005) (finding that "[t]o state a valid breach of contract claim, plaintiff must establish that (1) a valid contract existed between the plaintiff and defendant"); *Nat'l Util. Serv., Inc. v. Chesapeake Corp.,* 45 F.Supp.2d 438, 448 (D.N.J.1999) (stating that "[t]o succeed on the motion for summary judgement on its breach of contract claim, [plaintiff] must prove that it had a valid and binding contractual relationship with [defendants] ").

"Generally, of course, an agent of a disclosed principal, even one who negotiates and signs a contract for her principal, does not become a party to the contract." *Bel-Ray Co., Inc. v. Chemrite Ltd.,* 181 F.3d 435, 445 (3d Cir.1999) (citing *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503 (3d Cir.1994), *rehearing en banc denied,* 29 F.3d 111 (3d Cir.1994), *aff'd,* 514 U.S. 938 (1995)). Here, the only express or implied contract at issue is Related's employment manual, and this manual does not create a contractual relationship between plaintiff and Risueno or Basile. *See Monaco v. Am. Gen. Assur. Co.,* 359 F.3d 296, 308 (3d Cir.2004) (finding that "[i]n certain circumstances, a company's employment manual contractually can bind *the company"*) (emphasis added), *cert. denied,* 543 U.S. 814 (2004); *see also Witkowski v. Thomas J. Lipton, Inc.,* 136 N.J. 385, 398 (1994) (stating that "if a plaintiff can prove that an employment manual

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2358574 (D.N.J.)
**(Cite as: 2006 WL 2358574 (D.N.J.))**

... could reasonably be understood by an employee to create binding duties and obligations between *the employer* and its employees, the manual will constitute, in effect, a unilateral offer to contract") (emphasis added). Plaintiff alleges in his amended complaint that *"defendant Related Management had in effect an employment manual ... which created a contract of employment with plaintiff."* (emphasis added) (Am.Compl.¶ 6.) It is clear that the alleged contract existed between the company defendant and plaintiff, not between plaintiff and his superiors. *See Galbraith v. Lenape Regional High School Dist.,* 964 F.Supp. 889, 897 n. 4 (D.N.J.1997) (finding that there is no contractual relationship between plaintiff and a supervisor); *see also Nicholas v. Pa. St. Univ.,* 227 F.3d 133, 145 (3d Cir.2000) (holding that, under Pennsylvania law, a supervisor cannot be liable for a breach of contract when there is no contractual relationship between the plaintiff and supervisor). Because no contractual relationship did exist between plaintiff and the individual defendants Risueno and Basile, the claims against them for breach of express and implied contract are defective as a matter of law.

**\*4** Furthermore, in order for plaintiff to bring a valid cause of action for a breach of the covenant of good faith and fair dealing against the individual defendants, there must be a contractual relationship between the individual defendants and the plaintiff. *See Schlichtig v. Inacome Corp.,* 271 F.Supp.2d 597, 606-07 (D .N.J.2003) (holding that "because the Court has concluded that the terms of this employee manual could not have given rise to an implied contract of employment, it necessarily follows that the manual's provisions do not contain an implied covenant of good faith"); *Asen v. Cooper Hosp./Univ. Med. Ctr.,* No. 95-869, 1996 WL 347451, at *11 (D.N.J. June 7, 1996) ("[i]n the absence of an employment contract, 'there can be no breach of an implied covenant of good faith and fair dealing.' ") (citation omitted). Because no contract exists between plaintiff and either Basile or Risueno, the claim for breach of the implied covenant is likewise defective.

When there is plainly no valid cause of action against nondiverse defendants, courts in this circuit and without have denied remand based on fraudulent joinder. *See In re Briscoe,* 448 F.3d at 219 (upholding the District Court's decision that the doctrine of fraudulent joinder prevented plaintiff's joinder of defendants because no colorable claims existed against those joined after the relevant statute of limitations period expired); *Baer v. Hartford Mut. Ins. Co.,* No. 05-1346, 2005 WL 3054354, at *10 (E.D.Pa.2005) (finding joinder to be fraudulent when the court invalidated the only viable cause of action against the joined party); *see also Rodriguez v. Sabatino,* 120 F.3d 589, 592 (5th Cir.1997), *cert. denied,* 523 U.S. 1072 (1998) (finding that a defendant was fraudulently joined because the complaint stated no legal cause of action against him); *Lobato v. Pay Less Drug Stores, Inc.,* 261 F .2d 406, 409 (10th Cir.1958) (upholding the trial court's conclusion that certain defendants were fraudulently joined because there was no basis for the cause of action against them).

Because the employee manual does not create a contractual relationship between plaintiff and individual defendants, the Court finds that joinder was fraudulent and plaintiff's motion to remand is denied.[FN2]

> FN2. In both their opposition to remand and motion to dismiss, defendants request an award of costs and disbursements, including reasonable attorneys fees. The awarding of fees in a removal action is at the discretion of the Court. *See Mints v. Educ. Testing Serv.,* 99 F.3d 1253, 1260 (3d Cir.1996) (holding that "a district court has broad discretion and may be flexible in determining whether to require the payment of fees"). The Court finds no reason to award attorney fees absent an allegation that plaintiff personally committed fraud.

**B. Motion to Dismiss**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2358574 (D.N.J.)
**(Cite as: 2006 WL 2358574 (D.N.J.))**

1. Claims Against Related Management Company

Having determined that remand is not warranted and retaining jurisdiction over the matter, the Court turns now to defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim. While the New Jersey Supreme Court has recognized that employee handbooks may be contractually enforceable, *Woolley v. Hoffmann-LaRoche, Inc.,* 99 N.J. 284, 298 (1985), *modified on other grounds,* 101 N.J. 10 (1985), defendant asserts that no such implied contract exists because Related's employee handbook:

includes a clear and prominently placed disclaimer ... [providing] that: (i) nothing in the handbook shall be construed as an employment contract, (ii) all [Related] employees are employed at will, and (iii) [Related] may amend or terminate any of its policies in the handbook at any time, with or without notice.

*5 (Def. Br. at 2.) Based on this disclaimer language, defendant maintains that plaintiff's complaint must be dismissed as a matter of law.

Because the employee handbook is explicitly relied upon in plaintiff's complaint, the Court will consider the language of the entire handbook to decide whether, as a matter of law, plaintiff's complaint should be dismissed for failure to state a claim upon which relief can be granted. *See Mele,* 359 F.3d at 255 n. 5 (providing that a document relied on in a complaint may be considered in a motion to dismiss); *Nicosia v. Wakefern Food Corp.,* 136 N.J. 401, 410-11 (1994) (finding that if an employee seeks to rely on the provisions in an employee handbook as the source of a contract of employment, he or she must accept the agreement as a whole).

The New Jersey Supreme Court has held:

The basic test for determining whether a contract of employment can be implied turns on the reasonable expectations of employees. A number of factors

bear on whether an employee may reasonably understand that an employment manual is intended to provide enforceable employment obligations, including the definiteness and comprehensiveness of the termination policy and the context of the manual's preparation and distribution.

*Witkowski,* 643 A.2d at 550. "The test, therefore, asks whether the relevant manual is written in such 'definite and comprehensive' language to create in an employee's mind a reasonable expectation of enforceable rights." *Normand v. Goodyear Tire & Rubber Co.,* 2005 WL 1657032, *4 (D.N.J.2005). However, "[e]ven if the 'definiteness and comprehensiveness' of the termination policies are sufficient to create contractual expectations, the employer may still overcome the implied contract by including a 'clear and prominent disclaimer.'" *Id.* (citation omitted). The Court finds that the language of the disclaimer in Related's employee handbook is clear and located in a prominent place to overcome plaintiff's allegation that the handbook establishes a contractual relationship between Related and plaintiff.

A. The Language of the Employee Handbook Is Clear

An adequate disclaimer in an employee manual "should state: (1) that there is no promise of any kind contained in the manual; (2) that regardless of the contents of the manual, the employer remains free to change all working conditions without consultation or agreement; and (3) that the employer retains the power to fire anyone with or without cause." *Washington,* 2005 WL 3299006, at *10 (citing *Nicosia,* 136 N.J. at 412). "An effective disclaimer must be expressed in language 'such that no one could reasonably have thought [the handbook] was intended to create legally binding obligations.'" *Nicosia,* 136 N.J. at 413 (citing *Woolley,* 99 N.J. at 299).

The disclaimer in Related's employment handbook clearly states that the handbook does not create a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2358574 (D.N.J.)
**(Cite as: 2006 WL 2358574 (D.N.J.))**

legally binding obligation: "[n]othing in this hand-book shall be construed as a contract of employ-ment." *(See* Affidavit of Sherry L. Scurfield ("Scurfield Aff."), Ex. 2.) Additionally, the dis-claimer satisfies the three part test that has emerged to determine the adequacy of an employer's dis-claimer. First, it makes clear that Related did not include any "promises" within the handbook: "[i]f there are any differences between this handbook and Company procedure or benefits booklets and documents, the procedure or booklets or documents prevail." *Id.* The disclaimer also provides that Re-lated maintains the ability to change any conditions without consultation: "[t]he Company continually reviews its personnel policies and employee bene-fits and reserved the right to modify, supplement, amend or terminate any of the policies and benefits described in this handbook at any time, with or without notice." *Id.* Finally, Related retains the power to fire an employee without cause by includ-ing in the disclaimer the statement: "[t]he employ-ment of all Company employees is 'at will.' This means that both the Company and the employee have the right to terminate employment at any time, with or without notice, with or without cause." *Id.*

**\*6** Plaintiff challenges the adequacy of Related's disclaimer by comparing it to that in *Nicosia,* where the New Jersey Supreme Court found that a dis-claimer contained "confusing legalese" that did not satisfy the *Woolley* "clear and prominent" standard. *Nicosia,* 136 N.J. at 414-15. However, the *Nicosia* court cited, as an example of straightforward lan-guage, a disclaimer that expressly advises employ-ees that he or she is subject to discharge at will-a disclaimer that was lacking in that case. *Id.* at 560. Here, Related's disclaimer specifically provides that each employee is an "at will" employee, and the language of the disclaimer as a whole mirrors the straightforward language in disclaimers that this Court has previously determined did not create a legally binding obligation. *See iNormand,* 2005 WL 1657032, at \*6 (holding that a disclaimer which stated that the employee manual is "not intended to create nor to be construed to constitute a contract or

implied contract of continued employment or future employment" was sufficiently clear to remove any contractual obligations of the employer); *Warner v. Federal Express Corp.,* 174 F.Supp.2d 215, 226-27 (D.N.J.2001) (finding that an employment hand-book which stated that "[t]hese benefits and policies in no way constitute an employment con-tract" was sufficiently clear for an employee to know that the handbook did not provide any con-tractual rights).

In further support of his claim that an implied con-tract existed based on the employee manual, plaintiff notes a New Jersey appellate court de-cision that a disclaimer did not negate the intent to create a contractual right or obligation because the court determined that a company memorandum cre-ated "an enforceable commitment ... that the com-pany [would] endeavor (impliedly in good faith) to avoid termination." *Geldreich v. American Cyan-amid Co.,* 299 N.J.Super. 478, 485-86 (1997). The *Geldreich* court held that the "unqualified require-ments" of employee termination procedure in the memorandum, combined with the fact that the dis-claimer was located in a separate policy manual and provided only a general statement that company memoranda were "not intended to create a contrac-tual right," caused the disclaimer to fall "short of passing muster under *Woolley.*" *Id.* at 484-86. That case is distinguishable. Here, the disclaimer is loc-ated in the same document as the termination provi-sions. Also, Related's disclaimer directly qualifies the termination procedures of employees, stating that "the Company and the employee have the right to terminate employment at any time, with or without notice, with or without cause." (Scurfield Aff., Ex. 2.) Unlike *Geldreich,* the language of Re-lated's disclaimer does pass muster under *Woolley.*

Based on the clear disclaimer language, no employ-ee would have reasonably thought that the hand-book was intended to create a legally binding oblig-ation.

B. The Disclaimer Is In A Prominent Location

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2358574 (D.N.J.)
**(Cite as: 2006 WL 2358574 (D.N.J.))**

Within the Employee Handbook

**\*7** While the "prominence" requirement can be met in many ways, the general rule is that "a disclaimer must be separated from or set off in a way to attract attention." *Nicosia,* 136 N.J. at 415. "However, 'no single distinctive feature is essential *per se* to make a disclaimer conspicuous,' as courts recognize that a variety of different settings can be used to grab the attention of the reader." *Normand,* 2005 WL 1657032, at \*6 (quoting *Nicosia,* 136 N.J. at 416). The prominence requirement is satisfied if a reasonable employee would have noticed and read the disclaimer. *Nicosia,* 136 N.J. at 416.

Related's disclaimer is located within a bordered section of the first page of the table of contents, with the title, "Non-Contract Disclaimer," printed in bold and capitalized letters. (Scurfield Aff., Ex. 2.) Notwithstanding the prominence of the disclaimer, plaintiff cites *Jackson v. Georgia-Pacific Corp.,* 296 N.J.Super. 1 (App.Div.1996), to support the proposition that, as a matter of law, the disclaimer is not in a prominent location because it appears only in the table of contents of the employee handbook and not in the termination section. (Pl. Opp'n Br. at 8.) However, the *Jackson* court merely found that placement of the disclaimer within the termination section would lend further support for the conclusion that the disclaimer was prominently displayed; it did not make such placement a requirement. *Jackson,* 296 N.J.Super. at 15. This Court has found that a disclaimer, offset by a border and written in bold type, is prominently displayed when located at the beginning of an employee handbook. *See Washington,* 2005 WL 3299006, at \*11 (finding that a disclaimer that "physically appears in the 'Introduction' section and is set off in bold type and surrounded by a border" was prominently displayed); *Normand,* 2005 WL 1657032, at \*6 (holding that a reasonable employee would have noticed and read a disclaimer located in the first paragraph of the first page of the employment manual). The Court now holds that Related's disclaimer satisfies the prominence requirement.

Because the disclaimer satisfies the clarity and prominence requirements outlined in *Woolley,* the Court determines that Related's employee handbook did not create a contractual relationship between Related and plaintiff and plaintiff's Counts I and II of his Amended Complaint are therefore dismissed as to Related..

C. Nowhere In the Amended Complaint Did Plaintiff Allege Violation of an Oral Agreement

Plaintiff also relies on *Shebar v. Sanyo Bus. Systems Corp.,* 218 N.J.Super. 111 (App.Div.1987), aff'd, 111 N.J. 276 (1988) and *Gilbert v. Durand Glass Mfg. Co., Inc.,* 258 N.J.Super. 320 (App.Div.1992) to argue that "a written policy simply need not exist, if the employer has created a progressive discipline and just cause policy based on oral representations and actual cause policy based on oral representations and actual practice." (Pl. Opp'n Br. at 9.) However, nowhere in his amended complaint does plaintiff allege that Related created a contractual relationship with him based on "a progressive discipline and just cause policy based on oral representations" or "an actual cause policy based on oral representations and actual practice."

**\*8** Even if plaintiff had asserted these allegations in his complaint, *Shebar* and *Gilbert* do not support his contention that Related's termination policies based on oral representations constituted a contractual obligation. As the *Gilbert* court noted, "[t]he Supreme Court's holding in *Shebar* is ... not dispositive here, since plaintiff never alleged that [the employer] made a specific, individual oral agreement with [plaintiff] setting forth the conditions of termination." 258 N.J.Super. at 328. While the court in *Gilbert* recognized that an oral representation can contractually bind an employer and employee if the "employee reasonably believes that a particular personnel policy has been established and is applied consistently and uniformly to each employee," 258 N.J.Super. at 329, that court further noted that:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2358574 (D.N.J.)
**(Cite as: 2006 WL 2358574 (D.N.J.))**

there are simple ways for the employer to put to rest any ambiguity concerning whether there exists a company policy of giving notice prior to termination. All that need be done is the dissemination among the employees of an appropriate and prominent written disclaimer that any such termination policy exists.

*Id.* at 521 (citing *Woolley,* 99 N.J. at 309). As discussed, Related maintained a prominent and valid disclaimer such that plaintiff's claims of oral representations are mooted.

D. There Is No Valid Claim for Breach of the Covenant of Good Faith and Fair Dealing

To assert a valid claim for a breach of the covenant of good faith and fair dealing against Related, there must be a contractual relationship between Related and the plaintiff. *See Schlichtig,* 271 F.Supp.2d at 606-07 (holding that "because the Court has concluded that the terms of this employee manual could not have given rise to an implied contract of employment, it necessarily follows that the manual's provisions do not contain an implied covenant of good faith"); *Asen v. Cooper Hosp./Univ. Med. Ctr.,* No. 95-869, 1996 WL 347451, at *11 (D.N.J. June 7, 1996) ("[i]n the absence of an employment contract, 'there can be no breach of an implied covenant of good faith and fair dealing.' ") (citation omitted). Because no contract exists between Related and plaintiff, Count III for breach of the implied covenant against Related is dismissed.

2. Claims Against Manuel Risueno and Sabrin Basile

As evidenced by plaintiff's amended complaint, the only allegation of the existence of an express or implied contract stems from Related's employment manual. As discussed, the manual does not create a contractual relationship between plaintiff and Risueno or Basile. *See Monaco,* 359 F.3d at 308 (3d Cir.2004) (finding that "[i]n certain circumstances, a company's employment manual contractually can

bind *the company")* (emphasis added); *see also Witkowski,* 643 A.2d at 553 (stating "if a plaintiff can prove that an employment manual ... could reasonably be understood by an employee to create binding duties and obligations between *the employer* and its employees, the manual will constitute, in effect, a unilateral offer to contract") (emphasis added).

*\*9* This Court has dismissed contract claims asserted by employees against individual supervisors. *See Galbraith v. Lenape Regional High School Dist.,* 964 F.Supp. 889, 897 n. 4 (D.N.J.1997) (finding that there is no contractual relationship between plaintiff and a supervisor); *see also Nicholas v. Pa. St. Univ.,* 227 F.3d 133, 145 (3d Cir.2000) (holding that under Pennsylvania law, a supervisor cannot be liable for a breach of contract when there is no contractual relationship between the plaintiff and supervisor). Because no contractual relationship exists between plaintiff and the individual defendants Risueno and Basile, the claims against them for breach of express and implied contract (Counts I and II) are dismissed.

The claim for a breach of the covenant of good faith and fair dealing against Risueno and Basile also fails. *See Schlichtig,* 271 F.Supp.2d at 606-07 (finding that because "the terms of this employee manual could not have given rise to an implied contract of employment, it necessarily follows that the manual's provisions do not contain an implied covenant of good faith"). Because no contract exists between plaintiff and either Basile or Risueno, the claim against them for breach of the implied covenant (Count III) is dismissed.

CONCLUSION

Plaintiff's motion to remand is DENIED and defendants' motion to dismiss is GRANTED.

D.N.J.,2006.
Gil v. Related Management Co.
Not Reported in F.Supp.2d, 2006 WL 2358574

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2358574 (D.N.J.)
**(Cite as: 2006 WL 2358574 (D.N.J.))**

(D.N.J.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Not Reported in A.2d, 2005 WL 4127090 (N.J.Super.A.D.)
(Cite as: 2005 WL 4127090 (N.J.Super.A.D.))

☞
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.
Naomi R. HENDERSON, individually and on be-
half of all others similarly situated, Plaintiff-Ap-
pellant,
v.
The HERTZ CORPORATION, Defendant-Re-
spondent.
Argued Feb. 28, 2005.
Decided June 22, 2006.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, L-6937-03.
Bruce D. Greenberg argued the cause for appellant
(Lite, DePalma, Greenberg & Rivas, attorneys; Mr.
Greenberg on the brief, and Joseph N. Kravec, Jr.
(Specter, Specter, Evans & Manogue), of the
Pennsylvania bar, admitted pro hac vice, of counsel
and on the brief).

Alan E. Kraus argued the cause for respondent
(Latham & Watkins, attorneys; Lisa Ann T. Rug-
giero and Mr. Kraus, on the brief).

Before Judges A.A. RODRÍGUEZ, CUFF and
HOENS.

PER CURIAM.

**\*1** Plaintiff Naomi Henderson appeals from the
January 29, 2004 order of the Law Division grant-
ing the motion of defendant, The Hertz Corporation
("Hertz"), to dismiss her complaint for failure to
state a claim upon which relief may be granted. We
affirm.

For purposes of our review and in light of the pro-

cedural posture of this appeal, we accept as true the
facts set forth in plaintiff's complaint. Hertz is a na-
tional car rental company with its headquarters in
New Jersey. At all times relevant to this appeal,
Hertz not only rented vehicles to customers, but
also offered for sale three different varieties of in-
surance which could be purchased along with the
cars being rented. More particularly, defendant
offered third-party insurance known as Liability In-
surance Supplement (LIS), first-party insurance
coverage known as Personal Accident Insurance
(PAI), and personal property or damage insurance
referred to as Personal Effects Coverage (PEC).
Each type of insurance coverage was underwritten
by independent insurance companies and only made
available for sale by Hertz.

According to the complaint, plaintiff rented a car
from Hertz at Newark Airport on January 12, 1998.
In connection with that rental, she purchased LIS
coverage but chose not to purchase PAI or PEC
coverage. She returned the rental car without incid-
ent, never having had to make a claim against the
LIS coverage. Plaintiff further alleges that at vari-
ous times between April 1988 and August 2003,
she rented cars from Hertz in states other than New
Jersey and that she purchased one or more of the in-
surance products in connection with each of those
other rentals. She concedes she never filed any
claims under the coverages provided by any of the
insurance products she purchased.

Plaintiff filed her complaint seeking to sue indi-
vidually and as the representative of a class of indi-
viduals who both rented vehicles from Hertz and
purchased one or more of the insurance products
from Hertz during the period from April 1988
through August 2003. The complaint alleges that
Hertz misrepresented, concealed or failed to dis-
close to plaintiff and the other members of the class
that it was not licensed or registered to sell the in-
surance products that she and the class members
purchased. She asserts that she and other members
of the class are therefore entitled to damages from

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 4127090 (N.J.Super.A.D.)
**(Cite as: 2005 WL 4127090 (N.J.Super.A.D.))**

defendant based upon six separate causes of action, namely, a violation of the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8-1 to -20, common law fraud, illegal contract subject to rescission, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation and unjust enrichment.

Defendant filed a motion to dismiss the complaint for failure to state a claim, *see R.* 4:6-2(e), in lieu of answering the complaint. That motion, in summary, asserted that plaintiff's complaint failed to state a claim because it essentially sought to create a private right of action arising from a licensing requirement, which could only be enforced by the Commissioner of the Department of Banking and Insurance ("the Commissioner"), because it sought to rescind a fully executed contract and because plaintiff could not demonstrate that she had suffered an ascertainable loss as required by the Consumer Fraud Act. On January 29, 2004, Judge Bernstein granted the Hertz motion, separately addressing the sufficiency of each of the complaint's causes of action as a part of his oral decision.

**\*2** On appeal, plaintiff asserts that Judge Bernstein erred in dismissing the complaint for failure to state a claim. She argues that the complaint states a cause of action, cognizable within the Consumer Fraud Act, which is parallel to, but not coextensive with, the remedies that are available to the Department of Banking and Insurance to enforce the applicable insurance licensing statutes. In addition, she asserts that because she purchased a product that Hertz was not lawfully entitled to sell to her and which Hertz lacked the appropriate license to sell, she has suffered an ascertainable loss. In the alternative, she urges us to find that the factual allegations support relief based on her other causes of action. We disagree and we affirm.

We begin our analysis with an explanation of the relevant statutory and regulatory scheme governing insurance products and with an examination of the required elements of the Consumer Fraud Act. Since April 1988, the New Jersey Insurance Producer Licensing Act (IPLA), *N.J.S.A.* 17:22A-1 to -25, has required that an entity or person must be licensed in order to offer insurance for sale or receive a fee, commission or compensation for sales of insurance. *N.J.S.A.* 17:22A-3. Effective August 15, 2001, the Legislature repealed that statute, but replaced it with a revised enactment. *See* New Jersey Insurance Producer Licensing Act of 2001 (IPLA(2001)), *N.J.S.A.* 17:22A-26 to -48. The relevant language of the statute currently in force is similar to the requirements under IPLA.

As currently in force, IPLA(2001) provides that a "person shall not sell, solicit or negotiate insurance in this State unless the person is licensed for that line of authority in accordance with this act." *N.J.S.A.* 17:22A-29. In addition, IPLA(2001) specifically defines "person" to include both individuals and business entities. *Id.* at -28. Both IPLA and IPLA(2001) vest the Commissioner with authority for both issuance of licenses to sell insurance and enforcement of compliance with the statutes. *See* IPLA, *N.J.S.A.* 17:22A-4, -20; IPLA(2001), *N.J.S.A.* 17:22A-32, -33, -45.

Pursuant to IPLA, the Department of Banking and Insurance ("the Department") adopted regulations which plaintiff asserts require car rental companies, like Hertz, to register as limited insurance representatives for purposes of sales of insurance, such as the coverages Hertz offered. *See* 20 *N.J.R.* 904, 906-07, 909-10 (April 18, 1988). The regulations accomplish this result by defining car rental companies as sellers of "ticket insurance," *N.J.A.C.* 11:17-1.2, and by requiring sellers of ticket insurance to register in accordance with the Act. *N.J.A.C.* 11:17-2.2(a)(9)(iii). According to the complaint, Hertz did not register as required by IPLA or IPLA(2001) and therefore was not licensed to offer the insurance products that it made available in connection with its car rentals to plaintiff and the other class members from 1988 through 2003.[FN1]

> FN1. Hertz does not concede that these regulations apply to its sales of these products. Rather, it asserts that the scope

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 4127090 (N.J.Super.A.D.)
**(Cite as: 2005 WL 4127090 (N.J.Super.A.D.))**

of the regulations is more narrow than plaintiff's complaint alleges. For purposes of this appeal, and in light of its procedural context, we accept plaintiff's assertions about the applicability of these regulations as true.

**\*3** Plaintiff concedes that our Supreme Court has concluded that there is no private right of action under IPLA. *See Lemelledo v. Beneficial Management Corp. of Am.,* 150 *N.J.* 255, 272 (1997). She concedes that IPLA's licensing requirements can only be enforced by the Department, which it accomplishes through the imposition of fines and penalties. *Ibid.* She does not suggest that the analysis of the similar statutory scheme enacted by IPLA(2001) would yield a contrary result. She asserts, however, that the claims she has raised are cognizable causes of action within the Consumer Fraud Act, or sounding in common law fraud, illegal contract, breach of the covenant of good faith and fair dealing, negligence or unjust enrichment.

The Law Division judge found these arguments unconvincing. Addressing the first count of the complaint, in which plaintiff asserted that the contract for sale of the insurance products was illegal and subject to the equitable remedy of rescission, the judge concluded that although the contract was illegal under IPLA, the statute did not make the contract unenforceable. Moreover, he concluded that because the contract had been fully performed and plaintiff had received the full benefit of the insurance coverage for which she paid, rescission was not available as a remedy. With respect to the counts of the complaint seeking relief pursuant to the Consumer Fraud Act or for common law fraud or misrepresentation, the judge noted that the sole basis for these allegations was Hertz's failure to register and become licensed. Because permitting that claim to proceed would be tantamount to asserting a private remedy under IPLA or IPLA(2001), he concluded it was barred. Furthermore, the judge found no other allegation in the complaint suggesting that Hertz misled plaintiff or that it engaged in

any other deceptive practice such as, for example, leading her to believe that the purchase of the coverage was anything other than an option, or overcharging her for the coverage. As a result, the judge concluded that the complaint did not assert any fraud-based claim apart from the one resting on the violation of IPLA. The judge also dismissed the count in the complaint for breach of the covenant of good faith and fair dealing, concluding that this implied contract theory was unsupported by any of the factual allegations. Finally, the motion judge concluded that there could be no claim for unjust enrichment because plaintiff had received the benefit of her bargain.

On appeal, plaintiff asserts that the judge erred in dismissing the complaint for failure to state a claim. More specifically, she asserts that the allegations in the complaint suffice to support a cause of action pursuant to the Consumer Fraud Act which is parallel to the remedies that are available to the Commissioner as enforcement mechanisms for IPLA or IPLA(2001). In addition, she asserts that she has identified an ascertainable loss, a critical element to the Consumer Fraud Act analysis, arguing that she was damaged by purchasing a product that defendant was not lawfully entitled to sell to her and that she would not have purchased had she been aware that defendant lacked the appropriate license. In the alternative, she asserts that the judge erred in his analysis of the sufficiency of her other claims. In particular, she argues that he failed to consider that Hertz, by failing to advise her that it was not licensed to sell the LIS, PAI and PEC products, committed common law fraud and breached the covenant of good faith and fair dealing. Finally, she argues that Hertz has been unjustly enriched by being permitted to profit from the sale of these products in violation of IPLA and IPLA(2001).

**\*4** A motion for failure to state a claim requires the judge to search the pleading in depth and with liberality in order to determine whether a cause of action is suggested. *Printing Mart-Morristown v. Sharp Electronics Corp.,* 116 *N.J.* 739, 746 (1989).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 4127090 (N.J.Super.A.D.)
**(Cite as: 2005 WL 4127090 (N.J.Super.A.D.))**

In addressing any motion to dismiss for failure to state a claim, the court must "accept as true all factual assertions in the complaint." *Smith v. SBC Communications, Inc.,* 178 *N.J.* 265, 268-69 (2004). Moreover, in doing so, every reasonable inference to be drawn from the factual assertions must be accorded to the plaintiff. *Id.* at 282. We have specifically considered the effect of such a motion in the context of a Consumer Fraud Act complaint. *See New Jersey Citizen Action v. Schering-Plough Corp.,* 367 *N.J.Super.* 8, 13 (App.Div.), *certif. denied,* 178 *N.J.* 249 (2003). In particular, we have commented that a motion for failure to state a claim in the context of the Consumer Fraud Act should be approached "with hesitation." *Id.* at 13 (citing *Seidenberg v. Summit Bank,* 348 *N.J.Super.* 243, 249-50 (App.Div.2002)(other citations omitted)).

However indulgently the court is required to view the sufficiency of factual allegations in evaluating a motion to dismiss for failure to state a claim, the motion judge must nevertheless grant the motion if the complaint fails to articulate a legally sufficient basis entitling plaintiff to relief. *See Camden County Energy Recovery Assocs., L.P. v. New Jersey Department of Environmental Protection,* 320 *N.J.Super.* 59, 64 (App.Div.1999), *aff'd o.b* . 170 *N.J.* 246 (2001). As we have recently held, "[a] motion to dismiss a complaint under *R.* 4:6-2(e) for failure to state a claim upon which relief can be granted must be evaluated in light of the legal sufficiency of the facts alleged in the complaint." *Donato v. Moldow,* 374 *N.J.Super.* 475, 482 (App.Div.2005). Although a plaintiff need not prove the truth of the factual allegations in response to a motion to dismiss for failure to state a claim, it is plaintiff's duty to demonstrate allegations "which, if proven, would constitute a valid cause of action." *Sickles v. Cabot Corp.,* 379 *N.J.Super.* 100, 106 (App.Div.)(quoting *Leon v. Rite Aid Corp.,* 340 *N.J.Super.* 462, 472 (App.Div.2001)), *certif. denied,* 185 *N.J.* 297 (2005). With these indulgent standards of review in mind, we turn to the specific complaint and the arguments of the appellant.

Although there are six separate counts in the complaint, the central focus of plaintiff's appeal, and therefore the focus of our analysis, is on the Consumer Fraud Act, *N.J.S.A.* 56:8-1 to -20, and the related claims sounding in common law fraud and misrepresentation. We begin, therefore, by observing that the Consumer Fraud Act gives citizens a cause of action under certain conditions. As our Supreme Court has held, in order to state a claim under the Consumer Fraud Act, a plaintiff must allege each of three elements: (1) unlawful conduct by a defendant; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between defendant's unlawful conduct and that ascertainable loss. *See Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 24 (1994). Based upon our review of the allegations in the complaint, we conclude, as did the motion judge, that plaintiff has failed to state a claim consistent with these necessary requirements of the Consumer Fraud Act. In particular, her claim falls short because she cannot demonstrate that the unauthorized sale of insurance products is "unlawful conduct" as that concept is embodied in the Consumer Fraud Act and because she cannot demonstrate that she has suffered an ascertainable loss because of Hertz's conduct.

**\*5** We first conclude that plaintiff has failed to allege facts that would support relief under the Consumer Fraud Act because the nature of the misrepresentation or deceptive practice on which she bases her claim, namely, the sale of a product which Hertz was not authorized by license to sell, is not a legally cognizable claim. That is to say, IPLA and IPLA(2001) make plain that enforcement of the licensing provisions relating to the sale of insurance products is for the Commissioner. *See In re Commissioner of Insurance's March 24, 1992 Order,* 256 *N.J.Super.* 158, 176 (App.Div.1992), *aff'd,* 132 *N.J.* 209 (1993)("Implied remedies are unlikely to be intended by a Legislature that enacts a comprehensive legislative scheme including an integrated system of procedures for enforcement"); *Mizrahi v. Allstate Ins. Co.,* 276 *N.J.Super.* 112, 118 (Law Div.1994)(IPLA "seeks to compel compliance with

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 4127090 (N.J.Super.A.D.)
**(Cite as: 2005 WL 4127090 (N.J.Super.A.D.))**

its licensing requirements by permitting the Commissioner to impose substantial fines ... and to refuse to issue or renew a license for any statutory violation"). Our Supreme Court has specifically held that IPLA does not create a private right of action or a private remedy for an individual who purchases an insurance product from an unlicensed insurer. *See Lemelledo, supra,* 150 *N.J.* at 272. Nothing in IPLA(2001) would support a different conclusion as it relates to that legislative scheme.

Viewed against these precedents, plaintiff's claim must fail as a matter of law. A review of the complaint reveals that the only acts or practices plaintiff alleges give rise to her cause of action are that Hertz sold insurance without a license, that Hertz was required to be licensed and that Hertz's sale of insurance was either illegal or against public policy. None of these acts, however, falls outside the scope of IPLA or IPLA(2001); none can be the basis for a private remedy under the Consumer Fraud Act. None, by extension, can support a private remedy through any other misrepresentation-based theory.

Even were plaintiff to contend, and her complaint does not, that defendant should have revealed to her that it was an unlicensed seller of ticket insurance and that she would not have purchased the products had she been aware of those facts, we would reach the same result. Because her factual assertions are, fundamentally, that Hertz violated IPLA or IPLA(2001) they cannot support relief under any of the theories in her complaint. It is significant to our analysis that plaintiff has defined the class of claimants to include only those who purchased insurance products from Hertz but who thereafter made no claims for coverage pursuant to those policies. She concedes that any Hertz customer who purchased one of the insurance products and who thereafter made a claim under those policies was compensated for their covered claims. That being the case, plaintiff has defined the class of persons she seeks to represent to include only those individuals who have no claim at all. That is to say, the very definition of the class demonstrates that the in-

surance Hertz sold was recognized as valid by the underwriters, notwithstanding the fact that Hertz had no license to sell it. By defining the class to exclude all individuals who purchased the insurance and made a claim for which they were compensated, plaintiff only asserts a cause of action which IPLA and IPLA(2001) have reserved to the Commissioner. In short, she seeks to create a private right of action to remedy the unlicensed sale.

**\*6** Nor does the holding of the Supreme Court in *Perez v. Rent-A-Center, Inc.,* 186 *N.J.* 188 (2006), or the analysis of the Law Division in *Artistic Lawn & Landscape Co. v. Smith,* 381 *N.J.Super.* 75 (Law Div.2005), both called to our attention by plaintiff while this matter was pending, *see R.* 2:6-11(d), support a different result. In *Perez,* the Court concluded that a claim amounting to a statutory violation could also form the basis for a Consumer Fraud Act claim. Its reasoning, however, rested on the conclusion that a rent-to-own contract was a retail installment contract, within the meaning of the Retail Installment Sales Act ("RISA"), *N.J.S.A.* 17:16C-1 to -61, and subject to that statute. Having reached that conclusion, the Court then relied on the rationale of *Lemelledo, supra,* 150 *N.J.* at 264-66, which had earlier concluded that a RISA violation could support a Consumer Fraud Act cause of action. *See Perez, supra,* 186 *N.J.* at 219-20.

The Court's reasoning in *Perez* does not undercut the Court's earlier conclusion in *Lemelledo* that an IPLA violation does not similarly give rise to a Consumer Fraud Act claim. *Lemelledo, supra,* 150 *N.J.* at 272. Indeed, the *Perez* Court pointed out that there is no suggestion that the remedy of the Consumer Fraud Act would conflict with the RISA enforcement scheme. In light of the fact that the Court in *Lemelledo* reached the contrary conclusion in its separate analysis of the relationship between the Consumer Fraud Act and IPLA, based on the latter's lack of a private remedy, we find nothing in *Perez* that supports plaintiff's assertions. Indeed,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 4127090 (N.J.Super.A.D.)
**(Cite as: 2005 WL 4127090 (N.J.Super.A.D.))**

the Court has not altered its conclusion that a conflict between the regulatory scheme and the asserted private remedy compels the latter to give way to the former.

Similarly, although the Law Division judge in *Artistic Lawn* concluded that a contractor who was not licensed to perform a lawn irrigation installation project could be subject to a Consumer Fraud Act claim, neither the court's analysis nor the statutory framework addressed in that decision supports a like conclusion here. Apart from the fact that the licensing framework addressed in *Artistic Lawn* is unlike IPLA or IPLA(2001), as the court there recognized, the full performance of the contract itself, regulations notwithstanding, might compel an alternate result. *See Artistic Lawn, supra,* 381 *N.J.Super.* at 87. Indeed, the Law Division judge in *Artistic Lawn* relied in part on our earlier expression of a similar concern, that is, the inherent unfairness of preventing a remedy to a contractor who has fully performed. *See Scibeck v. Longette,* 339 *N.J.Super.* 72, 82 (App.Div.2001). Even were we to conclude that plaintiff here had a potential private remedy, because Hertz fully performed, the concern we expressed in *Scibeck* would support the same conclusion here, precluding plaintiff from pursuing her claim. As we noted in *Scibeck,* plaintiff, having received the full benefit of the bargain of the insurance coverage that Hertz sold her, should not be permitted to "use the [Consumer Fraud] Act as a sword rather than a shield." *Ibid.* Having reviewed and considered each of these additional precedents cited for us by plaintiff, we discern no basis on which to conclude that the Law Division judge erred in deciding that she has failed to state a claim for relief pursuant to the Consumer Fraud Act.

**\*7** Alternatively, we would affirm the motion judge's decision because plaintiff has failed to set forth facts that suffice to meet the ascertainable loss requirement of the Consumer Fraud Act. We need not describe this requirement or the history of the development of our understanding of it, *see Wein-*

*berg v. Sprint Corp.,* 173 *N.J.* 233, 251 (2002); *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 *N.J.* 464, 473 (1988), at great length, particularly in light of the recent guidance from our Supreme Court about the meaning of the term. *See Thiedemann v. Mercedes-Benz U.S.A., LLC,* 183 *N.J.* 234, 238 (2005). In *Thiedemann,* the Court reiterated that summary judgment on a Consumer Fraud Act claim is appropriate if a "plaintiff fails to produce evidence from which a finder of fact could find or infer" that the plaintiff sustained an ascertainable loss. *Ibid.* Significant to our analysis of plaintiff's complaint against Hertz, the Court there defined the concept of ascertainable loss as a "quantifiable or otherwise measurable loss." *Ibid.* In analyzing and in attempting to define the ascertainable loss requirement, the Court observed that "[t]here is little that illuminates the precise meaning that the Legislature intended in respect of the term 'ascertainable loss' in our statute." *Id.* at 248. In doing so, the Court echoed its earlier statement that "[w]e neither can ascribe a plain meaning to the term ascertainable loss, nor find legislative history that sheds direct light on those words." *See Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 11 (2004). Most significant to our analysis, in *Thiedemann,* the Court concluded that "[t]o give effect to the legislative language describing the requisite loss for private standing under the [Consumer Fraud Act], and to be consistent with *Weinberg,* a private plaintiff must produce evidence from which a factfinder could find or infer that the plaintiff suffered an actual loss." *Thiedemann, supra,* 183 *N.J.* at 248.

As a further illustration of the meaning of "actual loss" the Court noted that "[i]n cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages." *Ibid.* The Court stressed, however, that the "certainty implicit in the concept of an 'ascertainable' loss is that [such loss] is quantifiable or measurable." *Ibid.* The calculation does not

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 4127090 (N.J.Super.A.D.)
(Cite as: 2005 WL 4127090 (N.J.Super.A.D.))

need to be exact, and plaintiff need not experience any out-of-pocket loss. *Ibid.* Rather "an 'estimate of damages, calculated within a reasonable degree of certainty,' will" be sufficient to demonstrate an ascertainable loss. *Id.* at 249 (quoting *Cox, supra,* 138 *N.J.* at 22).

In the time since the Court decided *Thiedemann,* we have addressed several other issues related to the analysis of the concept of ascertainable loss. We have reiterated our earlier rejection of the "price-inflation" theory, *see Dabush v. Mercedes-Benz U.S.A., LLC,* 378 *N.J.Super.* 105, 123 (App.Div.) (citing *Citizen Action, supra,* 367 *N.J.Super.* at 16), *certif. denied,* 185 *N.J.* 265 (2005), and we have concluded that a plaintiff who relies only on hypothetical surmise about an automobile component without any out-of-pocket loss or evidence of its value cannot meet the *Thiedemann* test. *Id.* at 124. We have concluded that automobile repairs that would have been covered by warranties but which were voluntarily foregone in an effort to support a Consumer Fraud Claim Act also did not meet the ascertainable loss test. *See Perkins v. DaimlerChrysler Corp.,* 383 *N.J.Super.* 99, 112 (App.Div.2006).

**\*8** We recognize that the Court in *Thiedemann* had the benefit of a more complete record than the one we here review. While the *Thiedemann* appeal followed a motion for summary judgment, based on a record more fully developed in discovery than the limited record before us in light of the procedural posture of this matter, we do not find that difference significant. We conclude, rather, as we did in *Perkins,* that the parameters of the *Thiedemann* test for ascertainable loss are such that they can be applied appropriately to this complaint in the context of a motion to dismiss for failure to state a claim. *See Perkins, supra,* 383 *N.J.Super.* at 111.

Applying even these more recent precedents to plaintiff's complaint, we reach the same conclusion as did Judge Bernstein. Although plaintiff purchased insurance products from an allegedly unlicensed seller, she must concede that, had she had

the occasion to file a claim against that insurance coverage, it would not have been rejected on that ground. In fact, she got the benefit of her bargain because she was covered against the various perils as to which the insurance products applied each time she bought coverage. The mere fact that she did not need to file a claim does not mean that she did not receive the coverage for which she bargained. It therefore cannot equate with an ascertainable loss as our Supreme Court has interpreted that term. Rather, it is only by defining the putative class so as to exclude every purchaser who made a claim and who realized the full benefit of the coverage as well that plaintiff attempts to demonstrate a loss. We decline to interpret the reach of the ascertainable loss requirement to include plaintiff, who only by fortuity, did not actually need the coverage she purchased. Indeed, it is in the nature of insurance that some people will buy it and not use its available coverages. To suggest that every purchaser of insurance who does not thereafter make a claim against the coverage has suffered an "actual" loss in the sense required under the Consumer Fraud Act is to stretch the concept well beyond its meaning and intendment as we understand it.

Henderson also argues that the Law Division judge erred in dismissing her claims based on theories of common law fraud, negligent misrepresentation, illegal contract (rescission), breach of the covenant of good faith and fair dealing and unjust enrichment. Although we find no merit in her assertion that the judge erred, we separately address each of these theories. We begin by noting that the same factual allegations which plaintiff utilized to support her Consumer Fraud Act claim also give rise to each of the other claims.

We need only comment briefly on plaintiff's common law fraud and negligent misrepresentation claims. First, as Hertz points out, both of these claims are, in the context of the facts here, simply alternative articulations of a proposed private remedy, barred by IPLA and IPLA(2001), for Hertz's alleged failure to maintain a license or to advise

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 4127090 (N.J.Super.A.D.)
**(Cite as: 2005 WL 4127090 (N.J.Super.A.D.))**

plaintiff that it was not licensed. The result, therefore, of our analysis, can be no different from our decision on the Consumer Fraud Act claim. *See Crusco v. Oakland Care Center,* 305 N.J.Super. 605, 614-17 (App.Div.1997)(artful repleading of barred statutory claim insufficient to state a claim). Second, were we to examine the factual assertions in comparison to the elements of either of these causes of action, we would conclude that plaintiff's complaint fails to state a claim.

**\*9** The elements of common law fraud or misrepresentation are: (1) a false representation of fact; (2) made by defendant; (3) with knowledge that it is false; (4) with the intent to deceive plaintiff; (5) upon which representation plaintiff relies to his or her detriment; (6) sustaining a loss. *See Jewish Center of Sussex County v. Whale,* 86 N.J. 619, 624 (1981); *Louis Schlesinger Co. v. Wilson,* 22 N.J. 576, 585-86 (1956); *Fischetto Paper Mill Supply, Inc. v. Quigley Co., Inc.,* 3 N.J. 149, 152-53 (1949). As with our discussion of the Consumer Fraud Act's ascertainable loss requirement, plaintiff's inability to demonstrate that she suffered any loss as a result of Hertz's sale of insurance without a license is fatal to her claim. Moreover, as plaintiff does not assert and cannot demonstrate that she relied to her detriment on any statement, or omission, by Hertz, her claim cannot be sustained under either of these theories for this separate reason.

Similarly, plaintiff's illegal contract claim, on which she bases her demand for the equitable remedy of rescission, fails because the contract is fully executed. So articulated, the flaw in her reasoning is apparent, for the equitable remedy is not available after performance. *See County of Morris v. Fauver,* 153 N.J. 80, 97 (1998); *Intertech Assocs., Inc. v. City of Paterson,* 255 N.J.Super. 52, 59 (App.Div.1992)(quoting *Driscoll v. Burlington-Bristol Bridge Co.,* 28 N.J.Super. 1, 4 (App.Div.1953)). Even if by selling the insurance without a license, Hertz violated the law, the insurance coverage plaintiff bargained for was provided. Indeed, although the risk insured against did not occur during

the rental period, plaintiff concedes that had it, she would have been covered, just as those excluded from the putative class in fact were covered. Because her illegal contract claim seeks to rescind a contract for services after all obligations promised by Hertz have been performed, it fails as a matter of law.

We reject as well plaintiff's argument that Hertz breached the covenant of good faith and fair dealing. Judge Bernstein reasoned that because plaintiff received the full fruits of the contract of insurance, she could not prevail on this claim. On appeal, plaintiff urges us to conclude that the covenant of good faith and fair dealing required Hertz to affirmatively advise her that it was not licensed to sell the insurance coverage. We disagree. The essence of the covenant of good faith and fair dealing, implied in every contract, as defined by our Supreme Court, is that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Products, Inc.,* 69 N.J. 123, 129-30 (1976)(quotations omitted); *see Sons of Thunder v. Borden, Inc.,* 148 N.J. 396, 420 (1997). Even assuming that Hertz misrepresented whether it was licensed to sell the products, there are no allegations in the complaint that Hertz did anything to destroy or injure plaintiff's rights under the contracts of insurance. Because it is undisputed that the insurance policies sold by Hertz did provide the coverage as represented, plaintiff can have no claim for breach of the covenant of good faith and fair dealing.

**\*10** Finally, we agree with the motion judge that plaintiff's unjust enrichment claim also fails. Hertz performed its obligations to plaintiff by providing her with a valid insurance contract as promised. *See Paley v. Baron Sav. and Loan Ass'n.,* 82 N.J.Super. 75, 84 (App.Div.), *certif. denied,* 41 N.J. 602 (1964). There can be no claim for the equitable remedy of unjust enrichment, therefore, because Hertz did not receive a benefit at plaintiff's expense. *See Assocs. Commercial Corp. v. Wallia,*

Not Reported in A.2d, 2005 WL 4127090 (N.J.Super.A.D.)
**(Cite as: 2005 WL 4127090 (N.J.Super.A.D.))**

211 *N.J.Super.* 231, 243 (App.Div.1986). Rather, Hertz undeniably provided the insurance coverage even if it was not licensed to do so. Hertz therefore received only payment for that which it provided. In the absence of factual allegations that Hertz received a benefit that enriched it beyond its contractual rights, there can be no claim for damages pursuant to the unjust enrichment theory. *See Callano v. Oakwood Park Homes Corp.,* 91 *N.J. Super .* 105, 109 (App.Div.1966).

In summary, our review of the record compels us to conclude, as did Judge Bernstein, that the facts set forth in plaintiff's complaint fail as a matter of law to state claims for relief either within the Consumer Fraud Act, or for common law fraud, negligent misrepresentation, illegal contract, breach of the covenant of good faith and fair dealing or unjust enrichment.

Affirmed.

N.J.Super.A.D.,2006.
Henderson v. Hertz Corp
Not Reported in A.2d, 2005 WL 4127090 (N.J.Super.A.D.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

Н

United States Court of Appeals,
Third Circuit.
Elizabeth PICHLER; Kathleen F. Kelly; Russell
Christian; Deborah Brown; Seth Nye; Holly Mar-
ston; Kevin Quinn; Jose L. Sabastro; Deborah A.
Sabastro; Thomas Riley; Amy Riley; Russell
Daubert; Carrie Daubert
v.
UNITE (Union Of Needletrades, Industrial and
Textile Employees, AFL-CIO), A New York Unin-
corporated Association; Bruce Raynor, A New
York Resident; International Brotherhood of Team-
sters AFL-CIO, Does 1-10.
Unite Here, Appellant.
**Nos. 06-4522, 06-4721.**

Argued Dec. 6, 2007.
Filed: Sept. 9, 2008.

**Background:** Eight employees sued union, alleging
that union violated the Driver's Privacy Protection
Act (DPPA) by recording license plate numbers in
employee parking lot and using them to obtain em-
ployees' addresses from motor vehicle records. Fol-
lowing denial of union's motion to dismiss, 339
F.Supp.2d 665, and judgment in favor of employees
as to liability, 2006 WL 2529688, employees
moved to amend judgment and for class certifica-
tion. The United States District Court for the East-
ern District of Pennsylvania, Stewart Dalzell, J.,
228 F.R.D. 230, granted in part the motion for class
certification, and, 457 F.Supp.2d 524, granted in
part the motion to amend judgment. Parties cross-
appealed.

**Holdings:** The Court of Appeals, Chagares, Circuit
Judge, held that:
(1) District Court applied inappropriate standard in
granting union summary judgment on employees'
claim for punitive damages;
(2) assuming there were genuine issues of material
fact, employees had Seventh Amendment right to

jury trial on their punitive damages claim under the
DPPA;
(3) employees who were not specifically identified
in a motor vehicle record suffered no invasion of a
protected interest, and, thus, they lacked standing to
sue under the DPPA; and
(4) union's purpose for obtaining and using the in-
formation, namely, organizing labor, was imper-
missible.

Affirmed in part, vacated in part, and remanded.

Sloviter, Circuit Judge, filed dissenting opinion.

West Headnotes

**[1] Federal Courts 170B ⬅️660.20**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(E) Proceedings for Transfer of
Case
         170Bk660 Certification and Leave to Ap-
peal
            170Bk660.20 k. Multiple Claims. Most
Cited Cases
A decision to certify a final decision on some but
not all claims for immediate appeal involves two
separate findings: (1) there has been a final judg-
ment on the merits, that is, an ultimate disposition
on a cognizable claim for relief, and (2) there is no
just reason for delay. Fed.Rules Civ.Proc.Rule
54(b), 28 U.S.C.A.

**[2] Federal Courts 170B ⬅️776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most
Cited Cases
The Court of Appeals reviews the District Court's
construction of federal statutes de novo.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

**[3] Federal Courts 170B ⟐776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk776 k. Trial De Novo. Most
Cited Cases
The Court of Appeals reviews a grant or denial of
summary judgment de novo, applying the same
standard as the District Court.

**[4] Federal Civil Procedure 170A ⟐2543**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2542 Evidence
          170Ak2543 k. Presumptions. Most
Cited Cases
On cross-motions for summary judgment, the court
construes facts and draws inferences in favor of the
party against whom the motion under consideration
is made.

**[5] Federal Civil Procedure 170A ⟐2552**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2547 Hearing and Determina-
tion
          170Ak2552 k. Ascertaining Exist-
ence of Fact Issue. Most Cited Cases
On a motion for summary judgment, the court may
not weigh the evidence or make credibility determ-
inations, as these tasks are left for the fact-finder.

**[6] Federal Civil Procedure 170A ⟐2552**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2547 Hearing and Determina-

tion
          170Ak2552 k. Ascertaining Exist-
ence of Fact Issue. Most Cited Cases
District Court was required to determine whether
there were genuine issues of material fact as to
whether union willfully or recklessly contravened
the Driver's Privacy Protection Act (DPPA) by re-
cording license plate numbers in employee parking
lot and using them to obtain employees' addresses
from motor vehicle records, on union's motion for
summary judgment on employees' claim for punit-
ive damages; awarding remedies was not simply in
District Court's discretion. 18 U.S.C.A. § 2721 et
seq.; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[7] Jury 230 ⟐14(1)**

230 Jury
  230II Right to Trial by Jury
    230k14 Particular Actions and Proceedings
      230k14(1) k. In General. Most Cited
Cases
Employees' civil suit against union seeking legal re-
lief under the Driver's Privacy Protection Act
(DPPA) was analogous to common law causes of
action ordinarily decided in courts of law in the late
18th century, as required for employees to have
Seventh Amendment right to jury trial on their pun-
itive damages claim under the DPPA, where the
DPPA sounded in tort, and, just as common-law
tort actions provided redress for interference with
protected personal or property interests, so too did
the DPPA. U.S.C.A. Const.Amend. 7; 18 U.S.C.A.
§ 2721 et seq.

**[8] Action 13 ⟐25(.5)**

13 Action
  13II Nature and Form
    13k21 Legal or Equitable
      13k25 Under Codes and Practice Acts
        13k25(.5) k. In General. Most Cited
Cases

**Action 13 ⟐34**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

13 Action
   13II Nature and Form
      13k33 Statutory Remedies
         13k34 k. In General. Most Cited Cases
To determine whether a statutory cause of action is more analogous to actions decided in courts of law or equity, courts examine both the nature of the statutory action and the remedy sought.

**[9] Jury 230 ⊂⊃14(1)**

230 Jury
   230II Right to Trial by Jury
      230k14 Particular Actions and Proceedings
         230k14(1) k. In General. Most Cited Cases
Issue of punitive damages was tried to a jury in cases sounding in tort at time the Seventh Amendment was adopted, as required for employees to have Seventh Amendment right to jury trial on their punitive damages claim against union under the Driver's Privacy Protection Act (DPPA), where punitive damages constituted traditional legal relief, and relevant issues of whether union willfully or recklessly disregarded the prohibitions of the DPPA were trial issues of willfulness and recklessness that were common factual issues for juries to determine. U.S.C.A. Const.Amend. 7; 18 U.S.C.A. § 2721 et seq.

**[10] Federal Civil Procedure 170A ⊂⊃2552**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determination
            170Ak2552 k. Ascertaining Existence of Fact Issue. Most Cited Cases
Trial judge's traditional authority to dispose of an issue before sending it to a jury when the evidence is uncontradicted and raises only questions of law is not so broad as to permit the judge to find facts or resolve contradictory evidence at summary judgment. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[11] Records 326 ⊂⊃31**

326 Records
   326II Public Access
      326II(A) In General
         326k31 k. Regulations Limiting Access; Offenses. Most Cited Cases
Employees who were not registered owners of motor vehicles at issue, and whose names did not appear anywhere on the motor vehicle records, suffered no invasion of an interest that the Driver's Privacy Protection Act (DPPA) protected, and, thus, they lacked standing to sue union under the DPPA for recording license plate numbers in employee parking lot and using them to obtain employees' addresses from motor vehicle records, where they were not specifically identified in a motor vehicle record. U.S.C.A. Const. Art. 3, § 2, cl. 1; 18 U.S.C.A. §§ 2724(a), 2725(3).

**[12] Federal Civil Procedure 170A ⊂⊃103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

**Federal Civil Procedure 170A ⊂⊃103.3**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.3 k. Causation; Redressability. Most Cited Cases
The irreducible constitutional minimum of Article III standing consists of the following three elements: (1) the plaintiff must have suffered an injury in fact, that is, an invasion of a legally protected interest which is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of, that is, the injury has to be fairly traceable to the challenged

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

action of the defendant, and not the result of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[13] Records 326 ⟜31**

326 Records
  326II Public Access
    326II(A) In General
      326k31 k. Regulations Limiting Access;
Offenses. Most Cited Cases
Merely because both obtaining and using motor vehicle information for an impermissible purpose violates the Driver's Privacy Protection Act (DPPA) does not mean that each independent violation entitles plaintiffs to a separate liquidated damages award; Congress clearly contemplated that in most cases, a defendant who obtained motor vehicle information would put it to some use, and limited plaintiffs to one liquidated damages award for both aspects of a defendant's breach of the DPPA. 18 U.S.C. § 2724(b)(1).

**[14] Damages 115 ⟜76**

115 Damages
  115IV Liquidated Damages and Penalties
    115k75 Construction of Stipulations
      115k76 k. In General. Most Cited Cases
Under the common law of contracts, liquidated damages reflect an ex ante agreement of the parties.

**[15] Records 326 ⟜31**

326 Records
  326II Public Access
    326II(A) In General
      326k31 k. Regulations Limiting Access;
Offenses. Most Cited Cases
Given discretionary language in the statute and that the statute contains no limitation on the ability of the district court to grant cumulative awards, the Driver's Privacy Protection Act (DPPA) permits a district court to grant awards of liquidated damages

upon multiple uses or disclosures of confidential information. 18 U.S.C. § 2724(a).

**[16] Records 326 ⟜31**

326 Records
  326II Public Access
    326II(A) In General
      326k31 k. Regulations Limiting Access;
Offenses. Most Cited Cases
Union's purpose for recording license plate numbers in employee parking lot and using them to obtain employees' addresses from motor vehicle records, namely, organizing labor, was impermissible, and did not fall within Driver's Privacy Protection Act (DPPA) exceptions for permissible purposes of "litigation" and "acting on behalf of the government," even if it obtained and used the information in conjunction with those permissible purposes. 18 U.S.C.A. §§ 2721(b)(1, 4), 2724(a).

**[17] Records 326 ⟜31**

326 Records
  326II Public Access
    326II(A) In General
      326k31 k. Regulations Limiting Access;
Offenses. Most Cited Cases
The Driver's Privacy Protection Act (DPPA) contains no language that would excuse an impermissible use merely because it was executed in conjunction with a permissible purpose. 18 U.S.C.A. § 2721 et seq.

**[18] Records 326 ⟜31**

326 Records
  326II Public Access
    326II(A) In General
      326k31 k. Regulations Limiting Access;
Offenses. Most Cited Cases
For imposition of civil liability, Driver's Privacy Protection Act (DPPA) does not require that a defendant knowingly obtain or disclose personal information for a use the defendant knows is impermissible; rather, Congress differentiated between a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

knowing acquisition, disclosure, or use to establish civil liability, and any knowing violation to establish liability for a criminal fine. 18 U.S.C.A. §§ 2722(a), 2723(a), 2724(a).

**[19] Records 326 ☞31**

326 Records
    326II Public Access
      326II(A) In General
         326k31 k. Regulations Limiting Access;
Offenses. Most Cited Cases
Driver's Privacy Protection Act (DPPA) section granting a court authority to award actual damages, but not less than liquidated damages in amount of $2,500, does not require that a plaintiff prove actual damages to recover liquidated damages. 18 U.S.C.A. § 2724(b)(1).

**[20] Statutes 361 ☞190**

361 Statutes
    361VI Construction and Operation
      361VI(A) General Rules of Construction
        361k187 Meaning of Language
           361k190 k. Existence of Ambiguity.
Most Cited Cases
In interpreting a statute, the court must focus upon the plain language of the statute and if the statute is unambiguous, the court's inquiry begins and ends with the statutory text.

**[21] Torts 379 ☞330**

379 Torts
    379IV Privacy and Publicity
      379IV(B) Privacy
        379IV(B)1 Privacy in General
           379k330 k. In General. Most Cited
Cases
Courts permit recovery in privacy cases without proving actual damages because it is difficult to prove damages in such cases.
***383** Paul R. Rosen, David B. Picker (Argued), Spector Gadon & Rosen, P.C., Philadelphia, PA, Counsel for Appellant/Cross-Appellee.

Lawrence T. Hoyle, Jr. (Argued), Arlene Fickler, Arleigh P. Helfer III, John R. Timmer, Hoyle, Fickler, Herschel & Mathes LLP, Philadelphia, PA, Counsel for Appellee/Cross-Appellant.

Before: SLOVITER, CHAGARES, and HARDIMAN, Circuit Judges.

OPINION OF THE COURT

CHAGARES, Circuit Judge.

This case presents several issues of first impression in this court of appeals regarding application of the Driver's Privacy Protection Act of 1994 (the DPPA), 18 U.S.C. §§ 2721-2725. After certifying a class to proceed against the defendant-labor union, the District Court construed certain provisions of the DPPA and granted summary judgment to all but three of the named plaintiffs (plaintiffs). The court found that the union's labor organizing activities violated plaintiffs' privacy rights under the DPPA and awarded monetary and injunctive relief. However, the court granted the union summary judgment on plaintiffs' claims for punitive damages and dismissed the claims of the three other plaintiffs. The court deferred judgment as to class-wide relief, awaiting appellate clarification on the novel issues raised. Both sides have appealed. We will affirm in part, vacate in part, and remand for further proceedings.

I.

In the fall of 2002, the Union of Needletrades, Industrial & Textile Employees AFL-CIO (UNITE)[FN1] decided to launch a union organizing campaign targeting Cintas Corporation (Cintas). Cintas, the largest domestic employer in the industrial laundry industry, is philosophically opposed to unions and union organizing. UNITE was concerned with what it saw as Cintas' low wages, poor benefits, unsafe working conditions, discriminatory

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

practices, and violations of various labor laws. The International Brotherhood of Teamsters AFL-CIO (Teamsters) already represented some Cintas employees, and the two unions therefore agreed to work together on the campaign.[FN2]

> FN1. In July of 2004, UNITE merged with the Hotel Employees and Restaurant Employees International Union (HERE), and the combined entity has become known as "UNITE HERE." For the sake of simplicity, we will refer to the entity that is a defendant in this case as "UNITE."

> FN2. The Teamsters, however, are no longer a party to this case. The District Court approved a settlement between the Teamsters and the plaintiffs and dismissed the Teamsters from the case. *See Pichler v. UNITE,* 446 F.Supp.2d 353, 365 (E.D.Pa.2006).

From its inception, a major component of the campaign to organize and unionize Cintas workers was finding potential legal claims against Cintas. UNITE sought to use litigation as a means of raising the standards in the industrial laundry industry, and to demonstrate to Cintas' employees the effectiveness and usefulness of labor organizing. UNITE believed that *384 house calls were essential to the campaign's success because it thought workers would be reluctant to talk to union organizers at work for fear of retaliation by Cintas management. In order to contact employees, UNITE compiled lists of names and addresses of presumed Cintas workers from a variety of sources. Among these sources, UNITE used license plate numbers on cars found in Cintas parking lots to access information contained in state motor vehicle records relating to those license plates. This technique is known as "tagging."

Generally, UNITE organizers would enter or observe a Cintas parking lot and either write down or dictate into a tape recorder the license plate numbers on cars seen parked in, entering, or leaving the lot. The organizers would then take their lists of license plate numbers and access motor vehicle records either by using a Westlaw database or through private investigators or "information brokers." Appendix (App.) 229. The information brokers would-either directly or through intermediaries-obtain the information by applying to state motor vehicle bureaus.

Through these methods, UNITE accessed the motor vehicle records of the plaintiffs and a plaintiff class estimated by the parties to consist of between 1,758 and 2,005 Cintas employees, or relatives or friends of Cintas employees. UNITE visited the homes of many of these class members as well. During one such home visit on February 7, 2004, two women approached the house of plaintiff Kevin Quinn and rang his doorbell. When Quinn opened the door, they asked for him by name. He replied "That's me." App. 238. When the women informed him that "they were organizing a union campaign against Cintas," he told them he was not interested and shut the door. *Id.* The women returned to their car and departed.

In addition to Quinn, plaintiffs include other individuals employed by Cintas at all times relevant to this case-Elizabeth Pichler, Jose Sabastro, Thomas Riley, Seth Nye, and Russell Daubert.[FN3] Plaintiffs also include several non-Cintas employees-Russell Christian, Deborah Sabastro, Carri Daubert, Holly Marston, and Amy Riley. Russell Christian is the boyfriend and housemate of Cintas employee Kathleen Kelly (who the District Court dismissed for lack of standing).[FN4] Christian owns the car Kelly drives and is the person whose motor vehicle records UNITE accessed. When a UNITE organizer came to their home, he asked to speak to Christian. Holly Marston is the mother of Seth Nye, and the two co-own the car whose records were accessed (thereby obtaining the identities of both individuals). Amy Riley is Thomas Riley's wife, and they co-own the car whose records were searched as well. Deborah Sabastro and Carri Daubert are the wives of Jose Sabastro and Russell Daubert, but

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

UNITE accessed only their husbands' motor vehicle records as their cars were registered to their husbands. The court dismissed both wives' claims for lack of standing.

> FN3. The caption contains the name of one additional plaintiff-Deborah Brown. Brown stipulated to the dismissal of her claim without prejudice, and so her claim is not now before us. *See Pichler v. UNITE,* 228 F.R.D. 230, 240 (E.D.Pa.2005).

> FN4. Unlike the District Court's finding that Deborah Sabastro and Carri Daubert lacked standing, plaintiffs have not appealed the similar dismissal of Kathleen Kelly. Appellant Br. at 49.

The original complaint in this case was filed on June 28, 2004. App. 27. Shortly thereafter, plaintiffs filed a one-count amended class action complaint alleging that the Teamsters, UNITE, and **\*385** UNITE's President, Bruce Raynor, violated the DPPA.

On May 31, 2005, the court certified a class to proceed against UNITE, though not against Raynor, and dismissed the claims of Kathleen Kelly, Carri Daubert, and Deborah Sabastro for lack of standing. *See Pichler v. UNITE,* 228 F.R.D. 230 (E.D.Pa.2005) (*Pichler I* ). On August 30, 2006, the court granted summary judgment against UNITE and awarded the plaintiffs $2,500 each, and granted summary judgment in favor of Raynor. *See Pichler v. UNITE,* 446 F.Supp.2d 353 (E.D.Pa.2006) (*Pichler II* ). Pursuant to Federal Rule of Civil Procedure 54(b), the court also certified the case for appellate review, deferring the questions about class-wide and injunctive relief. Finally, on October 17, 2006, the court amended its previous judgment and granted UNITE summary judgment on the issue of punitive damages. *See Pichler v. UNITE,* 457 F.Supp.2d 524 (E.D.Pa.2006) (*Pichler III* ). The court also granted separate awards to Thomas Riley and Amy Riley, co-owners of a vehicle whose re-

cords UNITE searched,[FN5] and permanently enjoined UNITE and its employees from using or disclosing any of the plaintiffs' personal information obtained by UNITE in violation of the DPPA. This appeal followed.

> FN5. The court had already granted separate awards to co-owners Seth Nye and Holly Marston in its August 30, 2006 judgment.

II.

[1] The District Court had subject matter jurisdiction over this federal question action under 28 U.S.C. § 1331. We have jurisdiction over this appeal from the final decision of the District Court pursuant to 28 U.S.C. § 1291.[FN6]

> FN6. We agree with the parties that the District Court properly certified this case pursuant to Federal Rule of Civil Procedure 54(b). *See* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2654 (3d ed.1998) (explaining Rule 54(b)'s goal of avoiding "the possible injustice of a delay in entering judgment ... as to fewer than all of the parties until the final adjudication of the entire case by making an immediate appeal available"). There are two basic conditions on the rule's applicability: "(1) there has been a final judgment on the merits, i.e., an ultimate disposition on a cognizable claim for relief; and (2) there is 'no just reason for delay.' " *Berckeley Inv. Group, Ltd. v. Colkitt,* 455 F.3d 195, 202 (3d Cir.2006) (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.,* 446 U.S. 1, 7-8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980)).

> In this case, both requirements are met. The District Court granted summary judgment as to UNITE's liability under the DPPA and addressed all remedial is-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

sues except attorneys' fees-granting liquidated damages, denying punitive damages, and granting injunctive relief. *See Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 199-203, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988) (explaining that a decision on the merits is a final decision as a matter of federal law under 28 U.S.C. § 1291 even when the recoverability or amount of attorneys' fees for the litigation remains to be determined). Thus, all the rights and liabilities of UNITE, vis-a-vis the plaintiffs, have been fully adjudicated and finally decided. So too, the District Court found no just reason for delaying an appeal, and explained its rationale for this finding. *See Carter v. City of Philadelphia,* 181 F.3d 339, 346 (3d Cir.1999) (requiring that district courts explain their reasons for certifying a judgment for appeal under Rule 54(b)). We find no error in the District Court's finding that there was no just reason for delay. Accordingly, the requirements of Rule 54(b) are met, and we have appellate jurisdiction over the final decision of the District Court.

[2][3][4][5] We review the District Court's construction of federal statutes *de novo. Chao v. Cmty. Trust Co.,* 474 F.3d 75, 79 (3d Cir.2007). We also review a grant or denial of summary judgment de novo, applying the same standard as the District Court. *Marten v. Godwin,* 499 F.3d 290, 295 (3d Cir.2007). Summary judgment is **\*386** only appropriate if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *DL Res., Inc. v. FirstEnergy Solutions Corp.,* 506 F.3d 209, 216 (3d Cir.2007). On cross-motions for summary judgment, the court construes facts and draws inferences "in favor of the party against whom the motion under consideration is made." *Samuelson v. LaPorte Cmty. Sch.,* 526 F.3d 1046, 1051 (7th

Cir.2008) (quotation marks omitted). The court may not, however, weigh the evidence or make credibility determinations as "these tasks are left for the fact-finder." *Pertruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,* 998 F.2d 1224, 1230 (3d Cir.1993).

III.

Plaintiffs contend that the District Court erred in granting defendants' summary judgment motion on the issue of punitive damages and that they were denied their Seventh Amendment right to a jury trial on that issue.[FN7]

> FN7. The remedial section of the DPPA provides:
>
> **(b) Remedies.**-The court may award-
>
> **(1)** actual damages, but not less than liquidated damages in the amount of $2,500;
>
> **(2)** punitive damages upon proof of willful or reckless disregard of the law;
>
> **(3)** reasonable attorneys' fees and other litigation costs reasonably incurred; and
>
> **(4)** such other preliminary and equitable relief as the court determines to be appropriate.
>
> 18 U.S.C. § 2724(b).

A.

[6] The parties filed cross-motions for summary judgment with the District Court, and submitted certain jointly stipulated facts for purposes of disposing of the motions. The court properly granted summary judgment as to UNITE's liability (except as noted in section V, *infra* ) on the grounds that uncontroverted evidence established that UNITE acted for an impermissible purpose, in violation of the DPPA. *Pichler III,* 457 F.Supp.2d at 531.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

Regarding the issue of summary judgment on plaintiffs' request for punitive damages, however, the District Court seems to have applied an inappropriate standard. The court assumed that awarding remedies was simply "in its discretion." *Id.* at 527. Specifically, rather than determining whether there were genuine issues of material fact as to whether UNITE willfully or recklessly contravened the DPPA as § 2724(b)(2) requires, the court found that "[t]he DPPA plainly gives us the discretion to award *or* to deny punitive damages, even if UNITE violated the DPPA and did so willfully and recklessly. We must craft an appropriate award bearing in mind the purposes of the statute and the relevant jurisprudence on punitive damages." *Id.* at 531 (emphasis in original). In so doing, the court considered plaintiffs' arguments concerning UNITE's prior knowledge of the DPPA following UNITE's involvement in earlier litigation [FN8] and UNITE's continued use of motor vehicle information. The court also considered the fact that UNITE's legal department distributed a memorandum directing its campaigners not to use "license plate numbers to obtain any information from Department of Motor Vehicles records, including names and addresses." *Id.* **\*387** (quotation marks omitted). The court found that "this clear instruction, plus the certainty that further license plate retrievals will result in costly damages awards, will effectively deter UNITE from further violations of the DPPA. Thus, we achieve deterrence without imposing punitive damages." *Id.* at 532 (footnote omitted). The court refused to award punitive damages, deeming them "unnecessary" in this case. *Id.*

> FN8. In *Tarkington v. Hanson and UNITE,* No. 4-00-cv-00525 JMM (E.D.Ark. Aug. 25, 2000), the plaintiffs therein alleged that UNITE obtained motor vehicle license plate numbers from vehicles parked in the Dillard's Distribution Center in Mabelvale, Arkansas, which UNITE used to obtain personal information. The parties eventually settled the case. President Bruce Raynor discussed the terms of the settle-

ment with UNITE's counsel as it was being negotiated and Raynor executed the settlement documents on behalf of UNITE. *See Pichler II,* 446 F.Supp.2d at 364.

The District Court concluded that it had discretion to fashion an award, but it did not determine whether summary judgment was appropriate on the issue of punitive damages given the requirements of § 2724(b)(2). The court did not apply the standards for summary judgment, nor did it even mention summary judgment in its analysis. Furthermore, it appears that the court improperly engaged in weighing of evidence on the summary judgment record. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Bragen v. Hudson News Co.,* 278 F.2d 615, 618 (3d Cir.1960). Accordingly, we will vacate the court's denial of punitive damages and remand for the court to address explicitly whether summary judgment was appropriate on the issue of punitive damages.

### B.

If, on remand, the District Court determines that summary judgment is appropriate as to plaintiffs' punitive damages claim, then a trial will be unnecessary. *In re TMI Litig.,* 193 F.3d 613, 725 (3d Cir.1999); *see Tull v. United States,* 481 U.S. 412, 419, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). However, if the District Court determines that summary judgment is inappropriate, we agree with plaintiffs that they are entitled to a jury trial on their punitive damages claim, as we discuss below.

The Supreme Court has instructed that "[b]efore inquiring into the applicability of the Seventh Amendment, we must 'first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided.'" *City of Monterey v. Del Monte Dunes,* 526 U.S. 687, 707, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (quoting *Tull,* 481 U.S. at 417 n. 3, 107 S.Ct. 1831). It is clear that the DPPA makes no

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

mention of a right to a jury trial. As the District Court properly observed, "[t]he DPPA does not provide for a jury trial on this (or, for that matter, any) issue." *Pichler III,* 457 F.Supp.2d at 531.[FN9] Accordingly, we must engage in a Seventh Amendment analysis. *See Cox v. Keystone Carbon Co.,* 861 F.2d 390, 393 (3d Cir.1988).

> FN9. UNITE argues that the language of the DPPA vests the *court*-not a jury-with discretion to award damages and, therefore, plaintiffs have no right to a jury trial. *See* 18 U.S.C. § 2724(b) ("The court may award ... punitive damages...."). Because "the court" can refer to the judge, the jury, or some combination of the two, we reject UNITE's argument that the language evinces Congress's clear intention to abrogate the jury trial right for punitive damages. Along these lines, the fact that the statute seems to indicate an exercise of discretion does not alter our conclusion. There is ample "historical evidence that cases involving discretionary monetary relief were tried before juries." *Feltner,* 523 U.S. at 353, 118 S.Ct. 1279. Indeed, in *Feltner,* where the language of the statute seemed to demand discretion on the part of the trial judge ("the copyright owner may elect ... an award of statutory damages ... in a sum of not less than $500 or more than $20,000 *as the court considers just ....*" (emphasis added)), the Court held that "the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages ... including the amount itself." *Id.* at 355, 118 S.Ct. 1279.

The Seventh Amendment provides that "in Suits at common law, where the value in controversy shall exceed twenty dollars, *388 the right of trial by jury shall be preserved...." U.S. Const. amend. VII. Consistent with this textual mandate that the jury right be preserved, the Supreme Court has recognized:

our interpretation of the Amendment has been guided by historical analysis comprising two principal inquiries: "[F]irst, whether we are dealing with a cause of action that either was tried at law at the time of the founding or is at least analogous to one that was. If the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791."

*Del Monte Dunes,* 526 U.S. at 708, 119 S.Ct. 1624 (quoting *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 376, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)) (quotation marks and citation omitted).

1.

[7][8] Conducting the first inquiry, the Supreme Court has noted that "[t]he Seventh Amendment [ ] applies not only to common-law causes of action, but also to 'actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty.' " *Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 348, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998) (quoting *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)). To determine whether a statutory cause of action is more analogous to actions decided in courts of law or equity "we examine both the nature of the statutory action and the remedy sought." *Id.* It is undisputed that plaintiffs are seeking the remedy of legal relief under the DPPA. *See id.* at 352, 118 S.Ct. 1279 ("We have recognized the 'general rule' that monetary relief is legal...."). We must next determine whether civil suits seeking legal relief under the DPPA are analogous to common law causes of action ordinarily decided in courts of law in the late 18th century.

The Supreme Court in *Del Monte Dunes* considered, *inter alia,* whether an action for legal relief

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

under 42 U.S.C. § 1983 "is an action at law within the meaning of the Seventh Amendment." 526 U.S. at 709, 119 S.Ct. 1624. Recognizing that the right to a jury extends to statutory claims that did not exist at common law, the Court noted that the right inures in claims that "can be said to 'soun[d] basically in tort,' and seek legal relief." *Id.* (quoting *Curtis v. Loether*, 415 U.S. 189, 195, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974)). The Court then looked to the statute at issue and found that "there can be no doubt that claims brought pursuant to § 1983 sound in tort. Just as common-law tort actions provide redress for interference with protected personal or property interests, § 1983 provides relief for invasions of rights protected under federal law." *Id.* The Court concluded that because the § 1983 suit sought legal relief and sounded in tort, it was an action at law.

Like § 1983, the DPPA sounds in tort. Just as common-law tort actions provide redress for interference with protected personal or property interests, so too does the DPPA. The DPPA provides redress for violation of a person's protected interest in the privacy of his or her motor vehicle records and the identifying information therein. Accordingly, plaintiffs' claims for legal relief under the DPPA are analogous to common law causes of action ordinarily decided in the courts of law in the late 18th century. *Cf.* Samuel Warren & Louis D. Brandeis, *The Right to Privacy,* 4 Harv. L.Rev. 193, 213 n. 1 (1890) (noting that **\*389** "the common law has for a century and a half protected privacy in certain cases").

2.

[9] Having established that "the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791." *Markman,* 517 U.S. at 376, 116 S.Ct. 1384. The Supreme Court has acknowledged that "[w]e determine whether issues are proper for the jury, when possible, 'by using the

historical method' ... look[ing] to history to determine whether the particular issues, or analogous ones, were decided by judge or by jury in suits at common law at the time the Seventh Amendment was adopted." *Del Monte Dunes,* 526 U.S. at 718, 119 S.Ct. 1624 (quoting *Markman,* 517 U.S. at 378, 116 S.Ct. 1384). Where an examination of history does not provide a definitive answer as to the particular issues or analogous issues, "we look to precedent and functional considerations." *Del Monte Dunes,* 526 U.S. at 718, 119 S.Ct. 1624.

The Supreme Court has made clear that, historically, the issue of punitive damages was tried to a jury in cases sounding in tort. In *Day v. Woodworth,* 54 U.S. (13 How.) 363, 14 L.Ed. 181 (1851), the Court acknowledged that decisions regarding punitive damages should be "left to the discretion of the jury" and noted that this principle was supported by "repeated judicial decisions for more than a century." *Id.* at 371; *see id.* (recognizing that issue of punitive damages has "always" been a jury question). In particular, the Court observed, "[i]t is a well-established principle of the common law, that in ... all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant...." *Id.* Accordingly, we hold that the issue of punitive damages in cases sounding in tort (such as the DPPA) "were decided by [a] jury in suits at common law at the time the Seventh Amendment was adopted." *Del Monte Dunes,* 526 U.S. at 718, 119 S.Ct. 1624.

Even if history did not provide a definitive answer to the question of whether the issue of punitive damages should be tried by a jury, both precedent and functional considerations support our holding. First, regarding precedent, we held in *Klinger v. State Farm Mutual Auto. Insurance Co.,* 115 F.3d 230 (3d Cir.1997), that because punitive damages constituted traditional legal relief, the Seventh Amendment demanded that a jury assess whether punitive damages were appropriate in a statutory bad faith action. *Id.* at 235-36; *see also Tull,* 481 U.S. at 422, 107 S.Ct. 1831 ("Remedies intended to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

punish culpable individuals ... were issued by courts of law, not courts of equity."); *Curtis,* 415 U.S. at 196, 94 S.Ct. 1005 (noting that the remedy of punitive damages "is the traditional form of relief sought in the courts of law"). Second, regarding functional considerations, "[i]n actions at law predominantly factual issues are in most cases allocated to the jury." *Del Monte Dunes,* 526 U.S. at 720, 119 S.Ct. 1624. The relevant issue in this case is whether UNITE willfully or recklessly disregarded the prohibitions of the DPPA. *See* 18 U.S.C. § 2724(b)(2). Trial issues of willfulness and recklessness are common factual issues for juries to determine. *See Metzger v. Osbeck,* 841 F.2d 518, 521 (3d Cir.1988) ("[W]e cannot deprive plaintiffs of an opportunity to have a jury resolve the issue of [defendant]'s intent in their favor."); *United States v. House,* 524 F.2d 1035, 1045 (3d Cir.1975) (observing in tax evasion case that "question of wilfulness is uniquely for the trier of fact" and concluding that "[t]here was certainly a jury question*390 with respect to [defendant's] wilfulness"); *see also Fargo v. City of San Juan Bautista,* 857 F.2d 638, 641 (9th Cir.1988) ("When reasonable persons may disagree as to whether particular conduct constitutes negligence, gross negligence, or recklessness, the question is one of fact to be decided by the jury.").

[10] In sum, where there is a genuine issue of material fact regarding the willfulness or recklessness of a defendant's conduct, we hold that the Seventh Amendment requires a trial by jury on the issue of punitive damages under the DPPA.[FN10]

> FN10. It is true, as UNITE argues, that neither the DPPA nor the Seventh Amendment limits the trial judge's traditional authority to dispose of an issue before sending it to a jury where "the evidence is uncontradicted and raises only [questions] of law." *See Tull,* 481 U.S. at 419, 107 S.Ct. 1831. This authority, however, is not so broad as to permit the judge to find facts or resolve contradictory evidence at summary

judgment. *See McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 424 (3d Cir.2007).

## IV.

[11] Plaintiffs next contend that the District Court erroneously dismissed the claims of Carri Daubert and Deborah Sabastro for lack of standing. UNITE searched the motor vehicle records of their husbands-Russell Daubert and Jose Sabastro-revealing the couples' shared addresses. According to the court, as neither Carri Daubert nor Deborah Sabastro were the registered owners of the vehicles about which UNITE obtained information, they suffered no invasion of an interest that the DPPA protects, and they lack standing to sue. We agree.

Article III of the Constitution limits the "judicial Power" of the United States to the adjudication of "Cases" or "Controversies." U.S. Const. art. III, § 2. Courts enforce the case-or-controversy requirement through several justiciability doctrines that " 'cluster about Article III.' " *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178-79 (D.C.Cir.1983) (Bork, J., concurring)). They include standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions. *See DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). "[P]erhaps the most important of these doctrines" is standing. *Allen,* 468 U.S. at 750, 104 S.Ct. 3315.

[12] The "irreducible constitutional minimum" of Article III standing consists of the following three elements:

First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the chal-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

lenged action of the defendant, and not the result of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotation marks, footnote, and citations omitted). The main issue regarding the standing of Carri Daubert and Deborah Sabastro is whether they have suffered "an invasion of a legally protected interest" under the DPPA. *Id.* at 560, 112 S.Ct. 2130; *see Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the *391 invasion of which creates standing ....' ") (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 7, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)).

The DPPA provides that a "person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action...." 18 U.S.C. § 2724(a). The DPPA thus confers a cause of action to "the individual" whose personal information from their motor vehicle records is at issue. It is undisputed that Russell Daubert and Jose Sabastro had a viable cause of action under the DPPA because they were, respectively, "the individual" who was the registered owner of a vehicle about which UNITE obtained information. In contrast, neither Carri Daubert nor Deborah Sabastro were registered owners of the vehicles and, in fact, their names did not appear anywhere on the motor vehicle records. Nonetheless, in arguing that they have standing to sue under the DPPA, they focus on the fact that they share personal information-such as their addresses-with their husbands and, therefore, the personal information "pertains" to them as well. We believe that this argument reads § 2724(a) too broadly.

The DPPA protects the privacy interests of "the individual to whom the [personal] information pertains...." *Id.* Notably, Congress chose to employ the singular term "the individual" in this section. To adopt Carri Daubert's and Deborah Sabastro's argument, we would have to rewrite the statute to replace "the individual" with the words "*any* individual *s*." Taking their argument to its logical conclusion, the DPPA would grant a cause of action to anyone (*e.g.,* spouses, children, parents, friends, other relatives) who, for instance, resides at an address improperly obtained from motor vehicle records. [FN11] This would be an unwarranted extension of § 2724(a).

> FN11. Recognizing the implications of their argument, plaintiffs propose a limiting principle: a proper DPPA plaintiff must be "a relative by blood or marriage and member of the same household as the record owner." Appellee Reply Br. at 60. We reject this limitation as it finds no support in the language or history of the statute.

The consent provisions in 18 U.S.C. §§ 2721(b)(11)-(13) support our singular reading of the phrase "the individual" in the DPPA. Section (b)(13), for instance, permits personal information from motor vehicle records to be disclosed upon the written consent of "the individual to whom the information pertains." *See also id.* §§ (b)(11), (12) (requiring consent of "the person to whom such personal information pertains"). If we credit plaintiffs' argument, then presumably they-or any-one-residing at their home address could consent to the release of motor vehicle records that are not their own. Put another way, under plaintiffs' argument, an extended family member or other person residing at a house would be considered any "individual to whom" the address and telephone number "pertains" and that person could consent to release the "personal information" of anyone else residing in the house. Such a result would run contrary to the DPPA's purpose of preserving the privacy rights of individuals.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

Our view of § 2724(a) is also supported by § 2725(3), which limits the reach of the term "personal information" to "information that *identifies* an individual...." 18 U.S.C. § 2725(3) (emphasis added). We hold that individuals such as Carri Daubert and Deborah Sabastro, who are not specifically identified in a motor vehicle record, have no legally protected privacy interest under the DPPA. See *392*Pichler I, 228 F.R.D. at 241 (stating that UNITE "could not have violated [their] own DPPA-protected privacy interests because the motor vehicle abstracts contain no information about them"). Because Carri Daubert and Deborah Sabastro have not suffered "an invasion of a legally protected interest," they lack standing to sue, and, accordingly, we will affirm dismissal of their claims under the DPPA.

V.

Plaintiffs' final contention on appeal is that they are entitled to cumulative liquidated damages awards.[FN12] Specifically, they claim that the DPPA entitles them to a separate liquidated damages award for each time UNITE "obtain[ed]" or "us[ed]" plaintiffs' personal information,[FN13] and that the court erred by granting summary judgment to UNITE on this issue despite issues of fact as to the propriety of multiple awards. Appellant Br. at 55-56.

> FN12. As plaintiffs have not argued that the District Court erred by denying them a jury trial on the issue of cumulative liquidated damages awards, we need not discuss whether plaintiffs have a right to a jury trial on this issue.

> FN13. "Of the nine named plaintiffs, three claim they suffered two violations each and seek $5,000 per person, and six claim they suffered three violations each and seek $7,500 per person." Pichler III, 457 F.Supp.2d at 529.

While both parties seem to view the statutory interpretation issue as a binary one (either allowing multiple liquidated damage awards for every obtaining or use, or not), we see the statutory language as presenting a more nuanced damages scheme. There are two distinct questions: first, whether the DPPA permits a plaintiff to recover two separate liquidated damage awards because a defendant obtains and then uses plaintiff's confidential information; and second, whether the DPPA permits a plaintiff to recover multiple liquidated damage awards where a defendant has used plaintiff's confidential information on more than one occasion.

A.

[13] As to this first question, plaintiffs point out that the DPPA is written in the disjunctive ("a person who knowingly obtains, discloses *or* uses"), and so each act of obtaining, disclosing, or using of confidential information constitutes a separate violation of the statute. Plaintiffs contend that since the mere obtaining of personal information is a violation of the DPPA entitling a plaintiff to damages and other relief "it follows that a further *use* of that information is a separate invasion of privacy and a separate violation ... that independently entitles the victim to the relief prescribed by section 2724(b)." Appellant Br. at 56 (emphasis in original).[FN14]

> FN14. Plaintiffs do not argue, however, that mailings in connection with the *Veliz v. Cintas* litigation count as separate uses. Pichler III, 457 F.Supp.2d at 529. Veliz was one of six federal cases UNITE brought or assisted in bringing against Cintas from 2002 through October 13, 2004. App. 232-34.

Merely because both obtaining and using motor vehicle information for an impermissible purpose violate the DPPA (a premise with which we agree), it does not follow that each independent violation entitles plaintiffs to a separate liquidated damages award. The key phrase for purposes of our analysis

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

is the DPPA's provision of $2,500 in "liquidated damages." 18 U.S.C. § 2724(b)(1). The damages contemplated by the statute are not mere generic damages, *see, e.g.,* 5 U.S.C. § 552a(g)(4)(A) ("in no case shall a person entitled to recovery receive less than the sum of $1,000"), or even "statutory damages" as such, *see, e.g.,* **\*393** 15 U.S.C. § 1117(d) (providing that instead of actual damages, a plaintiff may recover "an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 ...."), but rather *liquidated* damages. The District Court noted correctly that "Congress's decision to use the technical term 'liquidated damages' in the DPPA suggests that it intended to incorporate the locution's well-understood meaning." *Pichler I,* 228 F.R.D. at 244. This "well understood meaning" undermines plaintiffs' position.

[14] Under the common law of contracts, liquidated damages reflect an *ex ante* agreement of the parties. *See* E. Allan Farnsworth, *Contracts* § 12.18 (4th ed.2004) (quoting *Banta v. Stamford Motor Co.,* 89 Conn. 51, 92 A. 665, 667 (1914) ("The standard of measure here is not furnished by the plaintiff's actual loss or injury, as the event proved, but by the loss or injury which might reasonably have been anticipated at the time the contract was made.... It is the look forward and not backward that we are called upon to take ....")); *see also In re Plywood Co.,* 425 F.2d 151, 154 (3d Cir.1970) (describing liquidated damages under New Jersey law as "the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is legally recoverable as agreed damages if the breach occurs") (quotation marks and citation omitted).[FN15] To incorporate the meaning of the term, we construe the DPPA with an eye toward the "loss or injury which might reasonably have been anticipated." *Banta,* 92 A. at 667.

> FN15. In this case, of course, we have an artificially-constructed "contractual" ar-

rangement: rather than the parties themselves agreeing on liquidated damages, Congress has forecast how these damages would likely be fixed.

Congress clearly contemplated that in most cases, a defendant who obtained motor vehicle information would put it to some use. *See Pichler III,* 457 F.Supp.2d at 530 ("Congress surely understood that the usual case would involve at least one instance of 'obtain[ing]' and one 'use[ ],' and it decided that a plaintiff who did not or could not show actual damages could nevertheless receive $2,500."). Therefore, given Congress's use of the term "liquidated damages" and the $2,500 amount provided, we conclude that this amount encompasses both aspects of a defendant's "breach" of the DPPA-one instance of obtaining and one of use-and that the defendant is limited to one liquidated damage award in this situation. A contrary holding would effectively result in a minimum award of $5,000 for every violation of the DPPA-a result we do not believe Congress intended.

In response, plaintiffs contend that this result would incentivize a defendant who has already obtained information to then use it. This argument is unpersuasive. To begin with, the DPPA provides for criminal liability, which should deter someone who has obtained confidential information from calling attention to his or her criminal conduct by using it. *See Gen. Instrument Corp. of Delaware v. Nu-Tek Elecs. & Mfg., Inc.,* 197 F.3d 83, 95 (3d Cir.1999). Moreover, plaintiffs are free to elect actual, rather than liquidated damages, and will certainly do so in appropriate cases. *See id.*[FN16] Further still, the DPPA permits the award of punitive damages**\*394** if the standard set forth in § 2724(b)(2) is met.

> FN16. In a case involving stalking, for example, the obtaining of information might cause very little actual damage, while the use of such information is where the actual damages would lie.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

B.

[15] While we understand Congress to have fore-cast "liquidated damages" as $2,500 for the most likely violation of the DPPA (obtaining and using confidential information), there is no reason to think that such an amount covers all subsequent vi-olations as well. The plain language of the statute contains no such restriction. *See* 18 U.S.C. § 2724(a). Accordingly, defendants can face addition-al damages if, after obtaining a plaintiff's personal information in violation of the DPPA, they re-peatedly use or disclose that personal information.

The language of the DPPA indicates a certain de-gree of discretion granted to the court in awarding damages. *See* 18 U.S.C. § 2724(b) ("The court *may* award") (emphasis added); *see also Kehoe v. Fid. Fed. Bank & Trust*, 421 F.3d 1209, 1216-17 (11th Cir.2005) ("The use of the word 'may' suggests that the award of any damages is permissive and discretionary. 'This common-sense principle of statutory construction is by no means invariable ... [but s]ince there is neither legislative history nor obvious inferences from the structure that suggests a contrary intent, we conclude that the use of the word 'may' implies a degree of discretion. Thus, the district court, in its discretion, may fashion what it deems to be an appropriate award.' ") (citations omitted). Given the discretionary lan-guage in the statute and that the statute contains no limitation on the ability of the district court to grant cumulative awards, we construe the DPPA to per-mit a district court to grant such awards upon mul-tiple uses or disclosures of confidential informa-tion.

In this case, there appears to be evidence of mul-tiple uses of personal information in the summary judgment record, but the District Court had a view that differed from ours regarding multiple uses or disclosures. The court did acknowledge that multi-ple awards of damages might be appropriate in cases where, for instance, a DPPA violator "bombarded" a plaintiff with visits and mailings. *Pichler III*, 457 F.Supp.2d at 530 n. 6. However,

the court determined that the record did not suggest such a "gross disregard" of a plaintiffs' privacy rights. As a result, the court, relying upon its "Congressionally-authorized discretion," awarded $2,500 to each plaintiff. *Id.* at 530-31.

While the District Court, when all is said and done, has discretion under the DPPA to fashion an award it deems appropriate, it must address the outstand-ing issue of liability regarding multiple uses of per-sonal information. The District Court must determ-ine whether there is sufficient evidence of multiple uses to proceed beyond summary judgment. Given our construction of the DPPA and the fact that the District Court did not appear to have applied the standards for summary judgment, we will vacate its grant of summary judgment as to this issue and re-mand for the District Court to address explicitly whether summary judgment was appropriate on this issue.

VI.

[16] UNITE's first contention as cross-appellant ad-dresses the District Court's finding of liability. UNITE claims that the court found it to have ob-tained plaintiffs' personal information "for a pur-pose not permitted" under the DPPA only by erro-neously construing the DPPA's "permissible uses" of personal information.

The DPPA is structured such that § 2721(a) provides the general prohibition on the release and use of motor vehicle **\*395** information, and § 2721(b) enumerates fourteen specific exceptions to the general prohibition. UNITE claims there are two exceptions which make its tagging activities permissible: the "litigation exception" and the "acting on behalf of the government" exception. *See* 18 U.S.C. §§ 2721(b)(1), (4).[FN17] The District Court carefully analyzed the applicability of both exceptions and concluded that UNITE's activities did not fall within either. *Pichler II*, 446 F.Supp.2d at 368-71.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

FN17. The statutory text provides:

**(b) Permissible uses.**-Personal information referred to in subsection (a) shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, ... and, subject to subsection (a)(2), may be disclosed as follows:

**(1)** For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

...

**(4)** For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

18 U.S.C. §§ 2721(b)(1), (4).

[17] We need not address the District Court's interpretation of the litigation and the acting on behalf of the government exceptions as we agree with the District Court that the language of the statute is clear: "The Act contains no language that would excuse an impermissible use merely because it was executed in conjunction with a permissible purpose." *Id.* at 367 ("[I]f UNITE had three purposes for 'obtain[ing], disclos[ing] or us[ing]' [plaintiffs'] personal information' and two of those were 'permissible uses' but the third was not, UNITE would still be liable for the third purpose."). Because UNITE obtained and used the confidential information for an impermissible purpose-union or-

ganizing-it does not matter what other permissible purpose UNITE may have had.

UNITE advances a unique argument. It claims that its labor-organizing purpose may not be severed from either its litigation purpose or its acting on behalf of the government purpose. For instance, UNITE contends that its

emphasis on litigation had a twofold purpose: raising the standards in the industry for the benefit of UNITE's members, whether or not employed by Cintas, and demonstrating to Cintas' employees the effectiveness and usefulness of organization. Thus, UNITE's activity in investigating potential litigation was part and parcel of its unionizing campaign, not separate and distinct from it.

Appellee Br. at 32.FN18

FN18. Our dissenting colleague relies upon a quotation from *Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King & Stevens, P.A.,* 525 F.3d 1107 (11th Cir.2008), that regards the litigation exception. *See* Dissent at 401-02 (quoting *Thomas,* 525 F.3d at 1115 n. 5). We note that the *Thomas* court explicitly rejected as waived the argument to which that quote pertained and, thus, the quote constitutes dicta.

The litigation component to UNITE's campaign should not obscure what UNITE was trying to accomplish-organizing labor. The same may be said for its acting on behalf of the government purpose. UNITE candidly admits that it launched the "campaign to organize and unionize Cintas workers." App. 226. Moreover, the organizers themselves, in conducting their home visits, unambiguously explained *396 that they were "organizing a union campaign against Cintas." App. 238. Regardless of UNITE's attempts to mask this clear labor-organizing purpose behind the veil of a litigation purpose or an acting on behalf of the government purpose, Congress has not permitted UNITE to do

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

so.

The statute clearly prevents obtaining or using personal information "for a purpose not permitted under this chapter...." 18 U.S.C. § 2724(a). It does not ask whether "litigation has become an increasingly important organizing tool" because "unions have found increasing resistance and difficulty using traditional organizing tactics." Appellee Br. at 31-32. The DPPA lists fourteen permissible purposes in § 2721(b) and union organizing is not one of them. *Pichler II*, 446 F.Supp.2d at 367 ("As we have already held, we will not engraft upon the DPPA a 'labor exception' that would permit unions to acquire and use employees' personal information, obtained from motor vehicle records, to contact them during organizing campaigns.").[FN19] Like the District Court, we decline to recognize an exception to the statute for which Congress has not provided.[FN20]

> FN19. At oral argument, UNITE raised an alternative argument suggesting that the Court engage in a "primary" versus "secondary" purpose analysis under the DPPA in an attempt to escape liability. UNITE failed to raise this argument at all before the District Court or in any of the briefs before this Court, and only raised the argument for the first time during oral argument. Despite the dissent's comments to the contrary, we will consider this argument waived and will not address it. *See Skretvedt v. E.I. DuPont De Nemours,* 372 F.3d 193, 202-03 (3d Cir.2004) ("We have held on numerous occasions that '[a]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court.' ") (quoting *Laborers' Int'l Union v. Foster Wheeler Corp.,* 26 F.3d 375, 398 (3d Cir.1994)).

> FN20. To hold otherwise would be to permit any union, or indeed any law firm, to

access the DMV information of individuals at nearly any large company. Such companies are often involved in, or at least susceptible to, litigation of some sort. If this legal exposure was the only criterion necessary to render an entity's activities investigations in anticipation of litigation, the DPPA's privacy protections would mean very little.

Accordingly, we will affirm the judgment of the District Court finding that UNITE obtained and used personal information for a purpose not permitted by the DPPA.

VII.

[18] UNITE's second argument-that civil liability requires a defendant *knowingly* obtain or disclose personal information for a use the defendant *knows* is impermissible-is patently without merit. Citing the similar language of §§ 2722 and 2724 of the DPPA, UNITE contends that the District Court erred in holding that the standard of civil liability-unlike the standard for criminal liability-"does not require proof that a defendant had any appreciation that its conduct was impermissible." Appellee Br. at 37-38.

This double-knowledge requirement simply does not fit into the DPPA's statutory scheme.[FN21] The provisions of §§ 2722(a) *397 and 2724(a) that UNITE claims to be identical can be read consistently. Section 2722(a) by itself does not create civil or criminal liability. It merely describes what conduct is wrongful under the DPPA. Section 2724(a), in turn, provides the standard for civil liability. Section 2723 provides the standard for criminal fines.

> FN21. In addition to our analysis set forth in the text, we concur with the District Court's analysis concerning the location of the adverb "knowingly" within § 2724(a). Restating its explanation, § 2724(a)'s first two clauses describe the act that subjects a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

defendant to civil liability (obtaining, disclosing, or using personal information from a motor vehicle record), while the third clause limits liability to acts done for "a purpose not permitted under this chapter." *Pichler I,* 228 F.R.D. at 241-42. "If Congress had intended for 'knowingly' to refer not only to the act element but also to the purpose element-so as to proscribe only those acts done for a purpose not 'knowingly' permitted-it would have been odd to locate the word 'knowingly' so removed from the purpose element. *Id.* at 242.

Congress' structuring of the DPPA-specifically, the interplay amongst its recitation of unlawful acts, civil penalties, and criminal penalties-is not unique. For instance, 18 U.S.C. § 842(a), like 18 U.S.C. § 2722, provides that "[i]t shall be unlawful for any person" to commit certain acts or omissions violative of the Controlled Substances Act. Section 842(c)(2), like 18 U.S.C. § 2723(a), creates criminal liability for violating those acts or omissions "knowingly." Section 842(c)(1), like 18 U.S.C. § 2724(a), creates civil liability for violating those acts or omissions, but does not premise civil liability on knowing violations. In fact, as we recognized in *United States v. Green Drugs,* 905 F.2d 694 (3d Cir.1990), the strict liability standard is applicable for civil violations of section 842(a). [FN22] Analyzing the statute, we noted this disparity in standards, observing that violation of 21 U.S.C. § 842(a) "subjects an offender to civil or penal penalties, depending on whether the act was committed knowingly." *Id.* at 695-96. We observed further that "Congress, therefore, plainly differentiated between civil and criminal violations of [§ 842(a) ], implementing different standards of fault." *Id.* at 697. Similarly, here, we hold that Congress differentiated between a knowing acquisition, disclosure, or use to establish civil liability, and any knowing violation to establish liability for a criminal fine.

FN22. In 1998, 21 U.S.C. §§ 842(5) and

(10) were amended to add the word "negligently."

Moreover, UNITE's reading of the DPPA is incomprehensible given the statute's punitive damages provision. Section 2724, as stated earlier, provides a civil cause of action against "a person who knowingly obtains, discloses or uses personal information ... for a purpose not permitted" under the statute. 18 U.S.C. § 2724(a). The DPPA continues that while the "court may award" actual damages, it may award punitive damages only "upon proof of willful or reckless disregard of the law." 18 U.S.C. § 2724(b)(2). According to UNITE, however, there is no violation of the statute absent evidence "that a defendant appreciated the illegality of his conduct," Appellee Br. at 37-38, thus making every single violation one for which punitive damages would apply. UNITE tries to save this argument by noting that "liability for compensatory damages would be proper on proof that a party appreciated it was engaging in wrongful conduct, but punitive damages would be reserved for those instances where a party knew it was violating the law or recklessly disregarded its obligations under the law." Appellee Reply Br. at 21. We cannot conceive of what willful or reckless disregard for the DPPA could be other than where a "party appreciated it was engaging in wrongful conduct" under the DPPA.

Accordingly, we will affirm the judgment of the District Court on this issue.

VIII.

[19] UNITE's final argument as cross-appellant addresses plaintiffs' burden to recover liquidated damages under the DPPA. According to UNITE, the District Court erroneously construed § 2724(b), permitting plaintiffs to recover liquidated damages without showing some measure of actual damages. We disagree.

*398 [20] UNITE begins its argument by noting-correctly-that we must focus upon the plain lan-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

guage of the statute and if the statute is unambiguous, our inquiry begins and ends with the statutory text. Appellee Br. at 48 (citing *BedRoc Ltd., LLC. v.United States,* 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004)). We agree with UNITE that the language of § 2724(b) is unambiguous, but we disagree about its meaning.

As we understand the plain meaning of the provision, the two phrases therein grant, and then limit, the authority of the court in awarding damages. Simply put, the first phrase ("The court may award-actual damages") is a grant of authority to the court-it enables the court to award actual damages, however high they might be. The second phrase ("but not less than liquidated damages ..."), then, limits that authority on the low end of the scale, creating a damage award floor. While the court may award actual damages, it may not grant an award "less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b)(1). But the first clause does not affect the baseline award of liquidated damages in the amount of $2,500 for *any* DPPA violation that the District Court chooses to compensate. In other words, the second phrase creates a base amount below which the court may not go, whether the plaintiff is able to prove actual damages or not.

Indeed, the Court of Appeals for the Eleventh Circuit, considering the identical issue now before us, arrived at the same conclusion as we reach here. *See Kehoe v. Fidelity Fed. Bank & Trust,* 421 F.3d 1209 (11th Cir.2005). The court in *Kehoe* began its analysis by reviewing the text of § 2724 and determined that "[t]here is no language in sub-section (b)(1) that confines liquidated damages to people who suffered actual damages." *Id.* at 1213. Instead, the court held that the second phrase of § 2724(b)(1) is not dependent upon proof of actual damages, but rather that the two clauses are to be read in the disjunctive: a plaintiff "may receive the greater of his actual damages or $2,500.00." *Id.* The court concluded that "[h]aving considered the plain text of the DPPA's remedial provision ... a plaintiff

need not prove actual damages to recover liquidated damages." *Id.* at 1216.

The Supreme Court's opinion in *Doe v. Chao,* 540 U.S. 614, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004), and the common law of privacy support this understanding of the plain language as well. In *Doe,* the Supreme Court considered the issue of whether the Privacy Act requires that plaintiffs prove actual damages to qualify to receive statutory damages. The Court ruled in the affirmative, but the difference between the Privacy Act and the DPPA, as well as the Court's broader analysis, actually support our holding to the contrary here.

Unlike the DPPA, the Privacy Act contains language providing that the defendant is liable for "actual damages sustained by the individual as a result of [certain agency conduct] ..., but in no case shall *a person entitled to recovery* receive less than the sum of $1,000." 5 U.S.C. § 552a(g)(4)(A) (emphasis added). Accordingly, "the simplest reading of that phrase looks back to the immediately preceding provision for recovering actual damages." *Doe,* 540 U.S. at 620, 124 S.Ct. 1204. Only a "person entitled to recovery" of actual damages can qualify for a statutory damage award. The DPPA, however, contains no such "critical limiting" language, *id.* at 626, 124 S.Ct. 1204, suggesting that a person need not prove actual damages to receive liquidated damages.

[21] Further support for our construction of § 2724(b)(1) comes from the common**\*399** law of privacy. As the Court in *Doe* pointed out, unlike common law negligence actions, the common law provided privacy tort victims with a monetary award calculated without proving actual damages. *See Doe,* 540 U.S. at 621 n. 3, 124 S.Ct. 1204 (quoting 4 Restatement of Torts § 867 cmt. d (1939)) (noting that damages are available for privacy tort victims "in the same way in which general damages are given for defamation," without proof of "pecuniary loss [or] physical harm"); *Parks v. Internal Revenue Serv.,* 618 F.2d 677, 683 (10th Cir.1980) (observing that the "common law tort of

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

invasion" seeks to remedy "personal wrongs which result in injury to plaintiffs' feelings and are actionable even though the plaintiff suffered no pecuniary loss nor physical harm"); *Nolley v. County of Erie,* 802 F.Supp. 898, 904 (W.D.N.Y.1992); *Bolduc v. Bailey,* 586 F.Supp. 896, 902 (D.Colo.1984). Courts permit recovery in privacy cases without proving actual damages because it is difficult to prove damages in such cases. *See Nolley,* 802 F.Supp. at 904 (stating that although violation of the right to privacy "is virtually certain to cause some injury ... the type of injury [ ] is very difficult to prove"); *Fairfield v. Am. Photocopy Equip. Co.,* 138 Cal.App.2d 82, 291 P.2d 194, 198 (1955) ("The fact that damages resulting from an invasion of the right to privacy cannot be measured by a pecuniary standard is not a bar to recovery.").[FN23] As the court in *Kehoe* correctly concluded:

> FN23. While the majority in *Doe* deviated from the common law understanding just explained, it did so based on various facts and circumstances not present in this case. Besides the "critical limiting" language of the Privacy Act, the "drafting history show[s] that Congress cut out the very language in the bill that would have authorized any presumed damages." *Doe,* 540 U.S. at 622, 124 S.Ct. 1204. In addition, as the Privacy Act involved a waiver of sovereign immunity, its construction followed the principle that "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman v. Nakshian,* 453 U.S. 156, 161, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981) (citation omitted); *see United States v. Williams,* 514 U.S. 527, 531, 115 S.Ct. 1611, 131 L.Ed.2d 608 (1995).

Damages for a violation of an individual's privacy are a quintessential example of damages that are uncertain and possibly unmeasurable. Since liquidated damages are an appropriate substitute

for the potentially uncertain and unmeasurable actual damages of a privacy violation, it follows that proof of actual damages is not necessary for an award of liquidated damages.
421 F.3d at 1213.

Finally, as discussed above in a different context, *see* section V, *supra,* the inclusion of the phrase "liquidated damages" supports the conclusion that the plain language of the DPPA aims to compensate not just those violations that can be shown to have caused actual damages. Liquidated damages have long been used as a substitute for actual damages in situations where "damages are uncertain in nature or amount or are unmeasurable." *Rex Trailer Co. v. United States,* 350 U.S. 148, 153, 76 S.Ct. 219, 100 L.Ed. 149 (1956). Further, we have just observed that the damages flowing from privacy violations have historically been considered "quintessential example[s] of damages that are uncertain and possibly unmeasurable." *Kehoe,* 421 F.3d at 1213. We believe it would make little sense, as a matter of statutory construction, for Congress to have inserted the phrase "liquidated damages" into § 2724(b)(1) if the only compensable violations of the DPPA were those for which the damages could be calculated precisely. Indeed, such an interpretation would violate our duty to give effect to each word of the statute. *See* \***400**\*Pa. v. United States Dep't of Health & Human Servs.,* 928 F.2d 1378, 1385 (3d Cir.1991).

The plain language of the DPPA, Supreme Court and other precedent, and the common law of privacy all support construing § 2724(b) so as not to require actual damages to recover liquidated damages. Accordingly, we will affirm the District Court's judgment on this issue.

IX.

For the foregoing reasons, we will affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

SLOVITER, Circuit Judge, dissenting.
Congress took an important step in protecting the privacy of drivers when it enacted the Driver's Privacy Protection Act ("DPPA" or "Act") in 1994. That Act prohibits the disclosure and resale of the personal information, defined as, inter alia, the name, address, telephone number and social security number, that a prospective licensee must disclose to the state motor vehicle department in order to secure a driver's license unless the disclosure and/or use falls within one of the fourteen enumerated statutory exceptions. *See* 18 U.S.C. § § 2721-2725.

The impetus for the Act is clear from the legislative history. A television actress in California who had an unlisted home number and address "was shot to death by an obsessed fan who obtained her name and address through the DMV." *See* 140 Cong. Rec. 7,924-25 (1994). In Tempe, Arizona, "a woman was murdered by a man who had obtained her home address from that State's DMV." 139 Cong. Rec. 29,466 (1993). The Senate debate focused on the need to protect the privacy of persons from stalkers and potential criminals. *See id.* at 29,469. At that time, personal information was easily available from 34 states' DMVs. *Id.* at 29,466.

Interestingly, although the debates in the House of Representatives and Senate were devoted to privacy issues, the commentary following the passage of the DPPA focused on the 10th and 11th Amendments and what many commentators viewed as the Act's clash with principles of federalism. The expressed concern was that the federal government was mandating certain actions by the states. *See Condon v. Reno,* 155 F.3d 453, 456 (4th Cir.1998) (holding that "Congress lacked the authority to enact the DPPA under either the Commerce Clause or Section 5 of the Fourteenth Amendment"), *rev'd* 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000). The Supreme Court's unanimous decision in *Reno v. Condon,* 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000), which held that in enacting the DPPA Congress did not run afoul of federalism

principles and sustained the DPPA under Congress' authority to regulate interstate commerce put an end to that debate. Because the Court limited its discussion to the federalism issue, it did not discuss either the scope of the privacy interest to which the DPPA is directed or any of the details of the Act to which the majority directs its opinion.

The holding of the majority with which I disagree is confined to its agreement with the District Court that even if UNITE obtained and used driver information for one of the purposes expressly permitted by the DPPA, it violated the statute if it also had a purpose not expressly permitted. As the majority recognizes, UNITE argued that "a major component of the campaign to organize and unionize Cintas workers was finding potential legal claims against Cintas." Maj. Op. at 383. The statute expressly exempts from its prohibitions "use in connection with any civil **401** criminal, administrative, or arbitral proceeding in our Federal, State, or local court or agency or before any self-regulatory body, including the service of process, *investigation in anticipation of litigation,* and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State or local court." 18 U.S.C. § 2721(b)(4) (emphasis added). The majority does not suggest that it doubts that UNITE did in fact have this objective. In its brief, UNITE lists various legal actions that it and/or Cintas employees filed against Cintas, including a class action alleging FLSA violations concerning drivers' overtime pay, an action in California for violations of living wage ordinances, a complaint with the EEOC alleging Cintas discriminated on the basis of race, color, sex, and national origin and subsequently a class action in federal court in which the EEOC intervened as a plaintiff. Appellee's Br. at 13-14. It also states that "[d]ozens of additional lawsuits and administrative actions were commenced before the EEOC, OSHA, NLRB, and other agencies." *Id.* at 14.

The District Court held, and the majority agrees, that because UNITE conceded that it also accessed

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

the motor vehicle records for the purpose of organizing workers, and union organizing is not listed a permissible purpose, the use of names and addresses of Cintas employees for that purpose violated the DPPA as a matter of law. *Pichler v. UNITE,* 446 F.Supp.2d 353, 368 (E.D.Pa.2006). I disagree.

In the first place, there is ample basis in the record to substantiate UNITE's assertion that it had the purpose of investigating legal claims against Cintas. Indeed, the District Court's opinion notes that UNITE prepared a 132-page "Legal Training Laundry Campaign" document that its attorneys and outside counsel used to train the twelve UNITE members who were the lead organizers for the regions where UNITE would kick off its campaign. *Pichler,* 446 F.Supp.2d at 357. The training covered such topics as the Fair Labor Standards Act, the Family Medical Leave Act, various types of discrimination, unfair labor practices, and workers' compensation. *Id.*

That such training would be useful can be gleaned from the statement in the District Court opinion that many employees working at the 350 Cintas locations are either female, black, or Hispanic. *Id.* at 355. Although neither the District Court nor the majority has so stated, I assume that not many of the 28,000 Cintas employees are well informed about their rights and UNITE may very well have a basis for instituting legal or administrative actions on behalf of the Cintas employees at issue in this case as it has done in other locations.

The District Court's view of the "investigation in anticipation of litigation" clause in § 2721(b)(4) was a narrow one. It asserted that "the Unions must prove that (1) they undertook an actual investigation; (2) at the time of the investigation, litigation appeared likely; and (3) the protected information obtained during the investigation would be of 'use' in the litigation," which "implies a reasonable likelihood that the decision maker would find the information useful in the course of the proceeding." *Pichler v. UNITE,* 339 F.Supp.2d 665, 668

(E.D.Pa.2004). The Court concluded that UNITE was "finding" claims, rather than investigating them, and that litigation was not "likely" where only thirty-one of 1758 to 2005 putative class members' information had led or was leading to litigation. *Pichler,* 446 F.Supp.2d at 369.

A recent decision of the Court of Appeals for the Eleventh Circuit offers a starkly different interpretation of § 2721(b)(4). Honing in on the clause allowing**\*402** "investigation in anticipation of litigation," that court stated that "even if the accumulation of potential witnesses related, in part, to certain cases not yet filed, we do not see how pre-suit investigation can be considered per se inapplicable to the litigation clause." *Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, and Stevens, P.A.,* 525 F.3d 1107, 1115 n. 5 (11th Cir.2008). The court concluded that a law firm's retrieval of 284,000 motor vehicle records, *id.* at 1109, "used to send one-thousand 'Custom and Practice' letters, which aimed at obtaining evidence showing a custom or practice of deceptive acts engaged in by [car] dealerships," *id.* at 1114, was a permissible use of the information in those records. *Id.* at 1115.

I would adopt the Eleventh Circuit's interpretation of § 2721(b)(4). The provision is written broadly. It allows the use of personal information from motor vehicle records "in connection with" a wide range of litigation activities, including "the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders...." 18 U.S.C. § 2721(b)(4). UNITE produced evidence that because it was aware of litigation against Cintas, it sought and obtained evidence of related legal violations during its home visits, and that it used that information to bring a considerable number of allegations before state, federal, and administrative adjudicatory bodies. *See supra* at pp. 384-85. In light of this evidence, there can be little doubt that at least one of UNITE's purposes for using the restricted information was in connection with investigation in anticipation of litigation.

Furthermore, it is important to note that there is

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096
**(Cite as: 542 F.3d 380)**

nothing illegal about efforts to organize a union. It is one of the activities protected by our labor laws. *See* National Labor Relations Act § 7, 29 U.S.C. § 157 ("Employees shall have the right to ... form, join, or assist labor organizations...."). There is no indication that the need to obtain names and addresses of employees for the purpose of unionization was ever brought to Congress' attention when it drafted the DPPA. We cannot speculate whether it would have added this as one of the enumerated permissible uses had the labor unions expressed their views. We do know, from the vignette included in the majority opinion, that the UNITE organizers did not engage in harassing the employees whose addresses they had obtained. The majority states that when two women rang the doorbell of Kevin Quinn and told him they were organizing, he told them he was not interested and they departed. Although they did nothing more offensive than ring his doorbell, he became a named plaintiff and, under the opinion of the District Court affirmed by the majority, will be entitled to $2,500. UNITE also calls to our attention record evidence that all union representatives who made home visits in connection with the campaign acted politely and left without conversation when asked to do so. Appellee's Br. at 15-16.

The majority cites no legislative history to support its conclusion that the presence of one unlisted purpose for obtaining the motor vehicle information overrides or cancels a listed purpose. When such cases are presented, I would adopt the approach courts have historically used in situations where there are multiple purposes and have the fact-finder determine which is the primary purpose and whether that purpose was permitted under § 2721(b). *Cf. Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (noting that Title VII requires plaintiff to prove that "race, color, religion, sex, or national origin was a motivating factor" for the challenged employment practice); *403Comm'r of Internal Revenue v. Groetzinger,* 480 U.S. 23, 35, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987) (whether income arises from a business or

trade under the Internal Revenue Code requires determination that "the taxpayer's primary purpose for engaging in the activity must be for income or profit").

I recognize the significance of the majority's footnote stating that UNITE waived any argument that we should analyze whether its purpose was primary or secondary because it failed to raise the argument in the District Court or in any of the briefs filed in this court. I do not minimize the force of that argument, but note that because our interpretation of this statute will set the boundaries of civil liability under the DPPA in this circuit, I would apply our precedent and exercise our discretion to consider the argument notwithstanding the waiver. *See Loretangeli v. Critelli,* 853 F.2d 186, 189 n. 5 (3d Cir.1988) ("This court may consider a pure question of law even if not raised below where refusal to reach the issue would result in a miscarriage of justice or where the issue's resolution is of public importance.").

In summary, I would reverse the District Court's grant of summary judgment for plaintiffs on liability and would remand so that a jury could decide whether UNITE's primary purpose in obtaining and using the information gleaned from motor vehicle records was to receive information from Cintas employees about potential legal violations, an expressly protected activity.

C.A.3 (Pa.),2008.
Pichler v. UNITE
542 F.3d 380, 184 L.R.R.M. (BNA) 3278, 156 Lab.Cas. P 11,096

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2568199 (D.N.J.)
**(Cite as: 2009 WL 2568199 (D.N.J.))**

Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
STANDARD FIRE INSURANCE COMPANY,
Plaintiff,
v.
MTU DETROIT DIESEL, INC., et al., Defendants.
**Civil Action No. 07-3827 (GEB).**

Aug. 13, 2009.

Michael E. Stern, Rubin, Fiorella & Friedman, LLP, New York, NY, for Plaintiff.

John C. Falls, Christie, Pabarue, Mortensen & Young, PC, Philadelphia, PA, Michael Thomas Kearns, Hoagland, Longo, Moran, Dunst & Doukas, LLP, New Brunswick, NJ, for Defendants.

### MEMORANDUM OPINION

BONGIOVANNI, United States Magistrate Judge.

*1 Currently pending before the Court is Plaintiff Standard Fire Insurance Company's ("Standard") motion to amend its Complaint. Standard seeks leave to file a Second Amended Complaint in order to assert an additional claim against both Defendant MTU Detroit Diesel, Inc. ("MTU") and Defendant Johnson & Towers, Inc. ("Johnson & Towers") (collectively, "Defendants") under the New Jersey Consumer Fraud Act (the "New Jersey CFA"), N.J.S.A. 56:8-1, *et seq.* The Court has reviewed the papers submitted in support of and in opposition to Standard's motion, and considers Standard's motion without oral argument pursuant to FED.R.CIV.P. 78. For the reasons stated below, Standard's motion is denied.

### I. Background

In 2003, Peter Cherasia ("Cherasia"), a non-party in this matter, purchased a motor yacht that was equipped with two 12V2000 marine diesel engines. After purchasing the yacht, Cherasia obtained a policy of marine insurance from Standard insuring same. On August 25, 2005, a fuel leak occurred at the yacht's starboard main engine, which resulted in a fire that damaged the yacht. Due to the damage caused by the fire, Standard paid approximately $510,000.00 for repairs to the yacht.[FN1]

> FN1. A second fuel leak, which also resulted in a fire, occurred on or about June 2, 2006 at the yacht's port main engine. As with the first fire, Cherasia's yacht was similarly damaged by this one. The June 2006 incident, however, is not at issue as all disputes related to this second fire have been settled.

On August 1, 2007, Standard filed a Complaint against MTU, the manufacturer of the engine used in Cherasia's yacht, asserting product liability claims. In its Complaint, Standard seeks to recover damages from MTU related to the cost of repairs made to Cherasia's yacht as a result of the August 25, 2005 fire. Standard later amended its Complaint to add claims against Johnson & Towers, the distributor and servicer of the engine at issue. As set forth in its Amended Complaint, Standard's claims against Johnson & Towers stem from Johnson & Towers' alleged failure to perform maintenance on the engine at issue in a non-negligent and workman like manner. Standard now seeks to amend its Complaint a second time in order to assert a New Jersey CFA claim against both MTU and Johnston & Towers.

Standard argues that it should be permitted to amend its Complaint to add a New Jersey CFA claim under the liberal standard set forth in FED.R.CIV.P. 15(a)(2), which specifies that "[t]he

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2568199 (D.N.J.)
**(Cite as: 2009 WL 2568199 (D.N.J.))**

court should freely give leave when justice so requires." In this regard, Standard argues that it did not delay in seeking the proposed amendment because it only learned of Defendants' alleged "knowing omissions with knowledge and intent to deceive Plaintiff" after discovery commenced. (Pl. Br. at 4). Further, Standard contends that it has a meritorious New Jersey CFA claim based on MTU and Johnson & Towers' unconscionable business practice of intentionally concealing information from consumers regarding problems with the fuel lines used in the engine at issue which caused leaks, which in turn caused fires like the August 25, 2005 fire that damaged Cherasia's yacht. Standard argues that MTU and Johnson & Towers knew of leakage problems associated with the fuel lines used in the 12V2000 marine diesel engines since at least 1999 and that they deliberately kept this information, which is material to a transaction involving the sale of a vessel, from consumers with the intention that consumers would rely upon the concealment. In support of this argument, Standard points to various service bulletins issued by MTU, which Johnson & Towers received, detailing leakage problems with the fuel lines used in the engine model found in Cherasia's yacht as well as to an email between MTU and Johnson & Towers, dated July 7, 2006, which Standard claims shows that Defendants were suppressing information that could be used to their detriment if a lawsuit involving the leakage problems associated with the engine model found in Cherasia's yacht ever evolved.

**\*2** In addition, Standard argues that despite Defendants' claims to the contrary, it has standing to bring a claim under the New Jersey CFA because "[a]ny person who has suffered an 'ascertainable loss of moneys' as a result of an unconscionable commercial practice may sue under the Act" and "[i]t is undisputed that Standard Fire sustained an 'ascertainable loss' in excess of $500,000[.]" (Pl. Reply Br. at 2-3 (quoting N.J.S.A. 56:8-19)). On this point, Standard notes that neither MTU nor Johnson & Towers have pointed "to any provision of either the New Jersey Consumer Fraud Act or

case law that holds that an insurer cannot bring a claim under the Consumer Fraud Act." (*Id.* at 2).

Further, Standard argues that in deciding a motion to amend, the Court should not examine the merits of the proposed amended pleading, as it is only if the non-movant establishes that the proposed amended complaint would not survive a motion to dismiss for failure to state a claim that the Court should deny a proposed amendment as futile. In this regard, Standard argues that MTU's "facile" attacks regarding Standard's proposed New Jersey CFA claim do not meet this standard. Similarly, Standard argues that Johnson & Towers' claim that Standard's proposed amendment is futile because Standard failed to plead fraud with specificity is likewise deficient. Specifically, Standard claims that Johnson & Towers' failure to (1) disavow knowledge that fuel leaks on the engine at issue were common; (2) aver that it took action to alert buyers, like Cherasia, of problems with fuel leaks in 12V2000 marine diesel engines; or (3) deny that it received documents from MTU, like technical service bulletins, concerning the potential for fuel leaks is fatal to Johnson & Towers' futility argument.

Both MTU and Johnson & Towers oppose Standard's motion to add a New Jersey CFA claim to its Amended Complaint. MTU argues that Standard's proposed amendment is futile both because Standard lacks standing to bring a New Jersey CFA claim and because Standard's proposed amended claim lacks merit. With respect to standing, MTU argues that "Standard Fire Insurance never explains how its subrogation rights extend to issues related to the original purchase of the yacht." (MTU Opp. Br. at 3). MTU claims that it is "hornbook law" that subrogation rights permit the insurer to succeed to its insured's rights in relation to the insured event, which here is the August 25, 2005 fire, not Cherasia's purchase of the yacht in 2003. As such, MTU contends that Standard lacks standing to assert the New Jersey CFA claim set forth in the proposed Second Amended Complaint.

MTU further argues that "New Jersey law has held

Slip Copy, 2009 WL 2568199 (D.N.J.)
**(Cite as: 2009 WL 2568199 (D.N.J.))**

that an assignee of claims against a defendant did not have standing to assert claims under the New Jersey Consumer Fraud Act, because the intent of the Act is to protect consumers from fraud, not consumers' assignees." (*Id.* at 3 (citing *Levy v. Edmund Buick-Pontiac, Ltd.,* 270 N.J.Super. 563, 637 A.2d 600 (Law Div.1993))). Like the assignee in *Levy,* MTU argues that, here, Standard "has not suffered any ascertainable loss arising out of alleged conduct related to the purchase of the yacht at issue[,]" and therefore lacks standing to pursue a New Jersey CFA claim.

**\*3** In addition, MTU contends that "New Jersey law also held that an insurance company, suing as subrogee of its insured, cannot assert a claim for punitive damages." (*Id.* at 4, 637 A.2d 600 (citing *Colonial Penn. Ins. Co. v. Ford,* 172 N.J.Super. 242, 411 A.2d 736 (Law Div.1979))). MTU argues that one of the main purposes of the New Jersey CFA is to punish wrongdoers through the award of treble damages and that, as a matter of law, Standard, an insurance company, not a consumer, is not entitled to such an award. MTU also argues that it would be an improper windfall to allow Standard to recover any amount greater than that which it paid under its policy with Cherasia.

Further, MTU argues that even under FED.R.CIV.P. 15's liberal standard, Standard's proposed New Jersey CFA claim lacks merit and should be denied as futile. MTU argues that Standard's claim that "the alleged acts of MTU-DD an/or Johnson & Towers 'might have' influenced Mr. Cherasia's decision to purchase the yacht at issue" are clearly insufficient. (MTU Opp. Br. at 5). In addition, MTU claims that Standard's proof of the alleged New Jersey Consumer Fraud Act violations all pre-date the build date of the actual engine at issue by approximately three years and/or address issues not relevant to the claims at issue. MTU also argues that the e-mail cited to by Standard as evidence that it has a valid New Jersey CFA claim in fact, when viewed in its entirety without Standard's selective omission of information, shows the MTU

never suppressed information concerning the fuel lines used in its engines that could be used to either MTU or Johnson & Towers' detriment.

Johnson & Tower joins in MTU's opposition to Standard's motion to amend on the ground that Standard lacks standing to bring a New Jersey CFA claim. Further, Johnson & Towers argues that Standard's proposed amendment is futile because Standard's allegations concerning Johnson & Towers' New Jersey CFA violations do not meet the heightened pleading requirements of FED.R.CIV.P. 9(b). In this regard, Johnson & Towers argues that Standard's broad allegation that " 'Defendants violated the provisions of Section 56:8-2 of the Act, by misrepresenting, suppressing, failing to disclose, or by concealing material information, with the intention that Plaintiff's subrogee rely on such omission in purchasing a 61-foot motor yacht, 'SHARK BYTE' ' " (Johnson & Towers Opp. Br. at 4 (quoting Ex. F to Stern Aff. at ¶ 50)), coupled with Standard's argument that had Cherasia been made aware of the fuel line leaks, then he "might have elected to purchase engines from another manufacturer" is not enough to meet the heightened pleading requirements employed for claims of fraud. (*Id.* (internal quotation marks omitted).

In addition, Johnson & Towers claims that not only has Standard "failed to plead fraud with the requisite specificity," but the facts asserted by Standard in its motion also "do not demonstrate any intentional, knowing and/or deliberate omission by Johnson & Towers with regard to the engine at issue." (*Id.*) Specifically, Johnson & Towers claims that the email referenced by Standard, which was written two days after the June 2006 fire, a fire not at issue here and about which no claims were ever brought against Johnson & Towers, does not establish that Johnson & Towers had any pre-existing knowledge of the alleged design defect with the fuel lines in the engine in question, nor does it prove an intent to mislead, nor could it as the email post dates Cherasia's purchase of his yacht by three years and therefore is "completely irrelevant to plaintiff's

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2568199 (D.N.J.)
**(Cite as: 2009 WL 2568199 (D.N.J.))**

claim and certainly cannot be the basis for a claim under the Consumer Fraud Act." (*Id.* at 5, 411 A.2d 736). Similarly, Johnson & Towers argues that the service bulletins it received from MTU do not support Standard's New Jersey CFA claim. Johnson & Towers notes that "MTU provided service bulletins to all its distributors and service managers pertaining to updates and/or modifications of the service manual." (*Id.* at 6, 411 A.2d 736). Johnson & Towers argues that its "only role is to incorporate and effectuate the updates and/or modifications as prescribed by the manufacturer of the engine." (*Id.*) Johnson & Towers claims that "MTU adjusted the torque specifications on high pressure fuel lines in order to provide for proper sealing" and that "Johnson & Towers followed these specifications." (*Id.*) Johnson & Towers contends that "[n]othing in these facts even remotely supports plaintiff's argument that Johnson & Towers, 'knew for years of problems with the fuel lines which cause fuel leaks.. and deliberately kept or omitted this information from consumers.' " (*Id.* quoting Pl. Br. at 5)). Thus, Johnson & Towers argues that Standard's proposed New Jersey CFA claim fails to state a claim upon which relief could be granted and consequently should be denied as futile.

## II. Analysis

**\*4** Pursuant to FED.R.CIV.P. 15(a), leave to amend the pleadings is generally given freely. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Alvin v. Suzuki,* 227 F.3d 107, 121 (3d Cir.2000). Nevertheless, the Court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Id.* However, where there is an absence of undue delay, bad faith, prejudice or futility, a motion for leave to amend a pleading should be liberally granted. *Long v. Wilson,* 393 F.3d 390, 400 (3d Cir.2004).

In deciding whether to grant leave to amend, "prejudice to the non-moving party is the touchstone for the denial of the amendment." *Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989) (quoting *Cornell & Co., Inc. v. Occupational Health and Safety Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)). To establish prejudice, the non-moving party must make a showing that allowing the amended pleading would (1) require the non-moving party to expend significant additional resources to conduct discovery and prepare for trial, (2) significantly delay the resolution of the dispute, or (3) prevent a party from bringing a timely action in another jurisdiction. *See Long,* 393 F.3d at 400. Delay alone, however, does not justify denying a motion to amend. *See Cureton v. Nat'l Collegiate Athletic Ass'n,* 252 F.3d 267, 273 (3d Cir.2001). Rather, it is only where delay becomes " 'undue,' placing an unwarranted burden on the court, or ... 'prejudicial,' placing an unfair burden on the opposing party" that denial of a motion to amend is appropriate. *Adams v. Gould Inc.,* 739 F.2d 858, 868 (3d Cir.1984).

Further, a proposed amendment is appropriately denied where it is futile. An amendment is futile if it "is frivolous or advances a claim or defense that is legally insufficient on its face." *Harrison Beverage Co. v. Dribeck Imps., Inc.,* 133 F.R.D. 463, 468 (D.N.J.1990) (Internal quotation marks and citations omitted). In determining whether an amendment is "insufficient on its face," the Court employs the Rule 12(b)(6) motion to dismiss standard. *See Alvin,* 227 F.3d at 121. Under Rule 12(b)(6), a motion to dismiss will be granted if the plaintiff fails to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Thus, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2568199 (D.N.J.)
**(Cite as: 2009 WL 2568199 (D.N.J.))**

1964-65 (citations omitted). Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact). *Id.* at 1965 (citations omitted). When determining whether a claim should be dismissed under Rule 12(b)(6), the factual allegations set forth in the pleading must be accepted as true and viewed in the light most favorable to the party asserting them. *Lum v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir.2004).

**A. Standing**

**\*5** The New Jersey CFA makes it unlawful for any person to

act, use or employ[ ] ... any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ... whether or not any person has in fact been misled, deceived or damaged."

N.J.S.A. 56:8-2. A private right of action under the New Jersey CFA exists for "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful" by the Act. N.J.S.A. 56:8-19. While the term "consumer" is not defined in the Act,

'[t]he entire thrust of the Act is pointed to products and services sold to consumers in the popular sense.... Thus, the CFA 'is not intended to cover every transaction that occurs in the marketplace[,]' but, rather, '[i]ts applicability is limited to consumer transactions which are defined both by the status of the parties and the nature of the transaction itself."

*Cetel v. Kirwan Fin. Group, Inc.,* 460 F.3d 494,

514 (3d Cir.2006) (quoting *Arc Networks, Inc. v. Gold Phone Card Co.,* 333 N.J.Super. 587, 589-90, 756 A.2d 636 (Law Div.2000) (citation omitted). In determining whether a plaintiff has standing to bring a New Jersey CFA claim, the Court therefore examines the charter of the transaction.

Further, in order for a business entity " 'to be a consumer respecting the transaction in question,' " such that it has standing to sue under the Act, " 'the business entity must be one who uses (economic) goods, and so diminishes or destroys their utilities.' " *Schering-Plough Corp. Intron/Temodar Consumer Class Action,* Master File No. 2:06-cv-5774 (SRC), 2009 WL 2043604, at * (D.N.J. July 10, 2009) (quoting *City Check Cashing, Inc. v. Nat'l State Bank,* 244 N.J.Super. 304, 309, 582 A.2d 809 (App.Div.1990) (internal quotation marks and citations omitted). Thus, a business entity "may qualify as a person under the Act when it finds itself in a consumer oriented situation, ... such as when it acts as the purchaser of a tow truck, ... as the purchaser of a yacht, ... or as the purchaser of computer peripherals[.]" *J & R Ice Cream Corp. v. California Smoothie Licensing Corp.,* 31 F.3d 1259, 1273 (3d Cir.1994) (internal quotation marks and citations omitted).

Here, Standard did not purchase the yacht in question for its own use. Indeed, Standard did not even purchase the yacht at issue. Instead, Standard contracted with Cherasia to receive a stream of payments from Cherasia in return for its promise to insure the yacht that Cherasia purchased and used. Under these circumstances, the Court finds that Standard is not in a "consumer oriented situation." Consequently, as in *Schering-Plough,* where the Court held that the third party payors ("TTPs"), which did not "use or consume the drugs they purchase[d,]" but rather "essentially serve[d] as middlemen or insurers, paying all or part of the cost of a beneficiary's drugs in return for a stream of payments from the beneficiary[,]" were "not consumers entitled to sue under the NJCFA[,]" the Court finds that Standard lacks standing to pursue

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2568199 (D.N.J.)
**(Cite as: 2009 WL 2568199 (D.N.J.))**

its proposed New Jersey CFA claim. *Schering-Plough,* 2009 WL 2043604, at *32. The fact that Standard's subrogee, Cherasia, might qualify as a consumer under the Act does not change the Court's analysis. Further, because Standard lacks standing to sue under the New Jersey CFA, the Court finds that Standard's proposed amendment would not survive a motion to dismiss. The Court therefore denies Standard's motion to amend because it would be futile.

**B. Standard's New Jersey CFA Claim**

*6 In addition, the Court finds that even if Standard had standing to pursue its proposed New Jersey CFA claim, Standard's proposed amendment would be futile. In order to assert a claim under the New Jersey CFA, Standard must allege each of the following three elements: "(1) unlawful conduct by defendant [s]; (2) an ascertainable loss by [Standard]; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.,* 197 N.J. 543, 557, 964 A.2d 741 (2009). Moreover, because Standard's proposed New Jersey CFA claim sounds in fraud, in order to survive a Rule 12(b)(6) motion to dismiss, Standard must also meet the pleading requirements of FED.R.CIV.P. 9(b), which require a party to "state with particularity the circumstances constituting fraud or mistake." *See Slim CD, Inc. v. Heartland Payment Sys.,* No. 06-2256, 2007 U.S. Dist. LEXIS 62536 at *32 (D.N .J. Aug. 22, 2007) (holding that "[t]he pleading requirements of Rule 9(b) apply to ... NJCFA claims[.]")

"The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" so that the defendants have an opportunity to respond meaningfully to the complaint, "and to prevent false or unsubstantiated charges." *Rolo v. City of Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998), *abrogation on other grounds recognized by Forbes v. Eagleson,* 228 F.3d 471 (3d Cir.2000) (quoting *Serville Indust. Machinery v. Southmost Machinery,* 742 F.2d 786,

791 (3d Cir.1984)). Thus, while plaintiffs need not "plead the 'date, place or time' of the fraud," in order to satisfy Rule 9(b), plaintiffs must employ some "means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* (quoting *Serville,* 742 F.2d at 791).

Here, rather than plead fraud with particularity, Standard merely alleges that "Defendants violated the provisions of Section 56:8-2 of the Act, by misrepresenting, suppressing, failing to disclose, or by concealing material information, with the intention that Plaintiff's subrogee rely on such omissions in purchasing a 61-foot motor yacht 'SHARK BYTE' ("the vessel")" and that "Plaintiff's subrogee has suffered damages as a result of the actions of Defendant's [sic] which damages include, but are not limited to $522,000.00." (Pl. Proposed Second Amended Compl. at ¶ 50-51). These broad statements, without further detail, fail to describe the circumstances of either MTU or Johnson & Towers' alleged fraud with particularity, and therefore violate *Twombly's* requirements. While Standard might be able to supplement its allegations to meet the heightened pleading requirements of Rule 9(b), as currently drafted, Standard's proposed New Jersey CFA allegations fail to raise Standard's "right to relief above the speculative level[.]" *Twombly,* 127 S.Ct. at 1965 (citations omitted). Thus, the Court finds that Standard's proposed New Jersey CFA claim is futile. Further, given the fact that the Court has already determined that Standard lacks standing to pursue its proposed NJ CFA claim, the Court shall not extend Standard the opportunity to attempt to meet the pleading requirements of Rule 9(b).

**III. Conclusion**

*7 For the reasons stated above, Standard's motion to amend its Complaint is DENIED. An appropriate Order follows.

D.N.J.,2009.
Standard Fire Ins. Co. v. MTU Detroit Diesel, Inc.
Slip Copy, 2009 WL 2568199 (D.N.J.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2568199 (D.N.J.)
**(Cite as: 2009 WL 2568199 (D.N.J.))**

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2465906 (D.Ariz.)
**(Cite as: 2005 WL 2465906 (D.Ariz.))**

☞
Only the Westlaw citation is currently available.

United States District Court,
D. Arizona.
Michael STOLLENWERK and Andrea DeGatica,
husband and wife; Mark William Brandt; et al.,
Plaintiffs,
v.
TRI-WEST HEALTHCARE ALLIANCE, Defendant.
**No. Civ. 03-0185PHXSRB.**

Sept. 6, 2005.

Barry Lawrence Bellovin, Matthew David Karnas,
Siegel Bellovin & Karnas PC, Tucson, AZ, Henry
T. Dart, Henry T. Dart Law Office, Covington, LA,
Joel Grant Woods, Law Offices of Grant Woods,
Kenneth Sean Countryman, Kenneth S. Countryman PC, Phoenix, AZ, for Plaintiffs.

Andrew Foster Halaby, Barry D. Halpern, Shane
De Gosdis, Snell & Wilmer LLP, Phoenix, AZ, for
Defendant.

OPINION AND ORDER

BOLTON, J.

*1 This matter arises out of the burglary of Defendant TriWest Healthcare Alliance's ("Triwest") corporate office on December 14, 2002. During this burglary, computer hard drives containing the personal information of Plaintiffs Michael Stollenwerk, Andrea DeGatica, and Mark Brandt were stolen, leading Plaintiffs to file a class action lawsuit alleging negligence under Arizona law as well as other violations that have since been dismissed by this Court. Pursuant to Fed.R.Civ.P. 56, Defendant now seeks summary judgment on the remaining negligence claim (Doc. 77).

I. BACKGROUND

Defendant TriWest, a contractor and agent of the federal government, manages the local region of the U.S. Department of Defense's health insurance program and, as a result, possessed the personal information, including names, addresses, birth dates, and social security numbers, of the beneficiaries of that program. Plaintiffs, current and former members of the U.S. military and their dependents, are several such beneficiaries whose data was stored in computerized and hard copy form at Defendant's facility in Phoenix, Arizona.

In May 2001, Defendant experienced a security breach wherein unauthorized personnel entered the Phoenix facility. Defendant reported the incident to the Phoenix Police Department, but Plaintiffs allege that no other action was taken to ensure the security of the facility despite its apparent vulnerabilities. On December 14, 2002, unidentified individuals again breached security and proceeded to burglarize the Phoenix facility, removing computer hard drives containing Plaintiffs' personal information and other items.

Beginning on January 28, 2003, Plaintiff Brandt's personal data was used on six occasions to open or to attempt to open unauthorized credit accounts in Plaintiff Brandt's name. Unknown individuals successfully opened at least two credit accounts and generated more than $7,000 in unauthorized charges to these accounts. Plaintiffs Stollenwerk and DeGatica allege a different form of injury; following the theft of their data, both have obtained both credit monitoring services and identity theft insurance.

On January 28, 2003, Plaintiffs Stollenwerk and DeGatica filed their original complaint in this action, alleging violations of the Privacy Act, the Ninth Amendment, and Arizona tort and contract law.[FN1] Plaintiff Brandt later joined the lawsuit and Plaintiffs filed and served their First Amended

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2465906 (D.Ariz.)
**(Cite as: 2005 WL 2465906 (D.Ariz.))**

Complaint in May 2003. The First Amended Complaint asserted claims for negligence, "gross negligence," "negligence per se," "res ipsa loquitur," breach of the implied bailment contract, and violations of the Privacy Act, the Ninth Amendment, and the Arizona Consumer Fraud Act. Defendant moved to dismiss the First Amended Complaint pursuant to Rule 12(b)(6), and at oral argument of the motion on October 20, 2003, the Court granted the motion to dismiss with leave to amend the Complaint as to only the negligence, Arizona Consumer Fraud Act, and Privacy Act claims.

> FN1. The original complaint was never served on Defendant.

**\*2** Plaintiffs filed their Second Amended Complaint on October 30, 2003. The Second Amended Complaint alleged two counts of Privacy Act violations, one count of negligence, one count of consumer fraud under the Arizona Consumer Fraud Act, and one count of breach of a contract intended to benefit Plaintiffs. On September 30, 2004, this Court granted Defendant's second motion to dismiss as to all counts but the negligence claim. Defendant now moves for summary judgment on the remaining negligence claim pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court heard argument on Defendant's motion on June 6, 2005.

## II. LEGAL STANDARDS AND ANALYSIS

The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of Civil Procedure. Under this rule, summary judgment is properly granted when: (1) no genuine issues of material fact remain; and (2) after viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285, 1288-89 (9th Cir.1987).

In considering a motion for summary judgment, the

Court must regard as true the non-moving party's evidence if it is supported by affidavits or other evidentiary material. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2548; *Eisenberg,* 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings, he must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986) (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

Defendant argues that summary judgment is appropriate because Plaintiffs Stollenwerk and DeGatica have not come forward with evidence legally sufficient to show that they incurred injury and because Plaintiff Brandt has not provided significant probative evidence of a causal connection between the theft of his personal information from Defendant and the fraudulent use of his personal information. Plaintiffs dispute these contentions.

### A. Plaintiffs Stollenwerk and DeGatica

Plaintiffs Stollenwerk and DeGatica maintain that the exposure of their sensitive personal information at the hands of Defendant necessitated the purchase of credit-monitoring services and that the cost of these services constitutes injury within the meaning of the law. In its Order of September 30, 2004, this Court found, for the purposes of deciding a motion to dismiss, that "an exposure of personal information likely to result in the unauthorized use of one's identity is sufficiently similar [to exposure to toxic chemicals or asbestos likely to result in disease] so as to justify the maintenance of a cause of action for recovery of the cost of credit monitoring services." (Sept. 30, 2004 Order at 8.) Plaintiffs contend that the Court is prevented from revisiting this position under the law of the case doctrine, and that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2465906 (D.Ariz.)
**(Cite as: 2005 WL 2465906 (D.Ariz.))**

even if the Court were to readdress its prior finding, caselaw concerning latent injury would require the Court to reach the identical conclusion.

**\*3** Generally, the law of the case doctrine precludes a court "from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *United States v. Alexander,* 106 F.3d 874, 876 (9th Cir.1997). Where a district court has never relinquished jurisdiction over a case, however, the law of the case doctrine is inapplicable and the Court is free to revisit its earlier decisions. *United States v. Smith,* 389 F.3d 944, 948-49 (9th Cir.2004). Because the Court never entered judgment in this matter nor otherwise relinquished jurisdiction over the case, the law of the case doctrine is "wholly inapposite," *id.,* (quoting *City of Los Angeles v. Santa Monica Baykeeper,* 254 F.3d 882, 888 (9th Cir.2001)), and the Court is free to revisit its determinations made within the context of a motion to dismiss.

With the intent of permitting the parties to explore fully the issue of credit monitoring as adequate injury in a negligence action, in deciding Defendant's Motion to Dismiss the Court found itself unable to say that a cause of action could never be maintained on such a basis. Having more fully considered the issue upon further briefing by the parties and after Plaintiffs had the opportunity to obtain discovery, the Court finds that summary judgment in Defendant's favor nevertheless is appropriate as to the negligence claims of Plaintiffs Stollenwerk and DeGatica. Defendant argues that credit monitoring costs should not be viewed as injury sufficient to establish the tort of negligence for several reasons: (1) unlike toxic tort or products liability cases, cases involving the exposure of sensitive personal information do not involve a latent injury at the time of exposure-the only injury occurs at the time the information is misused; (2) the interest in preserving public health, which merits awards for medical monitoring, does not exist with respect to claims for credit monitoring; and (3) any injury resulting from identity theft can be compensated with

monetary damages after the fact, eliminating the need for preventive monitoring. Defendant further argues that credit monitoring should not suffice as injury in this case, even if it might be adequate in other instances.

The Court is not convinced that the negligent exposure of confidential personal information is entirely dissimilar from negligent exposure to toxic substances or unsafe products. In both circumstances the individual may manifest more obvious injury, such as identity fraud or disease, after some period of time, and in neither instance is the later manifestation of patent injury guaranteed, although the certainty with which such a development may be anticipated may be greater for toxic torts. It is unnecessary for the Court to determine whether the timing and manifestation of the injuries are sufficiently analogous where credit monitoring and medical monitoring are sought, however, as another reason for granting summary judgment in Defendant's favor is apparent.

**\*4** The Court must acknowledge the important distinction between toxic tort and products liability cases, which necessarily and directly involve human health and safety, and credit monitoring cases, which do not. Arizona recognizes the importance of preserving public health and " 'fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease. The value of early diagnosis and treatment for cancer patients is well documented." ' *Burns v. Jaquays Mining Corp.,* 156 Ariz. 375, 752 P.2d 28, 33 (Ariz.Ct.App.1988), *quoting Ayers v. Township of Jackson,* 106 N.J. 557, 525 A.2d 287, 311 (N.J.1987). It is, in large part, this public health interest that justifies departure from the general rule that enhanced future risk of injury cannot form the sole basis for a negligence action. *See Amfac Distrib. Corp. v. Miller,* 138 Ariz. 152, 673 P.2d 792, 793-94 (Ariz.1983) (requiring actual injury to sustain cause of action in negligence); *Commercial Union Ins. Co. v. Lewis & Roca,* 183 Ariz. 250, 902 P.2d 1354, 1358 (Ariz.Ct.App.1995) (noting that a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2465906 (D.Ariz.)
**(Cite as: 2005 WL 2465906 (D.Ariz.))**

threat of future harm is insufficient). Notwithstanding the intimation in *Doe v. Chao,* 540 U.S. 614, 626 n. 10, 124 S.Ct. 1204, 1211 n. 10, 157 L.Ed.2d 1122 (2004), that "fees associated with running a credit report" might qualify as actual damages in the context of an action under the Privacy Act, the Court has been unable to identify a single instance where damages for the cost of monitoring were awarded absent increased risk of injury to human health or well-being. Although a victim of identity theft and/or fraud, like the victims in other negligence actions where present actual injury is required, may experience nonmonetary harm, the primary injury does not present a serious health risk. Thus, despite findings that identity theft results in more than purely pecuniary damages, including psychological or emotional distress, inconvenience, and harm to his credit rating or reputation, *see United States v. Williams,* 355 F.3d 893, 898 (6th Cir.2003); *United States v. Karro,* 257 F.3d 112, 121 (2d Cir.2001), as a matter of law identity theft and credit monitoring must still be differentiated from toxic torts and medical monitoring.

Defendants also maintain that even if credit monitoring costs were sufficient injury to state a cause of action for negligence in some circumstances, the evidence here is inadequate to maintain such an action. In medical monitoring cases, a plaintiff must meet several criteria before recovery is permitted. Proof must be offered to satisfy at least the following elements: (1) significant exposure to a toxic substance; (2) a significantly increased likelihood of developing a serious disease as a proximate result of exposure; (3) the reasonable necessity of periodic diagnostic testing; and (4) the existence of monitoring and testing procedures that facilitate the early detection and treatment of disease. *See Burns,* 752 P.2d at 33, *quoting Ayers,* 525 A.2d at 312; *Miranda v. Shell Oil Co.,* 17 Cal.App.4th 1651, 1657-58, 26 Cal.Rptr.2d 655 (Cal.Ct.App.1993), *quoting Ayers,* 525 A.2d at 312; *see also DeStories v. City of Phoenix,* 154 Ariz. 604, 744 P.2d 705, 711 (Ariz.Ct.App.1987) (implicitly requiring proof that the "frequency, cost or intensity of plaintiffs'

need for periodic medical examinations [exceeded] what would normally have been prudent for them"); *In re Marine Asbestos Cases,* 265 F.3d 861, 866 (9th Cir.2001), *citing In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 852 (3d Cir.1990). Applying these factors to identity theft cases, a plaintiff would be required to establish, at a minimum: (1) significant exposure of sensitive personal information; (2) a significantly increased risk of identity fraud as a result of that exposure; and (3) the necessity and effectiveness of credit monitoring in detecting, treating, and/or preventing identity fraud.

**\*5** Defendant challenges Plaintiffs' ability to establish these criteria, and the Court agrees that Plaintiffs are unable to provide evidence sufficient to prevent summary judgment in Defendant's favor. Plaintiffs have not brought forward evidence that the personal information on the stolen computers was ever exposed to the thieves involved. Unlike a case involving pure data theft, there is nothing in the record here to suggest that the data, rather than the hardware on which the data was stored, formed the thieves' target. Absent evidence that the data was targeted or actually accessed, there is no basis for a reasonable jury to determine that sensitive personal information was significantly exposed.

Furthermore, the affidavit of Plaintiffs' expert conclusorily posits that Plaintiffs' risk of identity fraud is significantly increased without quantifying this risk.[FN2] Defining "significant" for the purpose of awarding credit monitoring is a matter of law for the Court, however, and mere allegations that an increase is significant do not constitute evidence.[FN3] Similarly, although Plaintiff's expert opines that credit monitoring will "substantially" reduce the risk of identity fraud, he fails to quantify the reduction of risk in objective terms. Because the Court finds that there is no evidence in the record before it that Plaintiffs' personal information itself endured significant exposure, that Plaintiffs' risk of identity fraud is significantly increased, or that credit monitoring will reduce the risk of identity fraud to the necessary degree, Defendant's motion

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2465906 (D.Ariz.)
**(Cite as: 2005 WL 2465906 (D.Ariz.))**

for summary judgment must be granted as to this case even if credit monitoring were available in other circumstances.

> FN2. Plaintiffs' expert opines that Plaintiffs are at an increased risk of experiencing identity fraud for the next seven years, but fails to indicate the mathematical degree to which the risk is increased despite stating that his conclusions were arrived at as a matter of scientific probability.

> FN3. Defendant also argues that summary judgment is appropriate because Plaintiffs were aware of the risk of identity fraud, yet failed to utilize free measures for reducing this risk and did not obtain credit monitoring insurance until nearly a year after learning of the burglary. These facts are relevant only to demonstrating that any increased risk of fraud may not be solely attributable to Defendant's behavior and must be taken into account by experts when determining the portion of the increased risk attributable to Defendant.

B. Plaintiff Brandt

Defendant also seeks summary judgment as to the negligence claims of Plaintiff Brandt. Although Plaintiff Brandt's personal information was used to open or attempt to open unauthorized credit accounts in his name at various retailers, Defendant disputes Plaintiff Brandt's contention that these incidents of identity fraud can be causally connected to the burglary of Defendant's facility.

In order to maintain a cause of action for negligence, a plaintiff must prove causation; that is, that the defendant's act or omission, "in a natural and continuous sequence, unbroken by any efficient intervening cause, produce[d] an injury, and without which the injury would not have occurred." *Robertson v. Sixpence Inns of Am.,* 163 Ariz. 539, 789

P.2d 1040, 1047 (Ariz.1990). "[W]hen damage may have resulted from one of several causes, and ... it is as probable that it may have been a cause for which defendant was not responsible as one for which it was, a plaintiff may not recover." *Salt River Valley Water Users' Ass'n v. Blake,* 53 Ariz. 498, 90 P.2d 1004, 1007 (Ariz.1939); *see also Butler v. Wong,* 117 Ariz. 395, 573 P.2d 86, 87 (Ariz.Ct.App.1977) ("It is not sufficient in an action for damages that plaintiff show a certain injury might have been caused by the negligence of defendant. It is necessary to establish that the injuries have been so caused."). A plaintiff must show that causation by the defendant's act or omission is reasonably likely, not merely possible. *See Purcell v. Zimbelman,* 18 Ariz.App. 75, 500 P.2d 335, 342 (Ariz.Ct.App.1972).

*6 In the summary judgment context, a plaintiff must provide evidence from which a reasonable jury could conclude that Plaintiff Brandt's injuries were the result of the burglary rather than other causes. *See Taft v. Ball, Ball & Brosamer, Inc.,* 169 Ariz. 173, 818 P.2d 158, 162 (Ariz.Ct.App.1991). This evidence may be either direct or circumstantial. *Mason v. Ariz. Public Serv. Co.,* 127 Ariz. 546, 622 P.2d 493, 500 (Ariz.Ct.App.1980); *see also Robertson,* 789 P.2d at 1047 ("Plaintiff need only present probable facts from which the causal relationship reasonably may be inferred."); *cf. Clausen v. M/V New Carissa,* 339 F.3d 1049, 1059 (9th Cir.2003). Where evidence is circumstantial, it must permit a jury to draw reasonable inferences, not merely speculate or conjecture. *Sunward Corp. v. Dun & Bradstreet, Inc.,* 811 F.2d 511, 521 (10th Cir.1987); *Dreijer v. Girod Motor Co.,* 294 F.2d 549, 554 (5th Cir.1961).

Plaintiff Brandt's evidence primarily consists of information about six occasions after the burglary on which an unknown person(s) successfully or unsuccessfully attempted to open credit accounts in his name. The first of these incidents occurred on January 28, 2003, when an unidentified individual attempted to open a Home Depot account in his

Not Reported in F.Supp.2d, 2005 WL 2465906 (D.Ariz.)
**(Cite as: 2005 WL 2465906 (D.Ariz.))**

name. Additional incidents occurred on March 20, 2003 (an account opened via Citifinancial Retail Services at Rex Electronics in Uniontown, Pennsylvania), on March 31, 2003 (an account opened with T-Mobile Cellular in Youngstown, Ohio, an account opened with Sears in Youngstown, Ohio, and an attempted account opening with Kaufmann's in West Virginia) and in Spring 2003 (an attempted account opening via GE Credit Services at Walmart). The account with Rex Electronics allegedly was opened using a false address in Dover, Delaware, a city where Plaintiff Brandt was stationed while serving in the Air Force. Plaintiff Brandt also offers his own statements that he has never transmitted his personal information over the internet and shreds all mail he receives in relation to credit applications, approvals, and pre-approvals, but admits that he provided his sensitive personal information to individuals or organizations other than Defendant.

The Court notes Defendant's objections to Plaintiff Brandt's evidence as inadmissible hearsay drawn from conversations between Plaintiff Brandt and the involved businesses. Although the mere occurrence of unauthorized transactions is within Plaintiff Brandt's personal knowledge, any additional information about the circumstances surrounding these transactions is outside his personal knowledge and therefore hearsay inadmissible to prove the truth of the matter asserted. Fed.R.Evid. 602. Thus, Plaintiff Brandt's evidence that the Rex Electronics credit account was opened using a Dover, Delaware address, or any other evidence about the information used in these fraudulent acts, is inadmissible because it is only what he was told by others. Inadmissible evidence cannot create a genuine issue of material fact. *Urbina v. Gilfilen,* 411 F.2d 546, 547-58 (9th Cir.1969).

*7 Absent evidence that the Rex Electronics account was opened using an address similar to one of Plaintiff Brandt's addresses listed among the information contained on the equipment stolen from Defendant, the only evidence before the Court is

that Plaintiff's information was used to fraudulently open or attempt to open accounts beginning approximately six weeks after the burglary of Defendant's facility. Although "a temporal relationship between exposure to a substance and the onset of a disease ... can provide compelling evidence of causation," *Clausen,* 339 F.3d at 1059, *quoting Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 265 (4th Cir.1999), it is not dispositive of the causation issue. To the contrary, to determine that one event caused another merely because the first preceded the second is a classic example of *post hoc ergo propter hoc* ("after this, therefore because of this"), a logical fallacy. *See Choe v. Immigration & Naturalization Serv.,* 11 F.3d 925, 938 (9th Cir.1993); *Sunward Corp.,* 811 F.2d at 521 n. 8; *Dreijer,* 294 F.2d at 555. Standing alone, Plaintiff Brandt's evidence that the burglary preceded the incidents of identity fraud does not allow a reasonable jury to infer that the burglary caused the incidents of identity fraud. Such a conclusion would be the result of speculation and conjecture, not a reasonable inference. *See Sunward Corp.,* 811 F.2d at 521 n. 8 (citing cases that held that *post hoc ergo propter hoc* equates to speculation and conjecture, not reasonable inference).

Although the Court has determined that Plaintiff Brandt's evidence concerning the type of information used in opening the unauthorized accounts is inadmissible, in the interest of fully resolving the matter the Court will also discuss the impact of this evidence in the event that it could be offered in a form that would comply with the Federal Rules of Evidence. In short, it has no effect on Defendant's entitlement to summary judgment. Plaintiff Brandt's Dover, Delaware address and other information, including his social security number, was disclosed to others on multiple occasions. The mere use of such information in the course of acts of identity fraud, therefore, does not permit a finder of fact to draw the reasonable inference that the unidentified identity thieves obtained it from Defendant. Summary judgment is appropriate regardless of the admissibility of Plaintiff Brandt's evidence concerning in-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2465906 (D.Ariz.)
**(Cite as: 2005 WL 2465906 (D.Ariz.))**

formation used by the identity fraud perpetrators.

IT IS ORDERED granting Defendant's Motion for Summary Judgment (Doc. 77).

IT IS FURTHER ORDERED directing the Clerk of the Court to enter judgment in favor of Defendant and dismissing Plaintiffs' claims.

D.Ariz.,2005.
Stollenwerk v. Tri-West Healthcare Alliance
Not Reported in F.Supp.2d, 2005 WL 2465906 (D.Ariz.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.